**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STEVEN SCHMALZ on behalf of himself and   :
all others similarly situated,

     :

        Plaintiff,          Case 7:08-cv-00264-KMK

     :

    -against-       :

MBIA, INC., GARY C. DUNTON, EDWARD   :
CHAPLIN,

     :

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TEAMSTERS LOCAL 807 LABOR
MANAGEMENT PENSION FUND,      :
Individually and on behalf of all others
similarly situated,      :   Case No. 1:08-cv-01845-UA

        Plaintiff,      :

    -against-       :

MBIA INC., GARY C. DUNTON, C.      :
EDWARD CHAPLIN, and JOSEPH W.
BROWN

     :

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GARY KOSSEFF, Individually and on behalf  :
of all others similarly situated,

     :

        Plaintiff,       Case No. 7:08-cv-02362-UA

     :

    -against-       :

MBIA INC., GARY C. DUNTON, and C.   :
EDWARD CHAPLIN

     :

Defendants.

**NOTICE OF MOTION AND MOTION OF THE TULARE COUNTY EMPLOYEES'**
**RETIREMENT ASSOCIATION FOR CONSOLIDATION OF RELATED CASES AND**
**APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL**

PLEASE TAKE NOTICE that putative class member the Tulare County Employees' Retirement Association ("Movant"), by its undersigned attorneys, will and hereby does move this Court before the Honorable Kenneth M. Karas, at the Courthouse located at 300 Quarropas St., Courtroom 521, White Plains, New York 10601, at a time and date to be set by the Court, pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(3)(B), as amended by Section 101(a) of the Private Securities Litigation Reform Act of 1995, P.L. 104-67, 109 Stat. 737, for entry of an order:

 (1) consolidating the above-captioned related actions;

 (2) appointing Movant as Lead Plaintiff in these related actions on behalf of purchasers of the securities of MBIA, Inc.; and

 (3) approving Lead Plaintiff's selection of the law firm Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as Lead Counsel.

In support of this Motion, Movant relies upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Catherine A. Torell, and the proposed order granting the relief requested herein.

1

Dated: Washington, D.C..
      March 11, 2008

Respectfully submitted,

**Cohen, Milstein, Hausfeld & Toll P.L.L.C.**

By:       /s/ Catherine A. Torell
     Catherine A. Torell (CAT-0905 )
     150 East 52nd Street, 30th Floor
     New York, New York 10022
     Tel: (212) 838 7797
     Fax: (212) 838-7745
     *-and-*
     Steven J. Toll
     Mark S. Willis
     Jason M. Leviton
     1100 New York Avenue, N.W.
     Suite 500, West Tower
     Washington, D.C. 20005
     Tel:  202-408-4600
     Fax:  202-408-4699

**Proposed Lead Counsel for the Class**

2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------- X
STEVEN SCHMALZ on behalf of himself and   :
all others similarly situated,
                                          :
            Plaintiff,                        Case 7:08-cv-00264-KMK
                                          :
      -against-
                                          :
MBIA, INC., GARY C. DUNTON, EDWARD        :
CHAPLIN,
                                          :
            Defendants.
------------------------------------- X
TEAMSTERS LOCAL 807 LABOR
MANAGEMENT PENSION FUND,                  :
Individually and on behalf of all others
similarly situated,                       :   Case No. 1:08-cv-01845-UA

                                          :
            Plaintiff,
                                          :
      -against-
                                          :
MBIA INC., GARY C. DUNTON, C.
EDWARD CHAPLIN, and JOSEPH W.             :
BROWN

                                          :
            Defendants.
------------------------------------- X
GARY KOSSEFF, Individually and on behalf  :
of all others similarly situated,
                                          :
            Plaintiff,                        Case No. 7:08-cv-02362-UA
                                          :
      -against-
                                          :
MBIA INC., GARY C. DUNTON, and C.
EDWARD CHAPLIN                            :

                                          :
            Defendants.
```

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE TULARE COUNTY EMPLOYEES' RETIREMENT ASSOCIATION'S MOTION TO BE APPOINTED LEAD PLAINTIFF; TO APPROVE PROPOSED LEAD PLAINTIFF'S CHOICE OF COUNSEL; AND TO CONSOLIDATE ALL RELATED ACTIONS**

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ....................................................................................................... 1

II.     SUMMARY OF FACTS ............................................................................................ 2

III.    PROCEDURAL BACKGROUND........................................................................... 4

IV.     ARGUMENT .............................................................................................................. 4

     A.      The Above-Capitoned Actions Should Be Consolidated....................................... 4

     B.      Movant Should Be Appointed Lead Plaintiff Pursuant To The Reform Act......... 5

          1.      Movant Has A Significant Financial Interest In Te Relief Sought
               By The Class ................................................................................................... 7

          2.      Movant Has Made A Sustantial Showing That It Satisfied The
               Adequacy And Typicality Requirements O Rule 23 ................................. 8

               (i)     Movant Will Fairly And Adequately Protect The Interests Of
                       The Class................................................................................... 9

               (ii)    Movant's Claims Are Typical Of Those Of The Class................. 9

     C.      The Court Should Approve Movant's Choice of Counsel................................... 10

V.      CONCLUSION......................................................................................................... 10

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*,
    222 F.3d 52 (2d Cir. 2000)...................................................................................9

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) .......................................................................1, 7, 9

*Burke v. Ruttenberg*,
    102 F. Supp. 2d 1280 (N.D. Ala. 2000).................................................................9

*Hicks v. Morgan Stanley & Co.*,
    No. 01-Civ-10071(HB), 2003 WL 21672085 (S.D.N.Y. July 16, 2003)................10

*In re Corel Corp., Inc. Sec. Litig.*,
    206 F.R.D. 533 (E.D. Pa. 2002).........................................................................10

*In re Enron Corp. Sec. Litig.*,
    206 F.R.D. 427 (S.D. Tex. 2002) .............................................................. 1, 4, 6-7

*In re Interpublic Securities Litigation*,
    No. 02-Civ-6257(DLC), 2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003)...................9

*Mayo v. Apropos Tech., Inc.*,
    No. 02-CV-8406, 2002 WL 193393 .......................................................................5

*In re Network Assocs., Inc. Sec. Litig.*,
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ...................................................................1

*In re Olsten Corp. Secs. Litig.*,
    3 F. Supp. 2d 292 (E.D. N.Y. 1998) ......................................................................5

*Internet Law Library, Inc. v. Southridge Capital Management, LLC*,
    208 F.R.D. 59 (S.D. N.Y. 2002) ...........................................................................5

*Schulman v. Lumenis, Ltd.*,
    No. 02-Civ-1989, 2003 WL 21415287 (S.D. N.Y.  June 18, 2003) .........................5

**FEDERAL STATUTES**

15 U.S.C. §78u-4 ................................................................................................ Passim

PSLRA, P.L. 104-67, 109 Stat. 737.............................................................................1

**RULES**

Fed. R. Civ. P. 23 ............................................................................................... Passim

Fed. R. Civ. P. 42...................................................................................................................5

Rule 10b-5............................................................................................................................4

I.     **INTRODUCTION**

The Tulare County Employees' Retirement Association ("TCERA" or "Movant") suffered a substantial loss as a result of its purchases of securities issued by MBIA, Inc. ("MBIA" or the "Company") between October 26, 2006 through and including January 9, 2008 (the "Class Period"). Pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(3)(B) (the "Exchange Act"), as amended by Section 101(a) of the Private Securities Litigation Reform Act of 1995, P.L. 104-67, 109 Stat. 737 (the "Reform Act" or "PSLRA"), Movant respectfully submits this memorandum of law in support of its motion for an Order: (1) appointing Movant as Lead Plaintiff on behalf of purchasers of MBIA securities; (2) approving Movant's choice of the law firm Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein") as Lead Counsel for the class; and (3) consolidating the above-captioned actions, as well as any other related actions pending in this Court and any subsequently filed or transferred actions.[1]

Congress's objective in enacting the Reform Act was to encourage investors, such as Movant, who has a substantial stake in the action, to step forward to serve as Lead Plaintiffs in federal securities class actions. *See In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1020 (N.D. Cal. 1999). Congress decided that investors, and particularly institutional investors, with significant losses would not only have a true financial interest in the action, but also properly guide the litigation. *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 442 (S.D. Tex. 2002). Therefore, Movant is exactly the type of investor that Congress intended to serve as lead plaintiff.

Movant has the desire, ability and resources to actively participate in the monitoring of this class action so that a maximum recovery for the putative class is obtained. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 (5th Cir. 2001) ("securities class actions [should] be managed by

---

[1] Counsel is aware that, pursuant to Section II(A) of this Court's Individual Rules of Practice, a pre-motion conference is generally required prior to the filing of a motion. However, because this motion is specifically governed by the PSLRA, counsel respectfully requests relief from the rule.

active, able class representatives who are informed and can demonstrate they are directing the litigation").

Movant suffered damages of more than $1,691,000 as a result of its purchases of MBIA securities at artificially inflated values due to Defendants' conduct.  To counsel's knowledge, Movant's losses exceed those of any other plaintiff in these related actions who invested in MBIA securities.  Thus, under Section 21D of the Exchange Act, Movant is presumptively the "most adequate plaintiff" and should be appointed as Lead Plaintiff because it has "the largest financial interest in the relief sought by [the] class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  Movant is represented in this action by Cohen Milstein, who is seeking appointment as Lead Counsel for purchasers of MBIA securities, and is eminently qualified to prosecute securities fraud claims such as these.  Moreover, Movant has signed a certification expressing its desire and willingness to serve as a representative party on behalf of the class.  *See* Torell Decl., Ex. B.  Therefore, Movant should be appointed Lead Plaintiff in this action on behalf of purchasers of MBIA securities.

## II.    **SUMMARY OF FACTS**

On or about January 11, 2008, Steven Schmalz filed the first complaint against MBIA and certain of its officers and directors (collectively "Defendants") alleging violations of Sections 10(b) and 20(a) of the Exchange Act.  An additional related action (collectively, the "Related Actions") was filed shortly thereafter in this Court.[2]  The Related Actions allege that, throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects.

More specifically, the Related Actions allege that the Defendants misrepresented and/or failed to disclose the Company's exposure to losses stemming from MBIA's issuance of residential mortgage-backed securities ("RMBS"), including, in particular, its exposure to so-called "CDO-

---

[2] In addition to the Related Actions, a derivative action has also been filed on behalf of MBIA.

squared" securities, an investment that is particularly risky because it is a Collateralized Debt Obligation ("CDO") whose collateral is other CDOs. Throughout the Class Period, the Company reserved for new CDO defaults at the same 12% of new insurance premium income rate that it had applied to its municipal bond insurance. Subsequent disclosures regarding the CDO-squared portfolio indicate that MBIA's reserves were not adequate for the risk MBIA faced. If downgraded from a AAA credit rating, MBIA would not be able to write insurance policies on bonds that have a lower rating than it does, a segment that makes up the vast majority of the Company's business.

On December 19, 2007, Standard and Poor's ("S&P") issued a report placing the Company's AAA credit rating on negative watch. Contained within the S&P report was an analysis of information provided by MBIA to S&P (but not previously to investors) that showed the Company's total CDOs with RMBS exposure was $30.4 billion. This was nearly twice the figure reported in an August 2, 2007 analyst presentation and $11 billion more than the Company reported in its earnings call on October 5, 2007. After the close of trading on December 19, the Company put on its website an analysis of its CDO portfolio that disclosed for the first time that $8.1 billion of MBIA's Multi-Sector CDOs were exposed to a significant amount of RMBS risk. On this news, MBIA shares declined 26%, from $27.02 per share to $19.95 per share on December 20, 2007. This was the biggest one-day decline in the Company's history.

Then, on January 9, 2008, MBIA disclosed that its financial results were weaker than expected and that regulators were scrutinizing the Company's financial statements. First, MBIA reported that it expected to incur a total of $737 million in loss and loss adjustment expenses for the fourth quarter of 2007 as a result of securities backed by residential home equity loans. The Company announced that it estimated it would take a $3.3 billion loss as a result of its CDO portfolio. Moreover, MBIA supplemented its prior disclosure of its CDO-squared exposure to reveal even further information – indicating that its exposure was actually close to $9 billion. Lastly, the

Company announced that the New York State Insurance Department and the SEC were informally investigating the Company.

## III.    PROCEDURAL BACKGROUND

To date, there are at least two (2) cases pending in this District that allege claims for violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of investors who purchased MBIA securities during the Class Period.  The Related Actions are included in the caption of this memorandum.

The Reform Act provides that "if more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed," a court shall not make the determination of the most adequate plaintiff until "after the decision on the motion to consolidate is rendered."  15 U.S.C. §78u-4(a)(3)(B)(ii). *See also Enron*, 206 F.R.D. at 438. Consolidation is particularly appropriate in securities class action litigation especially where, as here, the claims asserted in all the actions are virtually identical.  *Id.*

## IV.    ARGUMENT

### A.    The Above-Captioned Actions Should Be Consolidated

The PSLRA provides that "if more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed," the Court shall not make the determination of the most adequate plaintiff until "after the decision on the motion to consolidate is rendered."  15 U.S.C. §78u-4(a)(3)(B)(ii).  Thereafter, the Court "shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions."  *Id.*

Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, when actions involving common questions of law or fact are pending, the district court is vested with broad powers to consolidate such actions if the court, in its discretion, determines that consolidation would facilitate the administration of justice.  *See Mayo v. Apropos Tech., Inc.*, No. 02-CV-8406, 2002 WL 193393,

at * 2 (N.D. Ill. Feb. 7, 2002).  Rule 42(a) states:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed. R. Civ. P. 42(a).

Consolidation is particularly appropriate in securities class action litigation.  *See, e.g., Schulman v. Lumenis, Ltd.*, 2003 WL 21415287, at *2 (S.D.N.Y. June 18, 2003); *Internet Law Library, Inc. v. Southridge Capital Management, LLC*, 208 F.R.D. 59, 61 (S.D.N.Y. 2002).  Indeed, "[i]n securities actions where the complaints are based on the same 'public statements and reports' consolidation is appropriate if there are common questions of law and fact and the parties will not be prejudiced."  *In re Olsten Corp. Secs. Litig.*, 3 F. Supp. 2d at 292.

As noted above, at least two Related Actions have been filed which allege the same fraud with respect to the same or substantially the same conduct.  All of the documents to be reviewed and testimony to be taken in the Related Actions are identical.  The witnesses, except for plaintiffs for class certification purposes, are virtually the same.  Therefore, consolidation is appropriate and in the interest of judicial economy.

### B.    Movant Should Be Appointed Lead Plaintiff Pursuant To The Reform Act

The Reform Act provides a detailed procedure for the selection of lead plaintiff to oversee securities class actions.  First, within 20 days after the date on which a class action is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class:

(I)    of the pendency of the action, the claims asserted therein, and the purported class period; and

(II)    that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

*See* 15 U.S.C. §78u-4(a)(3)(A)(i).  In this case, notice was first published on *Market Wire* on January 11, 2008.  *See* Torell Decl., Ex. A.  Accordingly, this motion is timely filed within 60 days of the date of publication.

The Court is directed by the Reform Act to consider any motions brought by plaintiffs or purported class members who wish to serve as lead plaintiff not later than 90 days after the date of publication, or as soon as practicable after the court decides any pending motion to consolidate.  *See* 15 U.S.C. §78u-4(a)(3)(B)(i).  In selecting a lead plaintiff, a court must appoint the "most adequate plaintiff" based on the following statutory factors:

> the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that …
>
> > (aa)    has either filed the complaint or made a motion in response to a notice;
> >
> > (bb)    in the determination of the court, has the largest financial interest in the relief sought by the class; and
> >
> > (cc)    otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii).

When applying these factors, courts have emphasized that, in enacting the Reform Act, Congress "call[ed] for greater supervision by the Court in the selection of which plaintiffs will control the litigation."  *Enron*, 206 F.R.D. at 439.  As a result, each movant has the initial burden of demonstrating to the court that it is the most adequate plaintiff.  *See Berger*, 257 F.3d at 481 ("[a]dequacy is for the plaintiffs to demonstrate"); *Enron,* 206 F.R.D. at 441 ("The adequacy of the putative class representative(s) and of plaintiffs' counsel should not be presumed, however, in the absence of proof to the contrary; plaintiff bears the burden of demonstrating his and his counsel's adequacy").  In support of its desire to serve as lead plaintiff, TCERA has signed a certification expressing its willingness to serve as a representative party on behalf of the class.  *See* Torell Decl., Ex. B.

### 1.     Movant Has A Significant Financial Interest In The Relief Sought By The Class

In adjudicating this motion, the Court must be guided by a presumption that the most adequate plaintiff is the person or group of persons who: (a) filed a complaint or made a motion to serve as lead plaintiff; (b) has the largest financial interest in the relief sought by the class; and (c) otherwise satisfies the requirements of Fed. R. Civ. P. 23. 15 U.S.C. § 78u-(4)(a)(3)(B)(iii)(I). This presumption may be rebutted by proof that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-(4)(a)(3)(B)(iii)(II). Movant overwhelmingly satisfies these requirements.

During the Class Period, Movant suffered a total loss of more than $1,691,000 from its purchases of MBIA securities. *See* Torell Decl., Ex. B. Movant believes it has the largest financial interest in the relief sought by the Class of purchasers of MBIA securities. Movant is willing to actively participate in the leadership of this litigation through both personal involvement and consultation with its chosen counsel.

Moreover, because Movant possess the largest financial interest in the outcome of this litigation, it is presumed to be the "most adequate plaintiff" to represent the class. 15 U.S.C.§ 78u-(4)(a)(3)(B)(iii)(I)(bb). Movant is both qualified to represent the class and is willing to serve as a representative party. In addition, Movant has selected counsel that is highly experienced in prosecuting securities class actions such as this one. *See* Torell Decl., Ex. C. Accordingly, Movant satisfies the requirements for appointment as Lead Plaintiff under the Reform Act and the instant motion should be granted.

As of this filing, Movant has not received any notice that any other potential applicant has sustained a greater financial loss in connection with the purchase and/or sale of MBIA securities during the Class Period, nor has it been served with any papers on behalf of any other movant for

Lead Plaintiff in this case. Accordingly, Movant satisfies the second prong of the "most adequate plaintiff" test.

### 2. Movant Has Made A Substantial Showing That It Satisfies The Adequacy And Typicality Requirements Of Rule 23

The third prong of the "most adequate plaintiff" test is that a lead plaintiff must otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure. *See* 15 U.S.C. §78u-4(a)(3)(B)(i). Rule 23(a) provides that a party may serve as a class representative only if the following four prerequisites are met:

1. the class is so numerous that joinder of all members is impracticable;

2. there are questions of law or fact common to the class;

3. the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4. the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In its determination and selection of the most adequate plaintiff, the "Court must be inordinately careful, making certain that the requirements of section 21D(a) are assiduously applied in line with the purposes of Congress in the enactment of the 1995 Reform Act." *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1309 (N.D. Ala. 2000); S*ee also Berger*, 257 F.3d at 484 (stating that the district court has an obligation "to assess the representatives own qualifications to take an active role in and control the litigation").

### (i)    Movant Will Fairly And Adequately Protect The Interests Of The Class

As stated above, it is equally important that the lead plaintiff not only have a significant financial interest in the case, but also demonstrates its adequacy to oversee the prosecution of the case as a fiduciary to the class.  Courts have noted that adequacy of representation requires inquiry into whether: (a) the plaintiff's attorneys are qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff's interests are not antagonistic to those of the class.  *See Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *see also In re Interpublic Securities Litigation*, No. 02-Civ-6257(DLC), 2003 WL 22509414, at *3 (S.D.N.Y. Nov. 6, 2003).

The interests of Movant are clearly aligned with those of the class, and there is no evidence of any conflict of interest between Movant and any other member of that class.  Indeed, Movant's financial stake in the outcome of this litigation provides significant and compelling evidence that its interests in prosecuting this action are aligned with the interests of the class.

### (ii)    Movant's Claims Are Typical Of Those Of The Class

The typicality requirement of Rule 23(a) of the Federal Rules of Civil Procedure is satisfied when a plaintiff's claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members and the claims are based on the same legal theory.  *See id.* at *7; *Hicks v. Morgan Stanley & Co.*, No. 01-Civ-10071(HB), 2003 WL 21672085, at *2 (S.D.N.Y. July 16, 2003).  Rule 23 does not require that the lead plaintiff be identically situated with all class members.

The questions of law and fact common to the members of the Class which also affect Movant include, but are not limited to, the following:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged in the complaint;

(b)     Whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants during the Class Period contained misstatements of material fact;

(c)     Whether the market price of MBIA stock during the Class Period was artificially inflated due to Defendants' conduct; and

(d)     Whether the members of the Class have sustained damages and, if so, the proper measure of those damages.

These common questions of law and fact apply to Movant and to all members of the purported class. Movant purchased securities issued by MBIA during the Class Period and suffered damages as a result of Defendants' fraudulent scheme and in reliance on their misrepresentations, as did all of the other members of the class. The typicality requirement is therefore satisfied because Movant's claims are based on the same legal theories and arise from the same event or course of conduct giving rise to the claims of other class members. *See In re Corel Corp., Inc. Sec. Litig.,* 206 F.R.D. 533, 541-542 (E.D. Pa. 2002).

## C.     The Court Should Approve Movant's Choice of Counsel

Pursuant to 15 U.S.C. §78u-4(a)(3)(B)(v), the proposed Lead Plaintiff shall, subject to the Court's approval, select and retain counsel to represent the class. Movant has selected the law firm Cohen Milstein as Lead Counsel. As illustrated by the attached firm biography, Cohen Milstein has extensive experience in successfully prosecuting securities fraud actions and has appeared in major class actions all around the country, including in this District. *See* Torell Decl., Ex. C.

## V.     CONCLUSION

For all the foregoing reasons, Movant respectfully requests that the Court: (1) appoint it as the Lead Plaintiff for the class; (2) approve its selection of Lead Counsel, and (3) consolidate the above-captioned actions, as well as any other related actions pending in this Court and any subsequently filed or transferred actions.

Dated: Washington, D.C.
      March 11, 2008

Respectfully submitted,

**Cohen, Milstein, Hausfeld & Toll P.L.L.C.**


By:       /s/ Catherine A. Torell
      Catherine A. Torell (CAT-0905 )
      150 East 52nd Street, 30th Floor
      New York, New York 10022
      Tel: (212) 838 7797
      Fax: (212) 838-7745
      *-and-*
      Steven J. Toll
      Mark S. Willis
      Jason M. Leviton
      1100 New York Avenue, N.W.
      Suite 500, West Tower
      Washington, D.C. 20005
      Tel:  202-408-4600
      Fax:  202-408-4699

***Proposed Lead Counsel for the Class***

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------- X
STEVEN SCHMALZ on behalf of himself and    :
all others similarly situated,
                                           :
          Plaintiff,                           Case 7:08-cv-00264-KMK
                                           :
     -against-
                                           :
MBIA, INC., GARY C. DUNTON, EDWARD         :
CHAPLIN,
                                           :
          Defendants.
------------------------------------- X
TEAMSTERS LOCAL 807 LABOR
MANAGEMENT PENSION FUND,                   :
Individually and on behalf of all others
similarly situated,                        :   Case No. 1:08-cv-01845-UA

                                           :
          Plaintiff,                       :

     -against-                             :

MBIA INC., GARY C. DUNTON, C.              :
EDWARD CHAPLIN, and JOSEPH W.
BROWN

                                           :
          Defendants.
------------------------------------- X
GARY KOSSEFF, Individually and on behalf
of all others similarly situated,          :

                                           :   Case No. 7:08-cv-02362-UA
          Plaintiff,
                                           :
     -against-
                                           :
MBIA INC., GARY C. DUNTON, and C.          :
EDWARD CHAPLIN                             :

          Defendants.                      :
```

**DECLARATION OF CATHERINE A. TORELL IN SUPPORT OF THE TULARE COUNTY EMPLOYEES' RETIREMENT ASSOCIATION'S MOTION FOR CONSOLIDATION, APPOINTMENT OF LEAD PLAINTIFF AND FOR APPROVAL OF LEAD PLAINTIFF'S CHOICE OF LEAD COUNSEL**

I, Catherine A. Torell, hereby declare the following under penalty of perjury:

1.      I am an attorney admitted to practice in this District and am counsel for the Tulare County Employees' Retirement Association ("TCERA").  I am submitting this declaration in support of TCERA's motion for consolidation, appointment as Lead Plaintiff, and selection of my firm, Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein"), as Lead Counsel.

2.      Attached hereto are true and correct copies of the following documents:

Exhibit A:    Notice of Pendency of Class Action Published on the *Market Wire* on January 11, 2008.

Exhibit B:    Certification and loss chart for TCERA.

Exhibit C:    Firm Resume of Cohen Milstein.

Exhibit D:    Complaint filed in *Schmalz v. MBIA, Inc., et al.*, Case No. 7:08-cv-00264-KMK.[1]

The foregoing is true to the best of my knowledge.

Dated: March 11, 2008

_____    /s/ Catherine A. Torell_____
                    Catherine A. Torell

---

[1] Counsel has attached a copy of the complaint in the first-filed related action pursuant to Section II(B) of this Court's Individual Rules of Practice.

# EXHIBIT A

Yahoo!  My Yahoo!  Mail     Make Y! your home page        Search:              [ Web Search ]

**YAHOO! FINANCE**     Welcome, jleviton        Finance Home -          marketwire
                       [Sign Out, My Account]   Help

**Welcome [Sign In]**                          To track stocks & more, Register

**Financial News**

          Enter symbol(s) _____   | Basic |  ▦  [ Get ]  Symbol Lookup

**Press Release**                          Source: Bernstein Litowitz Berger & Grossmann LLP

# Bernstein Litowitz Berger & Grossmann LLP Announces Filing of Class Action Suit Against MBIA, Inc. and Certain of Its Senior Officers and Directors

Friday January 11, 5:22 pm ET

NEW YORK, NY--(MARKET WIRE)--Jan 11, 2008 -- Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") today announced that a class action lawsuit has been commenced in the United States District Court for the Southern District of New York on behalf of purchasers of the common stock of MBIA, Inc. ("MBIA" or the "Company") (NYSE:MBI - News) during the period between January 30, 2007 through and including January 9, 2008 (the "Class Period"). The case is captioned Schmalz v. MBIA, Inc., et al., Case No., 08-CV-0264.

The Complaint alleges that during the Class Period, MBIA and the individual defendants, Chief Executive Officer Gary C. Dunton and Chief Financial Officer C. Edward Chaplin, violated the federal securities laws by issuing false and misleading press releases, financial statements, filings with the SEC and statements during investor conference calls. The Complaint alleges that, throughout the Class Period, Defendants misrepresented and/or failed to disclose the true extent of MBIA's exposure to losses stemming from MBIA's insurance of residential mortgage-backed securities ("RMBS"), including in particular its exposure to so-called "CDO-squared" securities that are backed by RMBS. This highly risky exposure was belatedly disclosed in a series of public statements beginning on December 19, 2007 and ending on January 9, 2008, the last day of the Class Period. One analyst observed that MBIA had withheld from the public the riskiest parts of its insured portfolio, while others expressed similar dismay at MBIA's failure to apprise investors of these risks in a timely manner.

The Complaint alleges that the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and that Defendants Gary C. Dunton and C. Edward Chaplin violated Section 20(a) of the Exchange Act.

If you wish to serve as lead plaintiff, you must move the Court no later than 60 days from January 11, 2008. If you wish to discuss this action or have any questions concerning this notice or your rights or interests, please contact Plaintiff's counsel, Salvatore J. Graziano or Gerald H. Silk or of Bernstein Litowitz at **212-554-1400**, or via e-mail at sgraziano@blbglaw.com or jerry@blbglaw.com, respectively. You can view a copy of the Complaint as filed online at http://www.blbglaw.com. Any member of the proposed class may move the Court to serve as lead plaintiff through counsel of their choice, or may choose to do nothing and remain a member of the proposed class.

Plaintiff is represented by BLB&G, a firm of 50 attorneys with offices in New York, California, Louisiana and New Jersey, which has extensive expertise in prosecuting investor class actions involving financial fraud. Since its founding in 1983, BLB&G has built an international reputation for excellence and integrity. Specializing in securities fraud, corporate governance, shareholders' rights, employment discrimination and civil rights litigation, among other practice areas, BLB&G prosecutes class and private actions on behalf of institutional and individual clients worldwide. Unique among its peers, BLB&G has obtained six of the ten largest and most significant securities recoveries in history, recovering nearly $20 billion on behalf of defrauded investors.

The MBIA action has been investigated and is being prosecuted by BLB&G's subprime litigation group, which is also representing investors in class and derivative subprime related actions against Citigroup, Washington Mutual, Inc., American Home Mortgage Investment Corp., New Century Financial Corporation, Countrywide Financial Corporation and State Street, among others.

More information about Bernstein Litowitz Berger & Grossmann LLP can be found online at www.blbglaw.com.

*Contact:*

```
CONTACT:
Bernstein Litowitz Berger & Grossmann LLP
New York, N.Y.

Salvatore J. Graziano
     212-554-1400

Gerald H. Silk
     212-554-1400
```

Source: Bernstein Litowitz Berger & Grossmann LLP

Copyright © 2008 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Send Feedback
Copyright © 2008 Marketwire. All rights reserved. All the news releases provided by Marketwire are copyrighted. Any forms of copying other than an individual user's personal reference without express written permission is prohibited. Further distribution of these materials is strictly forbidden, including but not limited to, posting, emailing, faxing, archiving in a public database, redistributing via a computer network or in a printed form.

# EXHIBIT B

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The Tulare County Employees' Retirement Association ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed a class action complaint asserting securities claims against MBIA, Inc. ("MBIA") and wishes to join as a plaintiff retaining Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as its counsel.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in MBIA securities during the Class Period of October 26, 2006 through January 9, 2008, inclusive were as indicated on the attached table.

5.    During the three years prior to the date of this Certificate, Plaintiff has sought to serve or served as a representative party in the following litigation under the federal securities laws:  *Cortese v. Radian Group, Inc.*, Case No. 2:07-CV-3375 (MAM) (E.D. Pa.).

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6ᵗʰ day of March, 2008.

David Kehler, ~~Administrator~~
Tulare County Employees' Retirement Association

Tulare County Employees' Retirement Association's Loss Chart

| Trade Date | Transaction Type | # Shares | Share Price ($) | Class Period Purchases | Class Period Sales | Sales on Class Period Purchases | Class Period Net Holdings | Cost | | Proceeds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/27/2006 | buy | 800 | 73.2371 | 800 | 0 | 0 | 800 | $ | 58,589.68 | | | Total Class Period Purchases: | | 71160 |
| 4/9/2007 | buy | 300 | 65.7568 | 300 | 0 | 0 | 1100 | $ | 19,727.04 | | | Total Class Period Sales: | | -31310 |
| 10/17/2007 | sell | 8005 | 61.1743 | 0 | -8005 | -1100 | 0 | | | $ | (67,291.73) | Total Sales on Class Period Purchases: | | -24405 |
| 10/25/2007 | buy | 20700 | 45.1061 | 20700 | 0 | 0 | 20700 | $ | 933,696.27 | | | Total Class Period Shares Retained: | | 46755 |
| 10/26/2007 | buy | 4000 | 47.4462 | 4000 | 0 | 0 | 24700 | $ | 189,784.80 | | | 90-day Loss Price | $ | 13.63 |
| 10/26/2007 | buy | 19750 | 49.1895 | 19750 | 0 | 0 | 44450 | $ | 971,492.63 | | | | | |
| 11/30/2007 | buy | 4510 | 35.6884 | 4510 | 0 | 0 | 48960 | $ | 160,954.68 | | | Total Purchases: | $ | 2,710,033.03 |
| 1/3/2008 | buy | 16700 | 18.9315 | 16700 | 0 | 0 | 65660 | $ | 316,156.05 | | | Total Sales Proceeds | $ | (381,228.72) |
| 1/9/2008 | buy | 4400 | 13.5527 | 4400 | 0 | 0 | 70060 | $ | 59,631.88 | | | Total Retained Value: | $ | 637,481.05 |
| 1/9/2008 | sell | 23305 | 13.4708 | 0 | -23305 | -23305 | 46755 | | | $ | (313,936.99) | | | |
| | | | | | | | | | | | | Total Loss: | $ | 1,691,323.26 |

Page 1 of 1

# EXHIBIT C





# Firm Resume

March 7, 2008



For decades, Cohen, Milstein, Hausfeld & Toll, P.L.L.C. has represented individuals, small businesses, institutional investors, and employees in many of the major class action cases litigated in the United States for violations of the antitrust, securities, environmental, consumer protection, civil rights/discrimination, ERISA and human rights laws. Cohen Milstein is at the forefront of numerous innovative legal actions that are expanding the quality and availability of legal recourse for aggrieved individuals and businesses both domestic and international.

The firm was established in March 1986 and is based in Washington, D.C. with offices in New York, Philadelphia, Chicago, San Francisco and London. From 1969 until 1986, the Firm was the Washington, D.C. office of the Philadelphia law firm currently known as Kohn, Swift & Graf, P.C.

Cohen Milstein is an innovator in new areas of the law. Cohen Milstein was in the forefront of filing antitrust claims on behalf of indirect purchasers in 1993 and 1994, when it filed state-court actions in 18 states on behalf of indirect purchasers of infant formula. This was the first effort to systematically and simultaneously pursue treble damages claims on behalf of indirect-purchasing consumers in all states where antitrust laws permitted such claims. This approach, and variations of it, has since become the accepted model for pursuing antitrust damages on behalf of indirect-purchasing consumers.

The firm also has been in the forefront of the development of international antitrust theory and litigation of claims. As the global economy has produced worldwide conglomerates, so, too, has the nature of antitrust violations changed. For example, in *Kruman v. Christie's International PLC, et al.* Docket No. 01-7309 and *In re Bulk Vitamins Antitrust Litigation*, MDL 1285 (D.D.C.), both the parties and the anticompetitive actions were played out on a world, rather than domestic, stage. Cohen Milstein also represents and won Lead Plaintiff status for domestic and foreign investors in a foreign company's bonds, in a PSLRA litigation being pursued in the United States, *In re Parmalat Securities Litigation*, Master Docket 04 Civ 0030 (LAK) (S.D.N.Y.).

Cohen Milstein has also served as lead or co-lead counsel, or on Plaintiffs' Executive Committee(s), in many dozens of antitrust, securities, consumer protection or product liability, civil rights, and human rights class action cases.

Cohen Milstein has contributed over 37,000 hours of time to human rights and *pro bono* cases since 1996. As an example, the Firm represented eight survivors and/or families of the victims of the September 11, 2001 attack on the Pentagon before the Federal compensation fund. Cohen Milstein has obtained a substantial recovery for each, including the highest recovery to date, $6.8 million, for an injured individual.



Over its history, Cohen Milstein has obtained many landmark judgments and settlements for individuals and businesses in the United States and abroad. The firm's most significant past cases include:

### *In re Vitamins Antitrust Litigation, MDL No. 1285 (D.D.C.).*
Cohen Milstein served as co-lead counsel for two certified classes of businesses that directly purchased bulk vitamins and were overcharged as a result of a ten year global price-fixing and market allocation conspiracy. Chief Judge Hogan approved four major settlements between certain vitamin defendants and Class Plaintiffs, including a landmark partial settlement of $1.1 billion. In a later trial before Chief Judge Hogan concerning four Class Plaintiffs' remaining unsettled Vitamin B4 (choline chloride) claims, a federal jury in Washington unanimously found Japan's second largest trading company, Mitsui & Co., Ltd., its wholly-owned U.S. subsidiary Mitsui & Co. (U.S.A.), Inc., DuCoa, LP, a choline chloride manufacturer based in Highland, Illinois, and DuCoa's general partner, DCV, Inc. liable for participating in the conspiracy and ordered them to pay $49,539,234, which is trebled to $148,617,702 under the federal antitrust laws. The case was subsequently settled against those defendants.

### *Dukes v. Wal-Mart Stores, Inc., No. C-01-2252 (N.D. Cal.)*
Cohen Milstein is one of the co-lead counsel in this discrimination case. In June 2004, U.S. District Court Judge Martin Jenkins ruled that six current and former Wal-Mart employees from California may represent all female employees of Wal-Mart who worked at its U.S. stores anytime after December 26, 1998 in a nationwide sex discrimination class action lawsuit (appeal pending). As the largest civil rights class action ever certified against a private employer, the Judge described the case as "historic in nature, dwarfing other employment discrimination cases that came before it." The action charges that Wal-Mart discriminates against its female retail employees in pay and promotions. The class in this case includes more than 1.5 million current and former female employees of Wal-Mart retail stores in America, including Wal-Mart discount stores, super centers, neighborhood stores, and Sam's Clubs.

### *In re Lucent Technologies Securities Litigation, Civ. Action No. 00-621 (JAP) (D.N.J.)*
A settlement in this massive securities fraud class action was reached in late March 2003. The class portion of the settlement amounts to over $500 million in cash, stock and warrants and ranks as the second largest securities class action settlement ever completed. Cohen Milstein represented one of the co-lead plaintiffs in this action, a private mutual fund.

### *Nate Pease, et al. v. Jasper Wyman & Son, Inc., et al., Civil Action No. 00-015 (Knox County Superior Court, Me.)*
In 2004, a state court jury from Maine found three blueberry processing companies liable for participating in a four-year price-fixing and non-solicitation conspiracy that artificially lowered the prices defendants paid to approximately

COHEN MILSTEIN
HAUSFELD & TOLL PLLC

800 growers for wild blueberries. The jury ordered defendants Cherryfield Foods, Inc., Jasper Wyman & Son, Inc., and Allen's Blueberry Freezer, Inc. to pay $18.68 million in damages, the amount which the growers would have been paid absent the defendants' conspiracy. After a mandatory trebling of this damage figure under Maine antitrust law, the total amount of the verdict for the plaintiffs is just over $56 million. The Firm served as co-lead counsel.

***In re StarLink Corn Products, Liability Litigation, MDL No. 1403. (N.D. Ill..***
Cohen Milstein successfully represented U.S. corn farmers in a national class action against Aventis CropScience USA Holding and Garst Seed Company, the manufacturer and primary distributor of StarLink corn seeds. StarLink is a genetically modified corn variety that the United States government permitted for sale as animal feed and for industrial purposes, but never approved for human consumption. However, StarLink was found in corn products sold in grocery stores across the country and was traced to widespread contamination of the U.S. commodity corn supply. The Firm, as co-lead counsel, achieved a final settlement providing more than $110 million for U.S. corn farmers, which was approved by a federal district court in April 2003. This settlement was the first successful resolution of tort claims brought by farmers against the manufacturers of genetically modified seeds.

***In re Diet Drug Litigation (Fen-Phen), MDL No. 1203 (E.D. Pa.)***
As a member of the Plaintiffs' Management Committee and Sub-Class Counsel, Cohen Milstein played a major part in the success of the Fen-Phen diet drug litigation and settlement *(In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation,* MDL 1203). CMHT and other plaintiffs' counsel achieved the largest settlement ever obtained in a mass tort case - $3.75 billion – on behalf of millions of U.S. consumers who used Pondimin (fenfluramine) or Redux (dexfenfluramine), either alone or in combination with phentermine, diet drugs that are associated with heart valve damage.

***Snyder v. Nationwide Mutual Insurance Company, No. 97/0633 (Sup. Ct. N.Y. Onondaga Cty.)***
Cohen Milstein served as one of plaintiffs' principal counsel in this case on behalf of persons who held life insurance policies issued by Nationwide through its captive agency force. The action alleged consumer fraud and misrepresentations. Plaintiffs obtained a settlement valued at more than $85 million. The judge praised the efforts of Cohen Milstein and its co-counsel for having done "a very, very good job for all the people." He complimented "not only the manner" in which the result was arrived at, but also the "time … in which it was done."

***Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al., No. 1:01CV02313 (D.D.C.)***
Cohen Milstein has been co-lead counsel in this case since its inception in 2001. Plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol.



Bristol's scheme included a conspiracy with American BioScience, Inc., a generic manufacturer, to block generic competition. Cohen, Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigations brought by the Federal Trade Commission and State Attorneys General offices.

### Kruman v. Christie's International PLC, et al., Docket No. 01-7309
A $40 million settlement on behalf of all persons who bought or sold items through Christie's or Sotheby's auction houses in non-internet actions was approved in this action. Cohen Milstein served as one of three leading counsel on behalf of foreign plaintiffs. The Court noted that approval of the settlement was particularly appropriate, given the significant obstacles that faced plaintiffs and plaintiffs' counsel in the litigation. The settlement marked the first time that claims on behalf of foreign plaintiffs under U.S. antitrust laws have been resolved in a U.S. court, a milestone in U.S. antitrust jurisprudence.

### In re Infant Formula Consumer Antitrust Litigation (multiple state courts)
Cohen Milstein instituted price-fixing cases on behalf of indirect-purchasers in 17 states under state antitrust laws against three companies who conspired to drive up the price of infant formula. The cases resulted in settlements of $64 million for purchasers of infant formula.

### Domestic Air Transportation Antitrust Litigation (N.D. Ga.)
Plaintiffs alleged a conspiracy among major airlines to set prices. In one of the largest consumer class actions ever brought to a successful conclusion, Cohen Milstein was one of the lead counsel and obtained a settlement of travel discounts and cash totaling $458 million for the class of individuals and businesses.

### In re The Exxon Valdez Litigation, No. A89-095 Civ. (D. Ak.)
The firm was selected from dozens of law firms around the country by federal and state judges in Alaska to serve as co-lead counsel for plaintiffs in the largest environmental case in United States history that resulted in a jury verdict of more than $5 billion (reversed and remanded for revised punitive damages award; further proceedings pending).

### Holocaust Litigation
In the historic Swiss Banks litigation, CMHT served, *pro bono,* as co-lead counsel for Holocaust survivors against the Swiss banks that collaborated with the Nazi regime during World War II by laundering stolen funds, jewelry and art treasures. Cohen Milstein obtained a $1.25 billion settlement, leading the presiding judge to call the firm's work "indispensable." *See In re Holocaust Victim Assets Litig.,* Case No. CV 96-4849 (ERK) (MDG) (Memorandum of Chief Judge Korman dated July 26, 2002). The Firm was also a lead counsel in litigation by survivors of World War II-era forced and slave labor in litigation against the German companies that profited from using the labor of concentration camp inmates. This



litigation, which resulted in an unprecedented settlement of $5.2 billion, was resolved by multinational negotiations involving the defendants, plaintiffs' counsel, and the governments of several countries for approximately two million claimants.

***Roberts v. Texaco, Inc., 94-Civ. 2015 (S.D.N.Y.)***
Cohen Milstein represented a class of African-American employees in this landmark litigation that resulted in the then-largest race discrimination settlement in history ($176 million in cash, salary increases and equitable relief). The Court hailed the work of class counsel for, *inter alia,* "framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole …".

***Conanan v. Tanoue, No. 00-CV-3091 (ESH)***
Cohen Milstein represented African-American employees at the Federal Deposit Insurance Corporation (FDIC) in this race discrimination suit, which settled for $14 million. The settlement provides the largest payment made in an employment discrimination class action based on race against a federal agency.

***Trotter v. Perdue Farms, Inc., Case No. 99-893 (RRM) (JJF) (MPT), D. Del.***
This suit on behalf of hourly workers at Perdue's chicken processing facilities – which employ approximately 15,000 people – forced Perdue to pay employees for time spent "donning and doffing," that is, obtaining, putting on, sanitizing and removing protective equipment that they must use both for their own safety and to comply with USDA regulations for the safety of the food supply. The suit alleged that Perdue's practice of not counting donning and doffing time as hours worked violated the Fair Labor Standards Act and state law. In a separate settlement with the Department of Labor, Perdue agreed to change its pay practices. In addition, Perdue is required to issue retroactive credit under one of its retirement plans for "donning and doffing" work if the credit would improve employees' or former employees' eligibility for pension benefits. CMHT was co-lead counsel.

***In re North Atlantic Air Travel Antitrust Litigation, Civ. Action No. 84-1103 (D.D.C.)***
The firm, as co-lead counsel, obtained a class settlement of $30 million in coupons for air travelers between the United States and England.

***In re Screws Antitrust Litigation, MDL No. 443 (D. Mass.)***
The firm, as co-lead counsel, obtained a class settlement of approximately $50 million.

***Ocean Shipping Antitrust Litigation, MDL No. 395 (S.D.N.Y)***
The firm, as co-lead counsel, obtained a class settlement of approximately $50 million.

***In re Corrugated Container Antitrust Litigation, MDL No. 310 (S.D. Tex.)***
The firm was one of a handful of firms involved in the successful trial of this



massive antitrust case which was eventually settled for approximately $366 million.

***Murphy, Derivatively On Behalf of Nominal Defendant National Health Laboratories Incorporated v. Perelman, Case No. 659511 (Cal. Sup. San Diego Cty.)***
As one of co-lead counsel in the derivative action, the firm and others obtained a global settlement of class and derivative litigation for $65 million.

***In re Flat Glass Antitrust Litigation***, *MDL No.1200, (W.D. Pa.)*
The firm as co-lead counsel obtained a total of $ 61.7 million in settlement funds on behalf of glass shops, window manufacturers, and others who directly purchased the affected products from the defendants.

***Buspirone Antitrust Litigation***, *MDL No. 1413 (S.D.N.Y.)*
As one of four co-lead counsel, the firm and others obtained a $90 million settlement for the class.

***Masonite Hardboard Siding Litigation, Civ. Action No. 996787 (Cal. Super. Ct.)***
The firm, as one of the lead counsel, obtained a settlement valued at hundreds of millions of dollars.

***Polybutylene Pipe Litigation, Civ. Action No. W 2004-017770COA-R3-CV (W.D. Tenn.)***
The firm helped obtain a settlement valued at $900 million.

***Biben v. Card, No. 84-0844-CV-W-6 (W.D. Mo.)***
The firm, as one of two co-lead counsel, negotiated settlements for $11.9 million, which was 93% of class members' damages.

***In re Newbridge Networks Securities Litigation, Civ. Action No. 90-1061 (D.D.C.)***
The firm, as co-counsel, obtained a cash and stock class settlement valued at approximately $20 million.

***Jiffy Lube Securities Litigation, Civ. Action No. Y-89-1939 (D. Md.)***
The firm, as co-lead counsel, obtained class settlements for a total of $12 million.

***In re Saxon Securities Litigation, Civ. Action No. 82 Civ. 3103 (S.D.N.Y.)***
The firm, as co-lead counsel, obtained a class settlement of approximately $20 million.

***Grossman v. Waste Management, Civ. Action No. 83 Civ. 2167 (N.D. Ill.)***
The firm, as co-lead counsel, obtained a class settlement of approximately $13 million.

***In re Warner Communications Securities Litigation, 618 F. Supp. 735 (S.D.N.Y. 1986)***
The firm was one of plaintiffs' counsel in this case where a class settlement of



$18.4 million was obtained.

***In re Tandon Securities Litigation, No. CV86-4566 (C.D. Cal.)***
The firm played a major role in this class action where settlement was valued at approximately $16 million.

***Immunex Securities Litigation, No. C92-548WD (W.D. Wash.)***
The firm was one of lead counsel where the largest securities class action settlement in Seattle -- $14 million – was recovered.

***In re Caremark Securities Litigation, Case No. 94 C 4751 (N.D. Ill.)***
The firm, as co-lead counsel, obtained a class settlement of $25 million.

***In re Commercial Explosives Antitrust Litigation, Consolidated Case No. 2:96md 1093S (D. Utah)***
The firm, as co-lead counsel, obtained a settlement of $77 million.



# Awards & Recognition

**50 Most Powerful People in DC**
GQ Magazine
September, 2007
Michael Hausfeld named #40.

**Beacon of Justice Award**
From the National Legal Aid and Defender Association
Summer 2007
For Cohen Milstein's work on the Guatanamo cases.

**Fierce Sister Award**
Summer 2007
For Cohen Milstein's work on the comfort woman case.

**500 Leading Plaintiffs' Lawyers in America**
Lawdragon
January-February, 2007

**Top Antitrust Plaintiffs' Firm**
Competition Law 360
February 14, 2007
Cohen Milstein named #1

**International World-shakers**
The Lawyer (UK)
February 8, 2007
Michael Hausfeld named as one of top 40 international lawyers "making waves" in the UK

Joseph Sellers has been selected by his peers to be included in the upcoming 2007 edition of **The Best Lawyers in America**® in the specialty of Civil Rights Law.

**500 Leading Litigators in America**
LawDragon
Spring 2006
Michael Hausfeld, Steven Toll and Joseph Sellers are named to the list.

**The Plaintiffs' Hotlist**
The National Law Journal
October 9, 2006

**100 Most Influential Lawyers**
The National Law Journal
June 19, 2006
Michael Hausfeld is named as one of "the most influential lawyers in America."

**Runner up for Matter of the Year**
Global Competition Review
February, 2005
On Empagran matter, praised for ingenuity in how the case was prosecuted.



## Attorney Profiles - Partners

### Herbert E. Milstein

Herbert E. Milstein began practicing law with Jerry S. Cohen in 1970 – the birth of the Firm. Mr. Milstein has been lead or principal counsel in many of the best known securities class actions litigated during the past 37 years. He is the senior member of the Securities Fraud/Investor Protection practice group.

Mr. Milstein is the author of numerous articles on topics involving class action litigations and the Federal securities laws. He recently authored an article on current issues involving federal securities laws. He also wrote a separate article in the book entitled *The Burger Years*. He is the author of a monograph on the attorney-client privilege.

As an adjunct Professor of Law at Georgetown University Law Center from 1980-1987, he taught complex litigation and continues to lecture on securities litigation and class actions at law schools and seminars sponsored by the American Bar Association, state bar associations, and continuing legal education organizations. In 1985, he received a Silver Gavel award from the American Bar Association for his distinguished example of public service.

Mr. Milstein formerly served on the staff of the Securities and Exchange Commission for five and one-half years, and last held the position of Chief Enforcement Attorney, Division of Corporate Regulation. From 1976-1980, Mr. Milstein served as Equity Receiver for National American Life Insurance Company, appointed by Judge Charles R. Richey, in *SEC v. National Pacific Corp.* For that work, the Chairman of the SEC said Mr. Milstein and the Firm served "with distinction."

Formerly the President of the National Association of Securities and Commercial Law Attorneys (NASCAT), he also served as Treasurer of that organization for six years. He is a member of the American Law Institute, and a member and former Chairman of the Executive Council of the Securities Law Committee of the Federal Bar Association.

Mr. Milstein is currently on the Board of Directors of several organizations, including the Appleseed Foundation and The Studio Theatre of Washington, DC.

Mr. Milstein graduated from Harvard College (*cum laude*, 1958) and Columbia University School of Law (LL.B., 1961).

Mr. Milstein is admitted to practice in the District of Columbia and Massachusetts.

### Michael D. Hausfeld

Michael Hausfeld, one of the country's top civil litigators, joined the Firm in 1971. He is the head of the Antitrust and International practice groups.

Mr. Hausfeld's career has included some of the largest and most successful class actions in the fields of human rights, discrimination and antitrust law. He long has had an abiding interest in

COHEN MILSTEIN
HAUSFELD & TOLL p.l.l.c

social reform cases, and was among the first lawyers in the U.S. to assert that sexual harassment was a form of discrimination prohibited by Title VII; he successfully tried the first case establishing that principle.  He represented Native Alaskans whose lives were affected by the 1989 Exxon Valdez oil spill; later, he negotiated a then-historic $176 million settlement from Texaco, Inc. in a racial-bias discrimination case.

In *Friedman v. Union Bank of Switzerland*, Mr. Hausfeld represented a class of victims of the Holocaust whose assets were wrongfully retained by private Swiss banks during and after World War II.  The case raised novel issues of international banking law and international human rights law.  He successfully represented the Republic of Poland, the Czech Republic, the Republic of Belarus, the Republic of Ukraine and the Russian Federation on issues of slave and forced labor for both Jewish and non-Jewish victims of Nazi persecution during World War II.  He currently represents Jubilee 2000, Khulumani, and other NGOs in litigation involving abuses under apartheid law in South Africa, and is pursuing a RICO litigation against the tobacco industry with regard to the sale of and representations on "light" cigarettes.

Mr. Hausfeld has a long record of successful litigation in the antitrust field, on behalf of both individuals and classes, in cases involving monopolization, tie-ins, exclusive dealings and price fixing.  He is or has been co-lead counsel in antitrust cases against manufacturers of genetically engineered foods, managed healthcare companies, bulk vitamin manufacturers, technology companies and international industrial cartels.  He is actively involved in ongoing investigations into antitrust cases abroad, and was the only private lawyer permitted to attend and represent the interests of consumers worldwide in the 2003 closed hearings by the EU Commission in the Microsoft case.

Chief Judge Edward Korman (E.D.N.Y.), has noted that Mr. Hausfeld is one of the two "leading class action lawyers in the United States."  He has been profiled in, and recognized by, many articles and surveys.  Most recently, a *Forbes* magazine article reported on Mr. Hausfeld's work to establish an international alliance for the protection of consumers and investors worldwide. He was named one of thirty master negotiators in *Done Deal: Insights from Interviews with the World's Best Negotiators*, by Michael Benoliel, Ed.D.  *The Wall Street Journal* profiled him and his practice, and he has been recognized by *The National Law Journal* as one of the "Top 100 Influential Lawyers in America."  He has been described by one of the country's leading civil rights columnists as an "extremely penetrating lawyer", and by a colleague (in a *Washington Post* article) as a lawyer who "has a very inventive mind when it comes to litigation.  He thinks of things most lawyers don't because they have originality pounded out of them in law school." *The New York Times* referred to Mr. Hausfeld as one of the nation's "most prominent antitrust lawyers," and *Washingtonian Magazine* has listed Mr. Hausfeld in several surveys as one of Washington's 75 best lawyers, saying he "consistently brings in the biggest judgments in the history of law" and that he is "a Washington lawyer determined to change the world -- and succeeding."

His most recent awards include the 2002 B'Nai Brith Humanitarian of the Year award; the Simon Wiesenthal Center Award for Distinguished Service; and the U.S. Department of Energy's Human Spirit Award, presented "in tribute to a person who understands the obligation to seek truth and act on it is not the burden of some, but of all; it is universal."

COHEN MILSTEIN
HAUSFELD & TOLL

He is a frequent speaker on antitrust, human rights and international law, most recently participating in a panel discussion at the Spring Meeting of the ABA Section of Antitrust Law entitled "International Antitrust: Developments After Empagran and Intel" and at the School of Oriental and African Studies (SOAS) Annual Meeting in London entitled "Human Rights in An Integrated World:  The Apartheid Reparations Litigation in the USA."  He taught Masters Degree courses at Georgetown University Law Center from 1980 to 1987, and was an Adjunct Professor at the George Washington University Law School from 1996 to 1998 and now sits on its Board of Directors.

Mr. Hausfeld is a graduate of Brooklyn College, receiving a B.A. in Political Science with a minor in Russian History (*cum laud*e, 1966) and the National Law Center, George Washington University (J.D., *with honors*, 1969).  He was a member of the Order of the Coif and the Board of Editors for the George Washington Law Review (1968-69).

Mr. Hausfeld is admitted to practice in the District of Columbia.

**Steven J. Toll**

Steven J. Toll joined the Firm in 1979 and has been lead or principal counsel in some of the most highly publicized stock fraud cases over the past 28 years.  He has been Managing Partner of the Firm since 1997 and is Head of the Securities Fraud/Investor Protection practice group.  Mr. Toll was profiled in the February 1996 *Washington Business Journal* as one of five attorneys that stand out as the "cream of the crop" in the Washington D.C. legal community.  In the Fall 2006 edition of LawDragon, he was named as one of the 500 Leading Lawyers in America.

In July 2005, Mr. Toll was lead trial counsel in one of the few securities class actions to go to trial involving Globalstar, a satellite manufacturer.  Mr. Toll successfully argued the motions before and during trial and ultimately achieved a settlement of $20 million shortly before the case was scheduled to go to the jury.  In approving the settlement, U.S. District Judge Kevin Castel remarked that Mr. Toll and his colleagues had "done a terrific job in presenting the case for the plaintiffs."

Some of Mr. Toll's other notable cases include those against Lucent Technologies, which was settled in 2001 for approximately $575 million, at the time, the second largest securities class action settlement ever achieved; *Southmark Securities Litigation*, where he helped achieve a settlement of $70 million from the company's auditors, Drexel Burnham and Michael Milken; *Norman v. Salomon Smith Barney,* where he negotiated a $50 million settlement on behalf of customers of Salomon's Guided Portfolio Management Program, who alleged that Salomon invested their money in companies in order to boost Salomon's investment banking business, *In re ECI Telecom Securities Litigation* (E.D.Va.)(telecom company accused of presenting false revenue and earnings figures; recovery of $22.75 million); *Gilat Securities Litigation* (company accused of misreporting revenue for a period of years -- recovery of $20 million).

Mr. Toll also served as co-lead counsel in one of the most publicized frauds of the 1990s -- Cascade International (S.D. Fla.) where the mastermind of the fraud, Victor Incendy, is still a fugitive from justice.  The case settled on the eve of trial against Raymond James Inc. -- the only securities class action ever successfully litigated against a brokerage firm for its role as a research analyst.

COHEN MILSTEIN
HAUSFELD & TOLL

He is currently leading the Firm's team serving as co-lead counsel in one of the most highly publicized fraud cases of this era, the securities fraud class action involving Parmalat, the Italian dairy manufacturer; the case is known as Europe's "Enron," because of the similarities of the fraudulent schemes and the non-existence of billions of dollars of assets that had been recorded on Parmalat's financial statements. He is also heading up numerous securities fraud cases against other public companies.

He has written for and spoken at various conferences about securities law issues, including, *inter alia*, *The Plaintiffs' Perspective, Securities Regulation and the New Law*, National Legal Center for the Public Interest, No. 1, Sept. 1996; *The Sarbanes-Oxley Bill Provides No Assistance To Investors Seeking To Recovery From Corporate Fraud*, ABA Annual Meeting, August 2002; and *The Analyst Cases Involving Merrill Lynch, and Its Internet Analyst Henry Blodget, and Salomon Smith Barney and Its Telecommunications Analyst Jack Grubman*, Mass Torts Made Perfect (presented January 2003).

Mr. Toll is an honors graduate of the Wharton School of the University of Pennsylvania (B.S., Accounting, *cum laude*, 1972). He graduated from Georgetown University Law Center (J.D., 1975) where he was Special Project Editor of the Tax Lawyer.

Mr. Toll is admitted to practice in Virginia and the District of Columbia.

### Lisa M. Mezzetti

Lisa Mezzetti, a Partner at Cohen Milstein, joined the Firm in 1984, and is a member of the Securities Fraud/Investor Protection and the Consumer Protection practice groups.

In her securities work, Ms. Mezzetti represented the corporate plaintiff in a private litigation alleging damages from the purchase of a healthcare technology company; in a separate matter, she represented 1,900 plaintiffs in a series of 25 federal court suits concerning municipal bonds. Her shareholder class actions include *In re VeriSign Securities Litigation* (settled for approximately $78 million); *Murphy, Derivatively On Behalf of Nominal Defendant National Health Laboratories Inc. v. Perelman* (Cal. Super. San Diego Cty.) (global settlement of class and derivative litigations for total of $65 million); *Flecker v. Hollywood Entertainment Corp.* (D. Or.) ($15 million settlement, reached the day before trial was to begin); *Biben v. Card* (W.D. Mo.)(93% of class members' damages recovered in settlement); and, currently, *In re Parmalat Securities Litigation* (S.D.N.Y.), which is litigating the alleged largest fraud in European corporate history. She also has represented parties in securities arbitrations (both as claimant's counsel or defense counsel for the broker) and defended clients in investigations and enforcement actions of the Securities and Exchange Commission.

In consumer cases, Ms. Mezzetti is or was one of the lead counsel in *In re Lupron Marketing and Sales Practices Litigation* (D. Mass.) (brought against pharmaceutical companies on pricing policies and methods; combined $150 million settlement); *Howard v. Ford Motor Co.* (Cal. Sup. Ct.) (order of the Court on equitable count required prospective recall of 1.7 million cars; settled immediately before scheduled second jury trial); and *Fischl v. Direct Merchants Credit Card Bank, N.A.* (Henn. Cnty. Minn.) (brought by credit card consumers, alleging improper charges

and payment processes; settlement included credits for overpayments and changes in business practices). She has litigated class actions under the ERISA laws, and brought one of the first class actions filed under the federal Family and Medical Leave Act.

Ms. Mezzetti is a public arbitrator for the National Association of Securities Dealers, hearing disputes between customers and brokers. She speaks at legal education seminars and has been quoted in the media on issues concerning both consumer law and securities class actions. Ms. Mezzetti was a panelist at the Federal Trade Commission's Workshop on Consumer Class Actions and at the annual conference of the Association of Trial Lawyers of America on unfair trade practices and deceptive trade practices statutes. The transcript of the FTC workshop, and her related article, *The Coupon Can Be the Ticket: The Use of "Coupon" and Other Non-Monetary Redress in Class Action Settlements* (co-authored with Whitney Case) are published at 18.4 Geo. J. Legal Ethics 1431 (2005). She also speaks on corporate governance issues at conferences of institutional investors, and was a guest panelist on a Washington, D.C. cable television show concerning hiring and working with stock brokers and financial advisors.

Before joining Cohen Milstein, Ms. Mezzetti was a litigation associate of Shea & Gould of New York City.

Ms. Mezzetti serves as a member of the Boards of Directors of The International Alliance for Women (a worldwide organization that supports and promotes women entrepreneurs, professionals and executives) and The Financial Women's Association of New York. She has served on the D.C. Advisory Board of The Joffrey Ballet of Chicago.

Ms. Mezzetti graduated from the Columbus School of Law, Catholic University of America in 1980, where she served as a Vice-Chancellor of the Moot Court Board. In 1986, she received a Master of Laws degree, with a specialty in Securities Regulation, from Georgetown University Law Center. Her bachelor's degree was awarded by Stonehill College (B.A, English., *magna cum laude*, 1977).

Ms. Mezzetti is admitted to practice in the District of Columbia and New York.

**Andrew N. Friedman**

Andrew Friedman, a Partner at the Firm, joined Cohen Milstein in 1985. He is the head of the Consumer Protection practice group and a member of the Securities Fraud/Investor Protection practice group.

In the consumer protection area, Mr. Friedman is litigating numerous class actions including cases relating to various insurance companies' failure to deliver promised benefits to thousands of persons who held flood insurance policies and suffered damage to their houses in September 2003 from Hurricane Isabel, *Howell v. State Farm Insurance* (D. Md.) and defective automobile engine coolants, *In re General Motors Dex-Cool Products Liability Litigation* (S.D. Ill). He has been instrumental in securing significant recoveries on behalf of thousands of consumers. He was one of the principal counsel in *Snyder v. Nationwide Mutual Insurance Company* (Sup. Ct., Onondaga Cnty, N.Y.), a class action that resulted in a settlement valued at between $85 million and $103 million. As one of two co-lead counsel in a class action against Thomson Consumer

COHEN MILSTEIN
HAUSFELD & TOLL

Electronics, Mr. Friedman reached a court-approved agreement that made up to $100 million available for persons who paid for unreimbursed repairs to televisions.

Mr. Friedman also has been involved in many successful securities class actions. In July, 2005, Mr. Friedman served as one of lead trial counsel at the trial of a certified class action in *In re Globalstar Secururites Litigation* in the United States District court for the Southern District of New York. Near the end of the second week of trial, a cash settlement of $20 million was reached for the benefit of the certified class. The settlement was approved by Judge P. Kevin Castel, who was highly complimentary of counsel:

> This case has been litigated by top trial lawyers, each of whom, as to both lead counsel and the other counsel in the case, have been exceptionally fine in their presentation of the evidence. Mr. Toll, Mr. Friedman, Mr. Shalov, their colleagues Mr. Devore, Ms. Peterson, have all done a terrific job in presenting the case for the plaintiffs.

In addition, Mr. Friedman served as one of co-lead or principal counsel in *Norman Frank et al. v. David L. Paul* (recovery of over $18 million); *In re Jiffy Lube Securities Litigation* (D. Md.) (recovery of over $12 million); and *In re Immunex Securities Litigation* (W.D.Wash.) (recovery of $14 million, then the largest securities class action settlement in Seattle). Mr. Friedman was one of the Firm's attorneys selected by the County of Cuyahoga, Ohio to prosecute a lawsuit that sought to recover losses from the County's Secured Assets Fund Earnings Program (S.A.F.E.). The lawsuit alleged that broker/dealers and a financial institution assisted the County in engaging in unsuitable and inappropriate investments and trading activity. The case settled favorably for $9.5 million.

Mr. Friedman has been a speaker on numerous panels for legal education seminars and institutional investor conferences on the issues of securities class actions, accounting fraud and corporate governance. He was featured in a November 15, 1997 *Washington Post* article about securities class actions and profiled in the April 14, 2000 edition of *The Washington Business Journal*. In 2007, LawDragon named Mr. Friedman as one of the 3,000 Leading Plaintiffs' Lawyers in America.

Prior to joining Cohen Milstein, Mr. Friedman served as an attorney with the U.S. Patent and Trademark Office.

Mr. Friedman graduated from Tufts University with a B.A. in Psychology (1980, *magna cum laude*, Phi Beta Kappa) and is a 1983 graduate of the National Law Center, George Washington University.

Mr. Friedman is admitted to practice in the District of Columbia and New York.

**Richard S. Lewis**

Richard Lewis, a Partner at the Firm, joined Cohen Milstein in 1987 and is the head of the Unsafe Drugs & Environmental Health Threats practice group, for both domestic and international matters.

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

He has been appointed to serve as co-lead counsel in mass tort and class action cases including *In re StarLink Corn Products* (N.D. Ill) (settlement of $110 million) and *In re PPA* (asserting claims by users of unsafe over-the-counter medicines). He has also been appointed to the MDL Steering Committee in *In re Prempro Products Liability Litigation* (E.D. Ark.).

In addition, Mr. Lewis served as lead counsel in numerous actions to obtain medical monitoring relief for communities exposed to toxic chemicals from hazardous waste disposal practices or unsafe drugs. These include *In re Diet Drug Litigation* (Fen-Phen) (E.D. Pa), which resulted in a $4 billion settlement providing medical monitoring in addition to individual personal injury awards in the hundreds of thousands of dollars, and *Harman v. Lipari,* a Superfund case that resulted in a settlement providing medical monitoring for thousands of residents who lived on or played near a landfill. He has litigated both individual and class childhood lead poisoning cases and he is presently lead counsel in a case against the lead pigment industry, *City of Milwaukee v. NL Industries Inc*. Mr. Lewis is also handling mass tort cases involving Vioxx, Celebrex, Bextra and Hormone Therapy, and environmental cases in India and Zambia.

Mr. Lewis graduated from Tufts University with a B.A. in English (*cum laude*, 1976), and earned his Master's in Public Health degree from the University of Michigan (1981) and his law degree from the University of Pennsylvania (J.D., *cum laude*, 1986). He was Comments Editor for the University of Pennsylvania Law Review (1985-86) and authored the Comment, *O.C.A.W. v. American Cyanamid: The Shrinking of the Occupational Safety and Health Act*, U. Pa. L. Rev. (July, 1985). After law school, he was a law clerk for the Honorable Stanley S. Brotman, U.S. District Court for the District of New Jersey.

Mr. Lewis is admitted to practice in the District of Columbia.

**Daniel S. Sommers**

Daniel Sommers, a Partner at the Firm, joined Cohen Milstein in 1988. He has served as the head of the firm's Securities Fraud/Investor Protection practice group and currently is the chief operating lawyer for that group.

During his career at Cohen Milstein, Mr. Sommers served as lead or co-lead counsel or otherwise played a significant role in numerous securities fraud class actions in federal courts throughout the United States. Many of those cases resulted in multi-million dollar recoveries for individual and institutional investors. For example, these cases include: *Steiner v. Southmark Corporation* (N.D.Tex.) (over $70 million recovery ); *In re PictureTel Inc. Securities Litigation* (D.Mass.) ($12 million recovery); *In re Physician Corporation of America Securities Litigation* (S.D. Fla.) ($10.2 million recovery); *In re Gilat Satellite Securities Litigation* (E.D.N.Y.) ($20 million recovery); *In re Pozen Inc. Securities Litigation* (M.D.N.C.) ($11.2 million recovery); *In re Nextel Communications Securities Litigation* (D.N.J.) (up to $27 million recovery); *In re PSINet Inc. Securities Litigation* (E.D. Va.) ($17.8 million recovery); *In re Cascade International Inc. Securities Litigation*, (S.D. Fla.) (global recovery of approximately $10 million); and *In re ECI Telecom Securities Ltd. Litigation* (E.D.Va.) ($21.75 million recovery). He currently is actively involved in the prosecution of the *In re Fannie Mae Securities Litigation* (D.D.C.).



Mr. Sommers is also experienced in non-class action litigation. He represented TBG Inc., a multi-billion dollar privately-held overseas corporation, in a multi-party, complex action alleging fraud in a corporate acquisition and represented individuals in connection with investigations brought by the United States Securities and Exchange Commission. He also has represented publicly traded corporations in the prosecution and defense of claims. Mr. Sommers has litigated cases covering a wide-range of industries including the financial services, computer software, pharmaceutical, insurance, real estate and telecommunications industries among others. He also has substantial experience in cases presenting complex accounting and auditing issues.

Mr. Sommers is a frequent commentator on the federal securities laws and corporate governance issues and addresses institutional investor groups and others on these topics as illustrated below:

- Guest panelist on "It's Your Business," a nationally syndicated television program, where he spoke on investor lawsuits.
- Panelist at the George Washington University Law School, where he spoke on the practice of law from the plaintiff's perspective.
- Addressed the California State Association of County Retirement Systems, to whom he spoke on corporate governance and fiduciary duties and liabilities.
- Spoke at a District of Columbia Bar Association program in 2005 where he addressed "Attorney Liability in the Post-Enron, Post Sarbanes-Oxley Era."
- Panelist at a 2006 presentation to Illinois-based institutional investors on the topic of "The Growing Emphasis on Fiduciary Responsibility: Implications For Illinois Pension Funds and the Emergence of Guiding Principles."
- Addressed the Professional Liability Underwriting Society in 2007 on the topic of "Global Companies, Global Risk: Exposure Arising Outside the U.S."

In 2007, Mr. Sommers was appointed to serve as the chairman of the Investor Rights Committee of the Corporation, Finance and Securities Law Section of the District of Columbia Bar. In addition, he is a member of the Securities Litigation Committee of the American Bar Association and is a member of the National Association of Public Pension Attorneys.

He is a 1983 graduate of Union College, earning a B.A. in Political Science (*magna cum laude*), and a 1986 graduate of the George Washington University Law School. Mr. Sommers is admitted to practice in federal courts including the United States District Courts for the Districts of New Jersey, Maryland, Eastern District of Michigan and the District of Columbia as well as the United States Courts of Appeals for the District of Columbia, Fourth, Ninth, Tenth and Eleventh Circuits. Mr. Sommers is also admitted to practice before the Supreme Court of the United States.

Mr. Sommers is a member of the bar of the states of New York and New Jersey as well as the District of Columbia.

**Daniel A. Small**

Dan Small, a Partner at Cohen Milstein, joined the Firm in 1988 and is a member of the Antitrust practice group.



Among the antitrust cases on which Mr. Small is currently working are: *In re Microsoft Antitrust Litigation* (D. Md.), in which he serves as chair of the experts committee and *Rasmussen v. General Motors* (Cir. Ct., Milwaukee Cty., Wisc.) (and related cases in eight other states), a state-wide class action alleging conspiracy among auto manufacturers and distributors to maintain dual price systems between the United States and Canada.  He was co-lead counsel for the end-user plaintiffs in *In re Buspirone Antitrust Litigation* (S.D.N.Y.), a case alleging monopolization and market allocation claims against a brand name drug manufacturer for delaying generic entry to the market that settled for $90 million.  Mr. Small also was lead counsel for the plaintiffs in *Pease, et al. v. Jasper Wyman & Son, et al.* (Super. Ct., Knox Cty., Me), a price-fixing class action brought on behalf of Maine wild blueberry growers.  The case was tried in November 2003, and the jury returned an $18.68 million verdict for the Class, which after trebling and other additions, resulted in a $56 million judgment.

Mr. Small's substantial appellate experience includes briefing and arguing *Free v. Abbott Laboratories* in the United States Supreme Court.  The case presented the issue of whether a supplemental jurisdiction statute overruled *Zahn v. International Paper Co*.  The Court split 4-4, with Justice O'Connor recusing herself.  Mr. Small successfully briefed and argued appeals before the Seventh Circuit Court of Appeals in *In re Brand Name Prescription Drug Antitrust Litigation* (7th Cir. 1997) on the issue of whether the district court had subject matter jurisdiction, and in *Paper Systems, Inc. v. Nippon Paper Industries Co., Ltd*. (7th Cir. 2002) holding that the federal direct purchaser rule does not immunize a defendant from liability for the direct sales of its co-conspirators.  Mr. Small also briefed and argued the appeal in *Mack v. Bristol-Myers Squibb* (Fla. 1st DCA 1996), the first opinion construing the Florida Deceptive and Unfair Trade Practices Act to permit indirect purchasers to sue for damages for antitrust violations.

He has been a speaker at events organized by the American Antitrust Institute, the Conference Board, the American Bar Association and the District of Columbia Bar, among others.

Mr. Small is a 1981 graduate of Colgate University, receiving a B.A. (*cum laude*) in History.  He graduated from the American University's Washington College of Law in 1986 and joined Cohen Milstein after serving as Law Clerk to the Honorable Roger Vinson, U.S. District Judge for the Northern District of Florida (1986 to 1988).

Mr. Small is admitted to practice in Maryland and the District of Columbia.

**Joseph M. Sellers**

Joseph Sellers, a Partner at the Firm and head of the Civil Rights & Employment practice group, joined Cohen Milstein in 1997.

Mr. Sellers has represented victims of discrimination and other illegal employment practices individually and through class actions. He has tried several civil rights class actions to judgment before juries and has argued more than 25 appeals in the federal and state appellate courts,



including the United States Supreme Court. He has served as class counsel, and typically lead counsel, in more than 30 civil rights and employment class actions.

Those cases have included: *Beck. v. Boeing Company* (W.D. Wash.), which included a class of more than 28,000 women employees at Boeing facilities in Washington state alleging sex discrimination in pay and overtime decisions; *Conway, et al. v. Deutsch* (E.D. Va.), for a class of all female undercover case officers at the CIA alleging sex discrimination in promotions and job assignments; *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), where the Court has certified the largest class in such a case: more than 1.5 million women employees at Wal-Mart stores, alleging sex discrimination in promotions and pay decisions; *Johnson, et al. v. Freeh* (D.D.C.), for a class of African-American FBI special agents alleging racial discrimination in promotion and job assignments; *Keepseagle v. Venaman* (D.D.C.), for a class of Native American farmers and ranchers denied equal credit opportunities by USDA; *Neal v. Director, D.C Dept. of Corrections* (D.D.C.), the first sexual harassment class action tried to a jury, for a class of women correctional employees and women and men subject to retaliation at the D.C. Department of Corrections; and *Trotter, et al. v. Perdue Farms* (D.Del.), for a company-wide collective action brought under the Fair Labor Standards Act for violations of federal wage and hour law.

Throughout his career, Mr. Sellers has also been active in legislative matters. He has testified more than 20 times before Committees of the United States Senate and House of Representatives on various civil rights and employment matters. He worked on the passage of the Civil Rights Act of 1991 and the Americans with Disabilities Act of 1990.

Mr. Sellers has trained lawyers at the U.S. Equal Employment Opportunity Commission and the U.S. Department of Justice on the trial of civil rights cases and has lectured extensively throughout the country on various civil rights and employment topics. He was an Adjunct Professor at the Washington College of Law at American University, where he taught Employment Discrimination law, and at the Georgetown University Law Center, where he taught a course on Professional Responsibility.

He served on the Clinton/Gore Transition Team in 1992 and 1993. He headed the teams reviewing the operations of the EEOC, the Office of the Assistant Attorney General for Civil Rights, and various sections of the Civil Rights Division of the Department of Justice. He also served as a Co-Chair of the Task Force of the D.C. Circuit on Gender, Race and Ethnic Bias and was appointed by panels of the D.C. Circuit Court of Appeals and the U.S. District Court for the District of Columbia.

At the request of the Ford Foundation and the American Bar Association, Mr. Sellers delivered a series of lectures and designed and delivered a mock trial on civil rights law to Chinese judges, lawyers and government officials.

Mr. Sellers has been recognized as one of the top lawyers in Washington and as one 10  the top plaintiffs' employment lawyers in the country  He is a professionally-trained mediator and has served as the President of the Washington Council of Lawyers.



Prior to joining Cohen Milstein, Mr. Sellers served as head of the Employment Discrimination Project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs for over 15 years.

Mr. Sellers received a J.D. from Case Western Reserve School of Law (1979), where he served as Research Editor of the *Case Western Reserve Law Review*, and a B.A. in American History and Literature from Brown University (1975).

Mr. Sellers is admitted to practice in the District of Columbia.

**Mark S. Willis**

Mark Willis joined the Firm in 1989 and is a Partner in the Securities Fraud/Investor Protection practice group. Mr. Willis heads the Firm's international securities practice as well as its domestic client development work.

Mr. Willis focuses his practice on investor protection issues, including the enforcement of the federal securities laws. In that role he works with a number of European and domestic institutional investors on investor protection and corporate governance matters. He currently acts as co-lead counsel in the *In re Parmalat Securities Litigation* (S.D.N.Y.), the largest fraud in European corporate history that is frequently referred to as Europe's "Enron". Mr. Willis represents Italian, French and Belgian institutions in that action. He also represented Brussels-based KBC Asset Management in the *In re Royal Dutch/Shell Securities Litigation*. Among other notable cases, Mr. Willis litigated against Caremark International in which Caremark was accused of federal Medicare fraud, subsequently pled guilty and paid the U.S. Government a fine of approximately $160 million and $25 million in a civil settlement. Mr. Willis also litigated against National Health Labs, which resulted in a $65 million settlement, and settled claims against Nextel Communications and Motorola.

Mr. Willis has written extensively on corporate, securities and investor protection issues, often with an international focus. He authored Chapter 60 of *Securities Law Techniques*, titled *Admission of Securities to Official Listing on Stock Exchanges Within the European Union and the Subsequent Disclosure Obligations* (1998). He published a related article in the Fall 1997 issue of the International Law News, *A Brief Overview of the European Union's Efforts to Harmonize the Requirements for Listing Securities*. He also authored Chapter 196 of *Business Organizations with Tax Planning*, titled *Company Laws of the European Union* (1998). Mr. Willis wrote about investor protection issues in an article published in the July/August 2003 edition of *Professional Investor*, a United Kingdom-based journal for institutional investors and investment professionals. A second article, co-authored by Mr. Willis, appeared in the same publication's May 2005 edition. He was also the co-author of the Comment entitled *Corporation Code Sections 309 and 1203: California Redefines Directors' Duties Towards Shareholders*, Pepperdine Law Review, Volume 16, No. 4 (1989).

Mr. Willis has been a frequent speaker at institutional investor conferences on the issues of investor protection through the federal securities laws and the importance of using corporate governance measures to force companies to put the interests of their shareholders first. In addition to numerous forums in the United States, Mr. Willis was invited to address these topics

COHEN MILSTEIN
HAUSFELD & TOLL

at institutional investor conferences held in London and Paris in January 2003 and spoke at similar conferences in Munich and Milan in the Spring of 2005. He also addressed corporate governance issues at the Annual Conference of the National Council on Teacher Retirement in October 2004.

Mr. Willis obtained a Masters in International Law, with an emphasis in securities regulation, from the Georgetown University Law Center in 1993. He graduated from Pepperdine University School of Law in 1989 where he was a member of the Moot Court Team and won the Dalsimer Moot Court Competition. Mr. Willis received his B.A. in English History from Brigham Young University in 1986.

Mr. Willis is admitted to practice in the District of Columbia and Massachusetts.

**Marc I. Machiz**

Marc Machiz, a Partner at Cohen Milstein, joined the Firm in 2000 and is the head of the Employee Benefits (ERISA) practice group. He is the resident Partner of the Philadelphia office.

Mr. Machiz litigates ERISA class actions involving a range of benefits cases including inappropriate pension plan investments, the inappropriate investment in company stock by 401(k) plans, discharges to interfere with pension rights and illegal plan terminations including, among others, *Hans v. Tharaldson et al.*(D.N.D.) (purchase by ESOP of employer stock allegedly imprudently and for more than adequate consideration); *Mehling, et al. v. New York Life Insurance Co., et al.*, (E.D. Pa.) (investment in allegedly overpriced mutual funds proprietary to the sponsor) and *In re Williams Company ERISA Litigation* (N.D. Okla) (investment by 401(k) plan in allegedly inflated company stock); *In re Dynegy ERISA Litigation* (S.D. Texas ) (same); Simpson v. Firemen's Fund Insurance Co. (N.D. Cal.) (discharge of disabled employees allegedly to interfere with their attainment of health benefits); *Stoeffels v. SBC Communications, Inc.*, (S.D. Texas).(termination of retiree telephone concession alleged to be a pension plan); *Wagener v. SBC Communications Inc. Pension Plan* (D.D.C.) (alleged failure to pay promised pension benefits); *Zhu v. Fujitsu*, N.D. Cal.(alleged vesting violation); *Banyai v. Mazur* (S.D.N,Y.) (alleged illegal transfer of fund assets). Mr. Machiz has submitted amicus curiae briefs to the Supreme Court and lower courts on behalf of the Pension Rights Center and the National Association of Insurance Commissioners. He consults with the AFL-CIO on state legislation to expand healthcare coverage so as to minimize the chance that such legislation will be held preempted, and he represents Fiduciary Counselors. Inc. in evaluating the adequacy of both ERISA and Securities settlements on behalf of plans participating in settlements with their plans sponsors and the officers of the plan sponsors, including evaluation of settlements in the the Enron Securities litigation.

He joined the Plan Benefits Security Division ("PBS") of the Office of the Solicitor of Labor as a trial attorney in 1978, and was appointed Assistant Counsel for Fiduciary Litigation in 1982. At the start of 1984, he joined Beins, Axelrod and Osborne, P.C. practicing general labor and ERISA law on behalf of unions and multiemployer plans. In 1986 he returned to the Department of Labor as Counsel for General Litigation at PBS, and from 1988 to 2000 held the position of Associate Solicitor, heading the Division. As Associate Solictor, Mr. Machiz was the Department of Labor's chief ERISA lawyer charged with responsibility for all enforcement

COHEN MILSTEIN
HAUSFELD & TOLL

litigation brought by the Secretary of Labor under the statute, which governs the vast majority of privately sponsored health, welfare and pension plans. He was also responsible for all legal advice under the statute provided to the Pension & Welfare Benefits Administration, which administers Title I of ERISA.

Mr. Machiz worked to institute the Department's innovative amicus program which aggressively advocated the Department's views throughout the judicial system on a wide range of ERISA issues ranging from the need to limit ERISA preemption of state worker and consumer protection laws to the need to strengthen participants' rights and remedies under the Act.

Mr. Machiz's expertise in ERISA has been recognized by his colleagues in the ERISA bar, who made him a Charter Fellow of the American College of Employee Benefits Counsel. Mr. Machiz is a frequent speaker on ERISA issues for the ABA, ALI-ABAPLI, and private seminars, and has served as plaintiffs' co-chair of a subcommittees of the Employees Benefits Committee of the ABA's Labor Section. He is also a member of the *BNA Pension and Benefits Reporter* Advisory Board.

Mr. Machiz has authored several articles including *Understanding DOL's New Class Exemption for the Release of Claims and Extensions of Credit in Connection with Litigation*, Pension & Benefits Reporter, Vol. 31, No. 2, January, 2004; and *ESOPS, ERISA, and Employer Stock: A Litigator's Approach*, ATLA Commercial Litigation Section Newsletter, Volume 7, Number 3 (Spring/Summer 2001).

He attended the University of Pennsylvania, where he earned a B.A. in History, and received his law degree from the University of California at Berkeley (Boalt Hall) in 1978.

Mr. Machiz is admitted to practice in the District of Columbia and Pennsylvania.

**Christine E. Webber**

Christine Webber, a Partner at the Firm and a member of the Civil Rights & Employment Practice group, joined Cohen Milstein in 1997. She is the Partner in charge of the law clerk and summer associate program.

Ms. Webber represents plaintiffs in class action employment discrimination and Fair Labor Standards Act cases. Ms. Webber's current docket includes *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), a certified class action for over 1.6 million current and former female employees of Wal-Mart with complaints of discrimination in pay and promotion; *Hnot v. Willis* (S.D.N.Y.), representing a class of women at the vice-president level and above challenging sex discrimination in compensation and promotions; and *Jenkins v. BellSouth* (N.D. Ala.), representing a proposed class of African-American employees challenging race discrimination in promotions and compensation.

She represented plaintiffs in *Beck v. The Boeing Co.* (W.D. Wash.), a class action alleging sex discrimination in compensation and promotions which settled in 2004 for $72.5 million. She was counsel in Trotter *v. Perdue* (D. Del.), representing plaintiffs who were wrongly denied payment of overtime wages, and obtaining a $10 million settlement. She is also representing

COHEN MILSTEIN
HAUSFELD & TOLL

workers in a similar case against Tyson Foods, Inc.

In 2004, Ms. Webber was named one of the Top Lawyers in Washington, D.C. by *Washingtonian Magazine* and named as one of the 2007 Washington, D.C. *Superlawyers* in the Civil Rights category.

Prior to joining Cohen Milstein, Ms. Webber received a Women's Law and Public Policy fellowship and worked for four years at the Washington Lawyers' Committee for Civil Rights and Urban Affairs in their Equal Employment Opportunity Project.  She worked on a variety of employment discrimination cases, and focused in particular on the sexual harassment class action *Neal v. Director, D.C. Department of Corrections, et al.*  Ms. Webber participated in the trial of this ground-breaking sexual harassment class action in 1995.  Ms. Webber also tried the race discrimination case *Cooper v. Paychex* (E.D. Va.), and successfully defended the plaintiffs' verdict before the Fourth Circuit.

Ms. Webber is a member of the National Employment Lawyers' Association (NELA) and co-chair of their Class Action Committee. She speaks regularly at CLE programs on employment discrimination class actions, including presentations for NELA, and most recently participated in a panel on Evidentiary Issues and Jury Instructions in Employment Discrimination Litigation for ALI-ABA's program at Georgetown University Law Center in February 2007.

She graduated from Harvard University with a B.A. in Government (*magna cum laude*, 1988) and the University of Michigan Law School (J.D., *magna cum laude*, 1991, Order of the Coif). Following law school, Ms. Webber clerked for the Honorable Hubert L. Will, United States District Judge for the Northern District of Illinois.

Ms. Webber is admitted to practice in Illinois and the District of Columbia.

**Richard A. Koffman**

Richard Koffman, a Partner at the Firm, joined Cohen Milstein in 2003 and is a member of the Antitrust practice group.  He is also a member of the firm's *Pro Bono* Committee.

He is currently serving as counsel for plaintiffs in, among other cases, *In re Rubber Chemicals Antitrust Litigation* (N.D. Ca.); *In re Polyester Staple Antitrust Litigation* (W.D.N.C.); and *In re Urethane Antitrust Litigation* (D. Kan.).

Mr. Koffman came to Cohen Milstein after four years as a senior trial attorney with the Antitrust and Civil Rights Divisions of the United States Department of Justice.  Prior to joining the Department of Justice, he spent seven years in private practice, with Fine, Kaplan and Black in Philadelphia (working primarily on antitrust class actions and other complex commercial litigation) and then with Bernabei & Katz in Washington, D.C. (handling employment discrimination cases).  While at Fine Kaplan, Mr. Koffman was actively involved in litigating several successful antitrust class actions on behalf of plaintiffs and classes, including *In re Nasdaq Market-Makers Antitrust Litigation* (S.D.N.Y.) (settled for more than $1 billion); *In re Polypropylene Carpet Antitrust Litigation* (N.D. Ga.); *In re Commercial Explosives Antitrust Litigation* (D. Utah); and *In re Drill Bits Antitrust Litigation* (S.D. Tex.).



Immediately after law school, he served as a judicial clerk for Judge James B. McMillan of the Western District of North Carolina, and for Judge Anthony J. Scirica of the U.S. Court of Appeals for the Third Circuit.

Mr. Koffman is the author of *It's Not The First Time: Fudging the Truth in Discovery Proceedings Didn't Start with Clinton*, *Legal Times*, August 24, 1998.

He is a graduate of Yale Law School (J.D., 1990), where he was a Senior Editor of the Law Journal, and Wesleyan University, from which he received a B.A., *with honors,* in English (1986).

Mr. Koffman is admitted to practice in the District of Columbia.

**Agnieszka M. Fryszman**

Agnieszka Fryszman, a Partner at the Firm, joined Cohen Milstein in 1998 and is a member of the International Human Rights and Antitrust practice groups.

She currently represents Indonesian villagers in a lawsuit against Exxon Mobil over torture and extrajudicial killings allegedly committed by the defendant's security forces (a unit of the Indonesian military). For the past several years, she has represented the former "comfort women," women and girls who were forced into sexual slavery by the government of Japan during World War II. Her past successes include cases brought by survivors of Nazi-era forced and slave labor against the German and Austrian companies that allegedly used and profited from slave labor, which were resolved by international negotiations that resulted in multi-billion dollar settlements.

In the Antitrust practice group, she represents small businesses that have been victims of alleged price-fixing in the polyester staple and rubber chemicals markets.

She has represented, *pro bono*, a number of victims of the September 11 attack on the Pentagon and obtained significant recoveries, including one of the highest awards for an injured survivor, from the Victim's Compensation Fund. She also represents, *pro bono*, individuals indefinitely detained without charge by the United States at Guantanamo Bay.

Before joining the Firm, Ms. Fryszman was Democratic counsel to the United States House of Representatives Committee on the Judiciary, Subcommittee on Commercial and Administrative Law. She also served as counsel to Representative Henry Waxman, Ranking Member on the House Government Reform and Oversight Committee.

Ms. Fryszman graduated from Brown University with a B.A. in International Relations and Georgetown University Law Center (J.D., *magna cum laude,* 1996, Order of the Coif), where she was a Public Interest Law Scholar.

Ms. Fryszman is admitted to practice in the District of Columbia and New Jersey.

COHEN MILSTEIN
HAUSFELD & TOLL

**Charles E. Tompkins**

Charles Tompkins, a Partner at Cohen Milstein, joined the Firm in 1999 and is a member of the Antitrust and Civil Rights & Employment practice groups, with an emphasis on obtaining redress on behalf of employees who have not been paid all of the wages they are owed.

In the antitrust field, Mr. Tompkins currently represents Registered Nurses employed by hospitals in Albany, Chicago, Detroit, Memphis, and San Antonio in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws. Mr. Tompkins also is serving as a member of the co-lead counsel team in *In Re Air Cargo Antitrust Litigation* (E.D.N.Y.), a multi-billion dollar antitrust action alleging that the world's major cargo airlines colluded in setting the amounts of various surcharges they imposed on their customers, and *In Re Air Transportation Antitrust Litigation* (N.D. Cal.), a federal antitrust action challenging a conspiracy among airlines to fix the amount of the fuel surcharge imposed on flights to and from Heathrow airport in London. Mr. Tompkins was a member of the trial team that, following a two-week jury trial, obtained a $56.4 million judgment on behalf of Maine wild blueberry growers who alleged their suppliers fixed the prices of wild blueberries. Mr. Tompkins also was a member of the team that litigated the federal antitrust action *Paper Systems, Inc. v. Mitsubishi Corp. et al.* (E.D.Wisc.), which settled for $20 million on the eve of trial.

In the employment field, Mr. Tompkins has represented a wide variety of employees, and twice obtained summary judgment on behalf of nationwide classes of Auto Damage Adjusters whose employer, GEICO, refused to pay them overtime. See *Robinson-Smith v. GEICO* (D.D.C.); *Lindsay v. GEICO* (D.D.C.). GEICO began paying overtime shortly after the adjusters' victory, and the United States Department of Labor has since cited *Robinson-Smith* in an official opinion letter. Mr. Tompkins also was part of the legal team that obtained a $10 million settlement on behalf of chicken-processing workers who were not paid for the time they spent putting on and taking off their required safety equipment, *Trotter v. Perdue Farms, Inc., et al.* (D. Del.). Perdue Farms changed its practices as part of a global settlement and now pays its employees for this time. Mr. Tompkins also is a member of the team litigating *Dukes v. Wal-Mart Stores, Inc.* (N.D.Cal.), the largest certified Title VII class action in history, in which female employees of Wal-Mart seek redress for unfair gender discrimination, and *Hnot v. Willis, et al.* (S.D.N.Y.), in which a certified class of over one hundred female insurance brokerage executives allege sexual discrimination in compensation and promotions. Mr. Tompkins also serves, on a *pro bono* basis, as a consultant for the Immigrant and Refugee Rights Project at the Washington Lawyers Committee for Civil Rights And Urban Affairs, providing guidance and oversight in litigations brought on behalf of immigrant workers subject to wage and hour violations.

Mr. Tompkins has significant appellate appearance. He second-chaired the argument of *Free v. Abbott Laboratories* before the United States Supreme Court; briefed and successfully argued *Lindsay v. GEICO* before the United States Court of Appeals for the District Of Columbia Circuit; and briefed and argued *Manchester v. Primerica Financial Services, et al.*, which was successfully settled prior to the issuance of a decision, before the United States Court of Appeals for the Eleventh Circuit.

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

Mr. Tompkins is the author of "Damages Issues in Fair Labor Standards Act Collective Action Litigation," which is scheduled to appear in Volume 10, Issue Number 2, of the Employee Rights and Employment Policy Journal of the Chicago-Kent School of Law; and the co-author, with Michael Hausfeld and Kalpana Kotagal, of "Innovation, Economics and the Law: The Health Care Industry's Exposure to Antitrust Liability," to be published by the ABA Antitrust Law Section in 2007. He has been asked on several occasions to lecture on employment law matters by both the American Bar Association and the National Employment Law Association.

Prior to joining Cohen Milstein, Mr. Tompkins was an associate with the Washington, D.C. office of Akin, Gump, Strauss, Hauer & Feld, L.L.P. He graduated *magna cum laude* from Colgate University and received his J.D. from the University of Virginia School of Law. He is licensed to practice in New York and the District of Columbia.

## Julie Goldsmith Reiser

Julie Goldsmith Reiser, a Partner at the Firm, joined Cohen Milstein in 1999 and has specialized in complex litigation involving violations of the federal securities laws and employment discrimination.

Currently, she is working on *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.) class action which has been certified for 1.5 million current and former female employees of Wal-Mart on complaints of discrimination in pay and promotion, and *In re Parmalat Securities Litigation* (S.D.N.Y.), a securities fraud class action alleging artificial inflation in the price of Parmalat's securities. She has also been involved in the litigation and successful settlement of *Beck v. The Boeing Co.* (W. D. Wash.), which alleged sex discrimination in compensation and promotions; *In re P-Com Securities Litigation* (N.D.Cal.) ($16 million settlement); and *In re Sabratek Securities Litigation* (N.D.Ill.) ($15.3 million settlement).

Ms. Reiser co-authored *Companies in the Cross Hairs: When Plaintiffs Lawyers Choose Their Targets, They Look for These Employment Practices,* The Legal Times, February 21, 2005. In 1999, she co-authored *Antitrust Introduction for the General Practitioner*, a chapter in the Washington Lawyer's Practice Manual.

Prior to joining Cohen Milstein, Ms. Reiser worked in Seattle, Washington where she focused primarily on guardianship and healthcare litigation. She was President of the Board of Directors of Seattle Works and chaired the Nominating Committee for the Board of Directors of the Eastside Domestic Violence Program. She also served a term as a Trustee for the Pacific Northwest Ballet. In 1997, Ms. Reiser worked as a Legal Intern for U.S. Senator Patty Murray.

Julie Reiser graduated from Vassar College (B.A. with honors 1992) and the University of Virginia Law School (J.D. 1997). While in law school, she was a member of the Virginia Journal of Law and Social Policy.

Ms. Reiser is admitted to practice in Washington State and the District of Columbia.

## Victoria S. Nugent

Victoria Nugent, a Partner at the Firm, joined Cohen Milstein in 2000 and is a member of the Consumer Protection practice group.



Ms. Nugent has focused on consumer protection and public health litigation throughout her career, including *In re StarLink Product Liability Litigation* (N.D. Ill.), representing farmers who sued Aventis Cropscience after an unapproved variety of genetically modified corn was detected in the U.S. corn supply and drove down prices for all U.S. corn exports. More than $100 million was recovered for the class in a landmark settlement. She is currently working on *In re General Motors Dex-Cool Products Liability Litigation* (S.D.Ill.), representing car owners seeking to enforce product warranties for an extended life coolant and *Howell v. State Farm* (D.Md.), representing flood policy holders who were denied the full benefits of their government-backed insurance policies following Hurricane Isabel. Ms. Nugent has argued cases before the high courts of Georgia, Nebraska and the District of Columbia, as well as the federal D.C. Circuit Court of Appeals.

Before joining Cohen Milstein, Ms. Nugent worked for seven years at Public Citizen, a national consumer advocacy organization. During that time, she worked on many legislative and regulatory campaigns addressing issues that ranged from automobile safety to international trade policy. In 1998, Ms. Nugent received a two-year fellowship sponsored by the National Association for Public Interest Law (NAPIL). As a NAPIL Fellow, she worked at Trial Lawyers for Public Justice (TLPJ), where she helped develop and prosecute impact litigation in the areas of arbitration, banking, credit and insurance.

Ms. Nugent received her undergraduate degree in History from Wesleyan University in 1991 and graduated from Georgetown University Law Center in 1998.

Ms. Nugent is admitted to practice in the District of Columbia and Maryland.

### Benjamin D. Brown

Benjamin Brown, a Partner at the Firm, joined the firm in 2005 and is a member of the Antitrust practice group. He has extensive experience in complex litigation and class actions.

He is currently serving as counsel for plaintiffs in, among other cases, *In re Aspartame Antitrust Litigation* (E.D. Pa.); *Brookshire Bros., Ltd., et al. v. Chiquita Brands Int'l., Inc., et al.* (S.D. Fla.); *In re Rubber Chemicals Antitrust Litigation* (N.D. Ca.); *In re Pressure Sensitive Labelstock Antitrust Litigation* (M.D. Pa.); and *John Boyd, et al. v. AWB Limited, et al.* (S.D.N.Y.).

Mr. Brown came to Cohen Milstein after four years as a trial attorney with the Antitrust Division of the United States Department of Justice. While there, Mr. Brown led and assisted in numerous investigations, litigations and trials involving anticompetitive conduct and mergers. Mr. Brown also prosecuted criminal cases as a Special Assistant United States Attorney in the Eastern District of Virginia. Prior to joining the Department of Justice, he spent three years as a litigator in private practice: first with Heller Ehrman White & McAuliffe in San Francisco, California, working on complex commercial litigation, including class actions, and then with Covington & Burling in Washington, D.C., handling insurance coverage and antitrust litigation.



Prior to practicing, Mr. Brown served as a judicial law clerk for Chief Judge Juan R. Torruella of the U.S. Court of Appeals for the First Circuit.

Since 2005, Mr. Brown has served as a state editor for the ABA's annual survey of state class action law.  He also co-authored a chapter on private antitrust recovery actions for the forthcoming 2008 Global Competition Review's Antitrust Review of the Americas.  He has been interviewed regarding antitrust class actions by CNBC and various NBC affiliates, and by radio networks including ABC and the AgriBusiness Network.

Mr. Brown is a graduate of Harvard Law School (J.D., *cum laude*, 1997), where he was an editor and executive board member of the Harvard Civil Rights - Civil Liberties Law Review, and the University of Wisconsin - Madison (B.A.in Philosophy, with distinction, Phi Beta Kappa, 1992).

Mr. Brown is admitted to practice in California and the District of Columbia.

### Avi S. Garbow

Avi Garbow, a Partner at the Firm, joined Cohen Milstein in 2005 and is a member of the Securities Litigation  practice  group and  Co-Chair of the International Human Rights  practice group.

In the securities field, Mr. Garbow focuses his practice on representing both domestic and international investors.  Mr. Garbow is currently involved in several major securities fraud actions, including *In re Parmalat Securities Litigation*  (S.D.N.Y.) and *In re Converium Holding AG Securities Litigation* (S.D.N.Y.), and also provides counsel to the independent fiduciary of the Enron employees stock ownership plans in connection with the Enron federal securities class action.

Prior to joining the Firm, Mr. Garbow was a Junior Partner at Wilmer Cutler Pickering Hale and Dorr in their Securities and Litigation Departments , where he focused on complex civil and criminal litigation, with an emphasis on internal investigations and financial fraud matters.  Mr. Garbow  also  served over ten years in government as a federal prosecutor in the Justice Department's Environmental Crimes Section, a Special Assistant United States Attorney, and a Special Assistant to the Assistant Adminstrator for Enforcement at the U.S. Environmental Protection Agency.  Mr. Garbow has also served as an instructor at the Justice Department's National Advocacy Center.  He received special commendations from both the Department of Justice and the Environmental Protection Agency for his trial work.

Mr. Garbow serves as  Co- Chair of the American Bar Association's International Human Rights Committee.   He has also done work on behalf of  the Robert F. Kennedy Memorial Center for Human Rights,  and serves on the Board of Directors for International Rights Advocates (an international human rights organization) and Urban Ecology Institute (an environmental, and community development organization) .

He is a graduate of the University of Virginia School of Law (J.D., 1992) (where he was the recipient of the Robert F. Kennedy Award for Public Service), the University of Virginia

COHEN MILSTEIN
HAUSFELD & TOLL™

Graduate School of Arts and Sciences (M.A. in Marine Affairs, 1994), and the University of Michigan (B.A., *magna cum laude*, 1988).  He is also a former firefighter.

Mr. Garbow is a member of the Virginia and District of Columbia bars.

### William P. Butterfield

William Butterfield, a Partner of the firm, is a member of the Antitrust practice group.

For several years, Mr. Butterfield has been leading plaintiffs' discovery efforts in *In Re New Motor Vehicles Canadian Export Antitrust Litigation*, MDL 1532.  He is also working on *In Re Hydrogen Peroxide Antitrust Litigation*, (E.D. Pa.), *In Re OSB Antitrust Litigation*, (E.D. Pa.), and *In Re Methyl Methacrylate (MMA) Antitrust Litigation*, (E.D. Pa.).

Previously, Mr. Butterfield was one of the principal attorneys involved in nationwide litigation challenging lending practices conducted by one of the nation's largest sub-prime lenders.  In that case, Mr. Butterfield worked extensively with the FTC, and was responsible for generating nationwide media and Congressional attention to lending practices conducted by Associates Finance.  Plaintiffs and the FTC eventually settled with Citigroup (which had acquired Associates Finance) for $240 million (*In Re Citigroup Loan Cases*, J.C.C.P. 4197).  Mr. Butterfield was also a principal attorney for the plaintiff classes in *In re Prudential Securities Limited Partnerships Litigation*, MDL No. 1005 (S.D.N.Y.), which settled for $137 million, and *In re PaineWebber Securities Litigation*, 94 Civ. 8547 (S.D.N.Y.), which settled for $200 million.

Mr. Butterfield is recognized as a leader in the field of electronic discovery.  He has developed electronic document management solutions since the early 1990s, when he helped design and led the implementation of an electronic document repository to manage more than 15 million pages of documents produced in *In re Prudential Securities Limited Partnerships Litigation*, MDL No. 1005 (S.D.N.Y.).  That system was recognized by Senior U.S. District Judge Milton Pollack as one of the most innovative and sophisticated high-tech document management/litigation support systems available @ 163 F.R.D. 200, 208 (S.D.N.Y. 1995).  In 2005, Mr. Butterfield testified before the U.S. Judicial Conference Rules Committee regarding proposed electronic discovery amendments to the Federal Rules of Civil Procedure.  He speaks at conferences internationally on electronic discovery issues.  Mr. Butterfield is also a member of The Sedona Conference, a nonprofit research and educational institute dedicated to the advanced study of law and policy.  His comments appeared recently in an article entitled, "E-Discovery:  Business is Booming and Lawyers are getting in on the Trend."  *Lawyers Weekly*, March 14, 2006.

Mr. Butterfield has also served as an adjunct professor at American University, Washington College of Law, where he taught a course in commodities law and regulation.

Before joining CMHT, Mr. Butterfield was a partner at Finkelstein, Thompson & Loughran, where he focused on antitrust, securities, consumer and banking litigation.  While at FT&L, he also served extensively as outside counsel for federal banking agencies, where he investigated and litigated claims in connection with failed financial institutions.  Mr. Butterfield has also



defended individuals and companies in federal courts and administrative tribunals in matters involving securities and commodities fraud, insider trading, takeover litigation, broker-dealer violations and registration issues.  He began his legal career as an assistant prosecuting attorney for Montgomery County, Ohio.

Mr. Butterfield graduated from the University of Toledo, College of Law in 1978, and earned his undergraduate degree from Bowling Green State University in 1975.

Mr. Butterfield is admitted to practice in the District of Columbia and is an inactive member of the Ohio bar.

**Carol V. Gilden**

Carol Gilden, a Partner at Cohen Milstein, is a member of the Securities Fraud/Investor Protection practice group. She is the resident Partner at the Firm's Chicago office.

Prior to joining Cohen Milstein, Ms. Gilden served as the head of Much Shelist's securities class action practice and as the Firm's Vice Chair of the Class Action Department. She also worked as an enforcement attorney with the Midwest Regional Office of the Securities and Exchange Commission.

Ms. Gilden has served as co-lead counsel in the Sears/Sears Acceptance Corp. Securities Litigation, Sara Lee Securities Litigation, 99 Cents Only Stores Securities Litigation, Quokka Sports Securities Litigation and the City of Chicago's case against on-line travel providers. Ms. Gilden also served on the Executive Committees of the Global Crossing Securities Litigation (settlements of $448 million) and the Merrill Lynch & Co. Research Reports cases ($125 million settlement). Among other notable cases, Ms. Gilden served as co-lead counsel in the ML Lee Securities Litigation and Smith Kline Litigation which settled for $33 million and $30 million respectively, as well as lead counsel in *Pacha et. al. v. McKesson Corporation, et.al.*, a private action which settled for a confidential sum, and as liaison counsel and a litigation team member in the Waste Management Litigation, which settled for $220 million. Under her leadership, the firm also served as active members of the litigation teams in the *AOL Time Warner Securities Litigation* ($2.5 billion settlement) and *Salomon Analyst Litigation/In re AT&T* ($75 million settlement).

In addition to her work on behalf of clients, Ms. Gilden publishes scholarly articles and course materials, and lectures at key industry conferences and seminars. She is an author and co-author of articles published by the National Law Journal, *Courts Grapple with Lead-Counsel Auctions*; IICLE on Illinois Causes of Action, *Shareholder Derivative Suits*; the American Bar Association, *The Impact of Central Bank on Securities Fraud Litigation: The Plaintiffs' Perspective*; Illinois Bar Journal, *Proposed Rule 225: A Death Warrant for Class Actions in Illinois* and Practising Law Institute on Class Actions Litigation: Prosecution and Defense Strategies *A Hybrid 23(B)(2) Rule For Hybrid Class Actions? New Developments In The Use Of Rule 23(B)(2) In Class Certification*. In January 2005, Ms. Gilden testified against Proposed Rule 225 before the Illinois Supreme Court's Rules Committee.



Ms. Gilden is a regular presenter at conferences and seminars around the country and has spoken at seminars sponsored by the American Bar Association, Chicago Bar Association, Practising Law Institute, Illinois CPA Foundation, Hines Insurance Symposium, the Ohio and Wisconsin Bar Associations, and the National Association of Shareholders and Consumer Attorneys, as well as at other symposiums.

Ms. Gilden was selected as an "Illinois Super Lawyer" in 2005, 2006, 2007 and 2008 by Law & Politics, which published its selections in Chicago magazine (May 2005, February 2006, February 2007 and February 2008 issues). Only 5 percent of Illinois attorneys are awarded this honor.

Ms. Gilden also is a frequent commentator in the national media on various class action topics. She frequently appears on CNBC, including on a special segment titled *I Want My Money Back*, where she was described as "one of the top investor advocacy attorneys in the country." She also has been featured on the ABC news programs *World News Tonight*, *World News Now* and *Good Morning America¸* as well as has made multiple appearances on *First Business Morning News*. Ms. Gilden recently appeared on the cover of *Chicago Lawyer* in connection with a feature article on The Ebb and Flow of Securities Class Actions.

Ms. Gilden is the President of the National Association of Shareholder and Consumer Attorneys (NASCAT), which is the preeminent trade association for securities class action attorneys, and serves on its Executive Committee. Prior to becoming President, she first served as Treasurer, then President-Elect for NASCAT. Ms. Gilden is the first woman in NASCAT's 18-year history to be elected Treasurer, President-Elect and subsequently, President. Ms. Gilden is also Vice President of the Institute for Law and Economic Policy (ILEP). She also was a member of Illinois Attorney General Lisa Madigan's Prescription Drug Transition Working Group. Ms. Gilden is a member of the American Bar Association, Illinois State Bar Association, Chicago Bar Association and the Association of Securities and Exchange Commission Alumni.

Ms. Gilden is a graduate of the University of Illinois (B.S., Business Administration, 1979). She graduated from Chicago-Kent College of Law (J.D., *with honors*, 1983) where she was a member of the Chicago-Kent Law Review.

Ms. Gilden is admitted to practice in Illinois, the federal district court for the Northern District of Illinois and the U.S. Court of Appeals for the Seventh Circuit.

**Robert G. Eisler**

Robert Eisler, a Partner at Cohen Milstein, joined the Firm in 2007 and is a member of the Antitrust practice group. He is the resident partner in the New York office. Prior to joining Cohen Milstein, Mr. Eisler was a partner at Lieff Cabraser Heimann and Bernstein.

Mr. Eisler has extensive experience in complex litigation at the trial and appellate levels, particularly in the prosecution of antitrust class actions. He has served as lead or co lead counsel in many cases in the state and federal courts, including In re Buspirone Antitrust Litigation, ($90 million settlement), In re Oxycontin Antitrust Litigation, and In re Ciprofloxacin Hydrochloride

Antitrust Litigation. Mr. Eisler is currently involved in the prosecution of numerous major antitrust actions throughout the United States.

Mr. Eisler is a 1986 graduate of LaSalle University, and a 1989 graduate of Villanova Law School.

He is admitted to practice in New York and Pennsylvania.

**Michael P. Lehmann**

Michael P. Lehmann has joined Cohen Milstein as a partner and will head our new San Francisco office. Mr. Lehmann brings to the firm 29 years of experience as a business litigator, with a practice that ranged from class action litigation to business litigation on behalf of individual clients to extensive regulatory work before federal, state and international bodies to domestic and international arbitration.

Prior to joining Cohen Milstein, Mr. Lehmann had worked since graduating from law school at what became Furth Lehmann LLP, where he eventually served as Managing Partner and in recent years has served as lead counsel for direct or indirect purchaser classes in numerous antitrust cases.

**Lynda J. Grant**

Lynda J. Grant joined Cohen Milstein in 2007 as a Partner in our New York office, and will concentrate her efforts in the securities practice area.

Ms. Grant is an accomplished lawyer with over 20 years of experience at Labaton Sucharow representing shareholders and limited partners. Throughout this time, her practice has consisted of class and derivative actions, ranging from large securities fraud cases to those seeking to enjoin unfair buy outs, acquisitions and mergers. Ms. Grant has also represented employees and pensioners in ERISA class actions. Her clients have included individual shareholders and limited partners, sophisticated hedge fund managers, major state, local and city pension funds, and union funds.

Ms. Grant's early career centered on representing limited partners and REIT holders in high-profile matters. In that capacity, she acted as Lead or Co-Lead Counsel in such cases as: *The Gillette Family Trust v. Insignia Financial Group, Inc., Inc. et al.* (the "Shelter Properties" Action); *Warren Heller v. McNeil Partners, L.P., et al.*; *Irving Zakin v. William Dockser, et al.* (the "CRITEF" Action): *Joan King v. Oxford Tax Exempt Fund II Corporation, and William Wallace v. Devon Associates, et al.* (the "Growth Hotel Investors" Action); and *Carlstrom v. Arvida/JMB Managers, Inc.*, (in which she helped to obtain a preliminary injunction after trial, which stopped a $160 million defensive recapitalization). She also commenced the action, *In Re Estate Associates Limited Partnership Litigation*, which eventually resulted in a $184 million jury verdict. Subsequently, Ms. Grant was part of a team which successfully tried the action *Gelfman, et al. v. Weeden Investors, L.P.*, and helped obtain an injunction in the action *In re MONY Group Inc. Shareholder Lit.*, temporarily stopping the $1.5 billion buyout of MONY

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

Insurance Co. by AXA Financial. Ms. Grant also successfully tried the books and records action captioned *Forsythe, et al. v. CIBC Employee Private Equity Fund (U.S.) L.P. et al.*

More recently, she was instrumental in obtaining a $67.5 million settlement for the class in *In re St. Paul Securities Litigation*, was part of a team which settled the action *In re DHB Industries, Inc. Class Action Litigation*, for $40 million and significant corporate governance reforms, and obtained an $8 million settlement in *In re Van der Moolen Securities Litigation*. She was one of the Lead Counsel in the action *In re Marsh ERISA Litigation*, and *In re St. Paul Travelers Sec. Litig. II*, and numerous other actions.

Ms. Grant is a member of the American Bar Association, and serves as a co-chairperson of the Class and Derivative subcommittee on securities litigation. Her article "CAFA: Is the Remedy Worse than the Illness?" was published in the *ABA Class and Derivative Action* newsletter. She is also a regular speaker on securities and class action related topics, having recently served as a panelist on the ABA program entitled Class Certification: Looking Beyond the Pleadings, and at the ABA Annual Convention in 2006, on the panel entitled, "It's a Small World After All: The Increasing Influence of Foreign and Multinational Class Actions." Late last year, she also spoke at a conference in Sydney, Australia regarding the international reach of the federal securities laws. Recently she moderated an ABA Panel concerning the impact of the IPO decision, and was a panelist for a telephone presentation regarding the extraterritorial effect of the federal securities laws. Given her vast experience in representing investors, Ms. Grant has earned the distinction of being named as one of the top female attorneys in the corporate governance area.

Ms. Grant received a J.D. from Cornell University Law School, and is admitted to practice in New York, and the United States District Courts for the Southern and Eastern Districts of New York.

**Brian A. Ratner**

Brian Ratner, a Partner at Cohen Milstein, joined the firm in 2001 and is Deputy Head of the International Practice Group and a member of the Antitrust Practice Group.

Mr. Ratner has extensive experience representing domestic and foreign businesses and individuals in complex litigation at the trial and appellate levels, particularly in the prosecution of antitrust class actions in state and federal courts throughout the United States. Mr. Ratner has litigated and is currently involved in numerous major antitrust class actions on behalf of direct and indirect purchasers alleging price-fixing and monopolization.

Specifically, Mr. Ratner has litigated the matter of *In Re Vitamins Antitrust Litigation* (D.D.C.) on behalf of two certified classes of vitamin direct purchasers who were overcharged as a result of a ten-year global price-fixing and market allocation conspiracy, which settled for over $1 billion. Mr. Ratner was a key member of a 2003 trial team in the case, in which a jury awarded a class of choline chloride purchasers more than $148 million in trebled damages. The National Law Journal ranked this verdict as the 12th largest in 2003. Mr. Ratner has also litigated, among other matters: *Empagran, S.A. et al. v. F. Hoffmann-LaRoche, Ltd., et al.* (D.D.C.), a case alleging a global vitamins price-fixing and market allocation conspiracy on behalf of foreign

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

purchasers (remanded by U.S. Supreme Court); *Oncology & Radiation Associates v. Bristol-Myers Squibb Co.* (D.D.C.), alleging monopolization against a drug manufacturer, which settled for $65 million; *Molecular Diagnostics Laboratories v. Hoffmann-La Roche, Inc., et al.* (D.D.C.), alleging unlawful monopolization on behalf of a class of purchasers of an enzyme used in DNA amplification, human-genome research, and medical diagnostics; and *In Re Vitamin C Antitrust Litigation* (E.D.N.Y.), alleging a conspiracy by Chinese manufacturers to fix prices and control the supply of vitamin C for export.

Mr. Ratner's substantial international work has included lecturing, organizing conferences, and writing articles and papers on issues such as the private civil enforcement of competition laws around the world and the mechanisms for collective redress in Europe.

Prior to joining Cohen Milstein, Mr. Ratner worked for Jones, Day, Reavis & Pogue where he focused on complex civil and commercial litigation, antitrust counseling, and merger clearance work related to the CBS/Viacom and AOL/Time Warner mergers.

Mr. Ratner graduated from Indiana University-Bloomington with a B.A. in Journalism (1996) and a second major in Political Science.  In college, he was a member of the Mortar Board National Honor Society, did undergraduate work at Hebrew University in Jerusalem, Israel, and worked on several political campaigns including the re-election campaign of former U.S. Senator Harris Wofford.  Mr. Ratner obtained his law degree from the University of Pittsburgh School of Law (1999), where he was the Managing Editor of the Journal of Law and Commerce.  During law school, Mr. Ratner externed for the Hon. Donetta W. Ambrose (W.D. Pa.).

Mr. Ratner is admitted to practice in New Jersey, Pennsylvania, and the District of Columbia.

**Jenny R. Yang**

Jenny Yang joined the Firm in 2003 and is a Partner in the Civil Rights & Employment practice group.

Currently, Ms. Yang works on *Aaron v. Pilgrim's Pride Corp.*, Civ. No. 06-1082 (W.D. Ark.), and related actions in a multi-district litigation proceeding, in which workers seek redress for unpaid overtime.  Ms. Yang is also litigating Dukes *v. Wal-Mart Stores, Inc.* (N.D. Cal.), the largest certified Title VII class action in history, in which female employees allege sex discrimination in promotions and pay decisions.  In addition, Ms. Yang represented the plaintiffs and class in *Beck v. The Boeing Company* (W.D. Wash.), a class action alleging gender discrimination, which settled in 2004 for $72.5 million.  She is also working on *Jenkins v. BellSouth* (N.D. Ala.), a race discrimination case alleging systemic discrimination in pay and promotions and *Robinson-Smith v. GEICO* (D.D.C.) and *Lindsay v. GEICO* (D.D.C.), two separate nationwide lawsuits challenging GEICO's refusal to pay auto damage adjusters overtime.

Ms. Yang is a contributing editor of the American Bar Association, Labor & Employment Law Section's employment discrimination treatise, Lindemann & Grossman, *Employment Discrimination Law*, upcoming 4th Edition.  She is a member of the National Employment



Lawyers Association (NELA) and has served as a speaker on race discrimination issues at their National Convention.

Prior to joining the Firm, Ms. Yang was a Senior Trial Attorney with the United States Department of Justice, Civil Rights Division, Employment Litigation Section, where she worked for five years on both pattern or practice and individual federal employment discrimination cases against state and local governments. She litigated cases involving discrimination based on race, sex, and national origin. Before her work at the Department of Justice, Ms. Yang received a community service fellowship to work at the National Employment Law Project in New York City, a non-profit organization focusing on low-wage workers' rights. While there, she worked on ground-breaking joint-employer liability litigation to hold garment manufacturers liable for unpaid wages owed to garment workers under the Fair Labor Standards Act. After law school, Ms. Yang clerked for the Honorable Edmund Ludwig on the United States District Court for the Eastern District of Pennsylvania. In 1992-1993, Ms. Yang worked on the Presidential Transition and at the White House, Office of Presidential Personnel.

Ms. Yang serves as a member of Board of Directors of the Asian Pacific American Legal Resource Center. From 2001-2003, she served as a government fellow for the American Bar Association, Labor and Employment Section, Equal Employment Opportunity Committee. She also served as a National Co-Chair and Board Member of the National Asian Pacific American Women's Forum from 1998-2004.

Ms. Yang graduated from Cornell University (B.A., Government, *with distinction*, 1992) and New York University School of Law (J.D., *cum laude*, 1996) where she was a Root-Tilden Public Interest Scholar and a Note and Comment Editor of the Law Review.

Ms. Yang is admitted to practice in the District of Columbia, New York, and New Jersey.

**Daniel W. Sigelman**

Daniel Sigelman, a Partner at the Firm, joined Cohen Milstein in 2005 and is a member of the Unsafe Drugs & Environmental Health Threats and International practice groups.

Mr. Sigelman concentrates on mass tort/product liability and economic injury litigation against pharmaceutical and medical device manufacturers. His work has included class action medical monitoring lawsuits focusing on the safety of heart valves; mass tort, ERISA, and securities fraud cases involving drug products; and third party payor litigation against drug and medical device companies. He has held lead roles in product liability actions against FDA-regulated companies, including his appointment to the MDL Plaintiffs' Steering Committee in In re St. Jude Medical, Inc., Silzone Heart Valves Products Liability Litigation (D. Minn.).

Mr. Sigelman is an Adjunct Assistant Professor at the George Washington University Department of Health Policy and Health Services, where he teaches pharmaceutical policy. He is a frequent lecturer and commentator on health care and pharmaceutical/medical device issues, including the role of FDA regulation in pharmaceutical litigation and congressional oversight of FDA's regulation of drug safety.



From 1979 to 1981, Mr. Sigelman served as a staff attorney to the Public Citizen Health Research Group. From 1981 to 1988, he was counsel to the House Subcommittee on Human Resources and Intergovernmental Relations, where he conducted investigative oversight of the Food and Drug Administration. His investigations produced numerous congressional hearings on the FDA's regulation of unsafe drugs, many of which were removed from the market for safety reasons. Some of his investigative findings forced changes in the FDA's regulations as well as review procedures and policies, while others led to several successful federal prosecutions of pharmaceutical manufacturers for violating the federal Food, Drug, & Cosmetic Act. He authored numerous congressional committee reports on his investigations of the FDA's regulation of the safety of the nation's human and animal drug and food supply. From 1988-2000, he practiced in Atlanta, Georgia, where he worked on drug and medical device cases and other types of litigations.

Mr. Sigelman is a graduate of Dartmouth College (summa cum laude, 1972), where he received a B.A. in English. He attended the University of California, Berkeley, earning a Master's degree in English (1975), and the Boalt Hall School of Law, the University of California, Berkeley (J.D., 1979).

Mr. Sigelman is admitted to practice in the District of Columbia and Georgia.

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

### Attorney Profiles – Of Counsel & Associates

**Sahar F. Aziz**

Sahar Aziz, an Associate at Cohen Milstein, joined the Firm in 2007 and is a member of the Civil Rights & Employment practice group.

Ms. Aziz currently is involved in *Dukes v. Wal-Mart Stores, Inc.* (N.D. Cal.), a class action which has been certified for over 1.6 million current and former female employees of Wal-Mart on complaints of discrimination in pay and promotion; *M.H. Fox, et al. v. Tyson Foods, Inc.*, a class action on behalf of chicken-processing workers who were not paid for the time they spent putting on and taking off their required safety equipment; *Chase v. AIMCO*, alleging that the U.S.'s largest apartment management company violates the Fair Labor Standards Act by failing to pay its maintenance employees for time spent responding to emergency tenant service requests; and *O'Connor v. BASF Corp.*, which alleges a nationwide pattern of age discrimination in layoffs from BASF, a major chemical company based in Germany, with North American headquarters in New Jersey. Ms. Aziz is also involved in a mediation involving a group of female employees alleging a pattern and practice of discrimination in pay and promotion. Ms. Aziz represented pro bono a female Afghan civil rights activist before the Asylum Office and Immigration Court and obtained asylum on behalf of her client.

Prior to joining the Firm, Ms. Aziz was an Associate at Wilmer, Cutler, Pickering, Hale & Dorr LLP in the Securities and Litigation Departments. At WilmerHale, Ms. Aziz was the lead Associate in an independent human rights investigation on the use of child camel jockeys in the Middle East. She also worked on white collar crime investigations and securities litigation. Prior to joining WilmerHale, Ms. Aziz clerked for the Honorable Andre M. Davis on the United States District Court for the District of Maryland.

Ms. Aziz graduated from the University of Texas at Arlington (B.S. in Management Information Systems, *magna cum laude*, 1997), the University of Texas Graduate School College of Liberal Arts (M.A. in Middle Eastern Studies, 2004), and the University of Texas School of Law (J.D., *cum laude*, 2004). At the University of Texas School of Law, Ms. Aziz served as an Associate Editor on the Texas Law Review, participated in the Immigration Clinic, and organized an academic conference entitled "Islam and the Law: The Question of Sexism." She authored two Notes, *The Laws on Providing Material Support to Terrorist Organizations: The Erosion of Constitutional Rights or a Legitimate Tool for Preventing Terrorism?*, 9 Tex. J. on C.L. & C.R. 45 (Winter 2003), and *Linking Intellectual Property Rights in Developing Countries with Research and Development, Technology Transfer, and Foreign Direct Investment Policy: A Case Study of Egypt's Pharmaceutical Industry*, 10 ILSA J Int'l & Comp L 1 (Fall 2003). While in law school, Ms. Aziz interned at the American Civil Liberties Union of Texas where she conducted community outreach regarding post September 11 civil rights and national security issues. Ms. Aziz also interned at the Commercial Law Development Program at the United States Department of Commerce where she focused on international development projects in Egypt.

Ms. Aziz is a member of the National Employment Lawyers Association. Ms. Aziz is fluent in Arabic and proficient in Spanish.

COHEN MILSTEIN
HAUSFELD & TOLL

Ms. Aziz is admitted to practice in Texas and the District of Columbia.

**R. Joseph Barton**

Joseph Barton joined Cohen, Milstein, Hausfeld & Toll P.L.L.C. as an associate in 2001 and is a member of the Antitrust, Securities and Employee Benefits practice groups.  Prior to joining the firm, Mr. Barton served as a judicial law clerk to the Honorable Lenore C. Nesbitt, United States District Judge for Southern District of Florida (2000-2001).  Since joining the firm, Mr. Barton has been actively involved in a diverse number of class action cases.

Mr. Barton has been actively involved in a number of employee benefit cases.  For example, in *Beam v. HSBC Bank*, No. (W.D.N.Y.) (settlement of $9.25 Million) which challenged the sale of stock for $25 million by the family shareholders to the Azon Corporation ESOP, Mr. Barton briefed and  argued the motions for summary judgment, resulting in denial of defendants' motions and granting plaintiffs' motion for partial summary judgment.  In *Simpson v. Fireman's Fund Insurance Company* (N.D. Cal.), Mr. Barton represented a class of active and terminated employees alleging that FFIC's policy of terminated persons on disability violated the discrimination provisions of ERISA, and obtained a settlement which included restoring their right to benefits for a period of years and also reimbursement of past expenses.  Additionally, Mr. Barton has also been involved in a number of cases alleging breach of fiduciary duty by investing the 401k plan in company stock.  Mr. Barton is currently working on a case against certain insiders at Tharaldson Motels who sold stock to the ESOP for $500 million, *Hans v. Gary Tharaldson et al.* (D.N.D.) and a case against SBC Communications (now AT&T), *Stoffels et al. v. SBC Communications* (W.D. Tex.) alleging that their provision and subsequent elimination of cash payments via a program known as Telephone Concession constituted a defined benefit pension plan under ERISA and violated ERISA.  At the hearing on the class certification motion, in *Stoffels*, the Court complimented Mr. Barton on the quality of his advocacy and subsequently certified the class as requested.

Mr. Barton has been active in a number of securities fraud lawsuits including *In re Physician Corporation of America Securities Litigation* (S.D. Fla.) (settlement of $10.2 million), and *In re MCI Securities Litigation* (D.D.C.) (settlement of $4.5 million) and also represented a small class of former Sterling shareholders who received Uniroyal stock in a merger in *Avery v. Uniroyal Technology Corp.,* (M.D. Fla.) (settlement of $2.3 million).  Mr. Barton currently represents limited partners of Lipper Convertibles, a now-defunct hedge fund, in a class action arbitration against the former general partners, *Levitt v. Lipper Holdings et al.* (AAA), and also in litigation against the outside auditor in federal district court, *Levitt v. PricewaterhouseCoopers* (S.D.N.Y.) alleging violations of the federal securities laws in connection with their investments in the Partnership which were allegedly overvalued for over 5 years.

Mr. Barton has also worked on a number of antitrust actions.  Mr. Barton was a part of the team that engaged in intensive trial preparations in *In re High Fructose Corn Syrup Antitrust Litigation*, (C.D. Ill.) a class action alleging price-fixing by the manufacturers of high fructose corn syrup, which settled for more than $500 million shortly before trial.  Mr. Barton is currently working on *In re Mercedes-Benz Antitrust Litigation* (D.N.J.), a class action alleging price-fixing of new Mercedes -Benz vehicles in the New York Region.  In connection with the *Mercedes-Benz* litigation, Mr. Barton briefed and argued and obtained summary judgment on a matter of

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

first impression that established that lessee-plaintiffs had standing to sue as direct purchasers under the federal antitrust laws.

Additionally, Mr. Barton considers pro bono activities to be an important part of his practice. Along with the non-profit law firm Midwest Environmental Advocates, Mr. Barton provided pro bono representation to the grassroots citizens action group Clean Water Action Council of Northeastern Wisconsin, in objecting to a settlement by the United States Department of Justice and the State of Wisconsin concerning natural resource damages in the Fox River area of Wisconsin. Mr. Barton also represented a client in D.C. Superior Court against her former employer who refused to pay her wages and overtime, in which the Judge described Mr. Barton's representation as follows: "everything done on behalf of the Plaintiff has been professional, timely and thorough."

Mr. Barton received his undergraduate degree from the College of William & Mary (B.A. 1991) where he majored in History and minored in Classical Studies, and graduated *Order of the Coif* from the College of William & Mary, Marshall-Wythe School of Law (J.D. 2000). At law school, he received the Lawrence W. I'Anson Award for outstanding student scholarship, character and leadership, the William B. Spong Award for professionalism and ethics, the Robert R. Kaplan Award for excellence in legal writing and *Order of the Barristers* . He served on the editorial board of the *William & Mary Law Review* and was a staff member of the *William & Mary Bill of Rights Journal*. Mr. Barton was a member of the William & Mary National Trial Team and served as Vice-President of the William & Mary Chapter of the Association of Trial Lawyers of America.

Mr. Barton is the author of *Determining the Meaning of "Direct Evidence" in Discrimination Cases Within the Eleventh Circuit: Why Judge Tjoflat was (W)right*, 77 Fla. B.J. 42 (2003), *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L. Rev. 1789 (2000), and *Utilizing Statistics and Bellwether Plaintiff Trials: What do the Constitution and the Federal Rules of Civil Procedure Permit?*, 8 Wm. & Mary Bill Rts. J. 199 (1999). Each of Mr. Barton's published articles has been cited by both courts and commentators.

Mr. Barton is admitted to practice in the State of California and the District of Columbia and is listed in the *Marquis' Who's Who in American Law*.

**Elizabeth A. Berney**

Elizabeth Berney joined the Firm as Of Counsel in 2005 and is a member of the Securities Fraud/Investor Protection practice group. Her work includes securities fraud class actions in federal courts throughout the country, including the *Parmalat* litigation in New York. For several of the firm's securities fraud cases, Ms. Berney has also led the investigations of witnesses which uncovered fraudulent activities.

Ms. Berney is the co-author of *Restoring Investor Trust in Auditing Standards and Accounting Principles*, published in the *Harvard Journal of Legislation* (Winter 2004). She also has written extensive materials for legal seminars and speeches. She served as a guest lecturer for a Cardozo Law School ethics class and a guest lecturer for a Harvard Law School corporations class

COHEN MILSTEIN
HAUSFELD & TOLL

regarding securities fraud, was a featured speaker and panelist for the Women's National Book Association, and appeared in a German television documentary. She is a member of the Federal Bar Council.

Prior to joining Cohen Milstein, Ms. Berney was an active member of the plaintiffs' legal teams in leading securities fraud, consumer, and human rights class actions including the Enron and Xerox shareholder litigations, the Ford Explorer/Firestone Tire litigation, and the Holocaust Assets cases. From 2000-2005, Ms. Berney practiced law at another prominent plaintiffs' class action firm. Previously, she worked at Dewey Ballantine in the tax and municipal bonds fields, where she obtained the rulings needed to finance construction of the Intrepid Museum; at Gilbert Segall and Young (now part of Holland & Knight), where she focused on foreign sovereign immunities and general commercial litigation; as in-house counsel for a college; and in her own legal and literary practice, where she negotiated agreements for computer companies and notable authors.

Ms. Berney is an avid amateur violinist. She played violin in the Chicago Civic Orchestra while in law school, and, more recently, has played in COSMOS (the Chamber Orchestra of Science and Medicine). She currently plays first violin in the New York City Bar Association Lawyers' Orchestra.

Ms. Berney is a graduate of Cornell University, where she earned a B.S. in industrial and labor relations with a minor in music (*with honors*, 1975), and the University of Chicago Law School (J.D., 1978).

Ms. Berney is admitted to practice in New York and Pennsylvania.

**Mark D. Bogen**

Mark Bogen focuses his practice on investor protection and consumer fraud issues.

Mr. Bogen received his law degree in 1983 from Loyola University School of Law in Chicago, Illinois. Prior to law school, he attended the University of Illinois, where he received a B.S.in 1980.

During the past 14 years, Mr. Bogen has written two weekly legal columns for the Sun-Sentinel newspaper located in Ft. Lauderdale, Florida. The Sun-Sentinel is a Tribune Company owned newspaper. Mr. Bogen, who is a former adjunct professor of business law, was also a legal correspondent for the local NBC affiliate in Palm Beach, Florida.

Mr. Bogen is admitted to practice law in the State of Florida and Illinois.

**Andrew B. Bullion**

Andrew Bullion joined Cohen Milstein as an Associate in February 2006 and is a member of the firm's Antitrust and International practice groups. He has extensive complex litigation experience on both the plaintiff and defense sides. Prior to joining the firm, Mr. Bullion spent



several years as a litigator in private practice in Philadelphia, handling complex commercial matters, including class actions, as well as tort law and intellectual property matters.

He is currently working on several national and international antitrust actions, including: *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), alleging price-fixing of rates for airfreight shipping services by dozens of major international flagship airlines; and the *In re Air Passenger Antitrust Litigation* (N.D.Ca.), alleging price-fixing by British Airways and Virgin Atlantic airlines of surcharges added to the price of passenger tickets for long-haul flights.

Mr. Bullion is a graduate of Villanova University School of Law (J.D. 1996) and Villanova University (B.A. 1989). During law school he clerked for the Federal Trade Commission's Bureau of Competition, and with Advokatfirman Vinge KB, Sweden's largest law firm.

Mr. Bullion is admitted to practice in Pennsylvania, New Jersey, and the District of Columbia.

### S. Douglas Bunch

Doug Bunch, an Associate at the Firm, joined Cohen Milstein in 2006 and is a member of the Securities practice group.

Mr. Bunch is currently working on several active securities fraud actions against issuers of securities for allegedly misleading investors, including *In re Pozen Securities Litigation* (M.D.N.C.), *Blatt v. Corn Products International, Inc.* (N.D. Ill.), and *Levitt v. PricewaterhouseCoopers, LLP* (S.D.N.Y.).

Mr. Bunch is a graduate of the William & Mary School of Law (2006), where he was a recipient of the Benjamin Rush Medal. A member of Phi Beta Kappa, he graduated *summa cum laude* from the College of William & Mary in 2002 with a Bachelor's degree in Government and Classical Studies. Mr. Bunch is also a 2003 graduate of Harvard University's Graduate School of Education, from which he holds a Master's degree in Administration, Planning, and Social Policy. At Harvard, he served as an intern in the Boston office of the U.S. Department of Education's Office for Civil Rights, where he worked closely with attorneys to enforce federal laws that protect students from discrimination on the basis of race, gender, age, and disability.

Mr. Bunch is actively involved in several nonprofit endeavors. He serves as Chairman of *Global Playground, Inc.*, an organization which promotes education in developing countries; as Executive Director of *Ascanius: The Youth Classics Institute*, which promotes the study of classics in the elementary school; and as a member of the Board of Directors of the *Northeast Conference on the Teaching of Foreign Languages*, which promotes the study of world languages more broadly.

Mr. Bunch is admitted to practice in New York and the District of Columbia.

### Whitney R. Case

Whitney R. Case joined Cohen Milstein as an Associate in 2005 and is a member of the Employee Benefits and Consumer Protection practice groups.

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

Ms. Case has been actively involved in a number of class action employee benefit cases, including a case against SBC Communications, Inc., which alleges widespread miscalculation of pension benefits owed to their employees in violation of ERISA. Ms. Case also represents Tharaldson Motels, Inc. Employee Stock Ownership Plan in an action for breach of fiduciary duties against the Trustee and other fiduciaries. In addition, Ms. Case is involved in a case alleging breach of fiduciary duty owed to participants in the TXU Corp. 401(k) Plan and a case against Qwest Communications alleging that it violated ERISA regarding certain benefits provided to its retirees.

In the area of consumer protection, Ms. Case represents homeowners whose properties were severely damaged by floods from Hurricane Isabel in a class action filed against eight insurance companies who allegedly mishandled class members' claims and ultimately failed to pay proceeds to which the policyholders were entitled.

Ms. Case is the author of *The Coupon Can Be the Ticket: The Use of "Coupon" and Other Non-Monetary Redress in Class Action Settlements*, 18 Geo. J. Legal Ethics 1431 (2005) (co-authored with Lisa Mezzetti).

Prior to joining the Firm, Ms. Case served as a summer associate and as a law clerk at the District of Columbia Bar's Board on Professional Responsibility. She also studied International Law at University College in London, England and was a student attorney in the Domestic Violence Clinic at Georgetown University Law Center.

Ms. Case received her law degree from Georgetown University Law Center in 2005. She received her undergraduate degree from Tulane University (B.A., Political Economy and French, *cum laude*, 2002) during which time she spent a year studying at Universite de Paris IV, La Sorbonne.

Ms. Case is admitted to practice in New York, New Jersey and the District of Columbia.

**Christopher J. Cormier**

Christopher J. Cormier joined Cohen Milstein in 2003 as an Associate in the Antitrust practice group.

Mr. Cormier is actively involved in antitrust actions alleging both concerted and unilateral anticompetitive conduct. For example, in *In re Urethane Antitrust Litigation* (Polyether Polyol Cases), Civ. No. 04-md-1616-JWL (D. Kan.), he represents a putative class of direct purchasers of several types of chemicals who allegedly were overcharged as a result of a nationwide price-fixing and market allocation conspiracy. One defendant, Bayer, already has settled for $55.3 million and is providing cooperation pursuant to its obligations under the settlement agreement. In In *re Endosurgical Products Direct Purchaser Antitrust Litigation*, CV 05-8809-JVS(MLGx) (C.D. Cal.), he represents a putative class of direct purchasers of certain medical instruments used in laparoscopic surgery who allegedly were overcharged as a result of Johnson & Johnson's monopolistic conduct, which included sole source group purchasing organization contracts and tiered market share discounts to customers.

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

He also is involved in: *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group L.P.*, Master File No. CV-05-6419 MRP (AJWx) (C.D. Cal.) (putative class action alleging monopolistic conduct in the pulse oximetry market); In *the Matter of the Arbitration Between Animalfeeds International Corp., et al v. Stolt-Nielsen SA, et al.* (putative class arbitration alleging price-fixing and market allocation for parcel tanker shipping services); and *In re Cotton Yarn Antitrust Litigation*, Civ. No. 1:04MD1622 (M.D.N.C.) (putative class action alleging price-fixing of cotton yarn; $7.8 million settlement obtained from one defendant).

Mr. Cormier graduated from the University of Virginia (B.A., Government, 1999) and from the American University's Washington College of Law (J.D., *magna cum laude*, 2002). After his first year of law school, he served as a judicial intern to the Honorable Deborah K. Chasanow, United States District Court for the District of Maryland. During his second year of law school, he served as a legal intern in what is now known as the National Criminal Enforcement Section of the United States Department of Justice's Antitrust Division.

Prior to joining Cohen Milstein, he practiced at a large Baltimore-based law firm, where he focused primarily on commercial litigation.

Mr. Cormier is admitted to practice in Maryland and the District of Columbia.

## Joshua S. Devore

Joshua Devore, an Associate at the Firm, joined Cohen Milstein in 2000 as a member of the Securities Fraud/Investor Protection practice group.

He is currently working on several securities fraud class actions (including the litigation on the collapse of the Italian dairy conglomerate Parmalat), and has been heavily involved in litigation regarding Wall Street research analysts. He has actively participated in a number of cases that resulted in substantial recoveries for investors, including In *re Lucent Technologies, Inc. Securities Litigation* (settlement of approximately $575 million); *In re Merrill Lynch Research Reports Securities Litigation* (settlement of $125 million); *In re VeriSign Corp. Securities Litigation* (settlement of $78 million); and *Norman v. Salomon Smith Barney* (settlement of $51 million on behalf of Guided Portfolio Management Account holders).

Mr. Devore has been the primary author of numerous briefs addressing complex and novel issues of the federal securities laws, leading to notable reported decisions such as *In re Parmalat Securities Litigation*, 376 F.Supp.2d 472 (S.D.N.Y. 2003), that affirmed claims of "scheme" liability against a corporation's outside investment banks, and *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), that reversed a dismissal on statute of limitations grounds and reset the standards for pleading loss causation. He was also a member of the trial team in *In re Globalstar Securities Litigation*, which settled for $20 million during trial after Plaintiffs had fully presented their case.

Mr. Devore is actively involved in the representation of the firm's institutional investor clients and personally developed and oversees the analysis of the firm's clients' investments in securities that may have been affected by fraud.

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

Mr. Devore graduated from Rice University in 1997 with a B.A. in Chemistry, and obtained his law degree from Georgetown University Law Center in 2000. While at Georgetown, Mr. Devore served as an Executive Editor of the Georgetown International Environmental Law Review.  Mr. Devore is co-author of *State Court Class Actions: Trends and Issues, in National Institute on Class-Actions*, C-1 (ABA CLE 1999).

Mr. Devore is admitted to practice in the District of Columbia and Virginia.

**George F. Farah**

George Farah joined the Firm as an Associate in 2005 and is a member of the Antitrust, Unsafe Drugs & Environmental Health Threats, and Human Rights practice groups.

Mr. Farah is currently working on *City of Milwaukee v. NL, Inc.*, in which he and other attorneys represent the City of Milwaukee in a public nuisance lawsuit against the leading lead paint manufacturer. He is also currently working on *Schwartz Lee, et al. v. Deutsche Bank AG and Desdner Bank AG*, in which he and other attorneys represent survivors of Nazi-era forced and slave labor against German companies for failing to provide sufficient compensation for allegedly using and profiting from slave labor.

Prior to joining the Firm, Mr. Farah worked on several issue-oriented campaigns.  He is the founder of Open Debates, a nonprofit, nonpartisan Washington-based organization committed to reforming the presidential debate process.  Before attending law school, Farah worked to expose the harms of media concentration and the IMF's structural adjustment programs at Ralph Nader's Center for the Study of Responsive Law.

Mr. Farah is the author of the book *No Debate: How the Republican and Democratic Parties Secretly Control the Presidential Debates* from Seven Stories Press (April, 2004).  His articles have been published in *The Boston Globe*, *The Philadelphia Inquirer*, *The Denver Post*, *The Christian Science Monitor*, *Fort Lauderdale Sun-Sentinel, Extra! Magazine*, and other publications.

Mr. Farah has appeared on dozens of television programs, including "Nightline," "NOW with Bill Moyers," "20/20," "CBS Evening News with Dan Rather," "NBC Nightly News with Tom Brokaw," "CNN Lou Dobbs Tonight," and "Countdown with Keith Olbermann."  Mr. Farah has been interviewed on over 100 radio shows, including NPR's "To the Point," "Keep Hope Alive With Jesse Jackson," "Democracy Now!," "CounterSpin," and "Judicial Watch Report."

Farah has given several talks on the political process at colleges and universities, hosted numerous televised press conferences and was a Newsmaker at the National Press Club in 2004.

Mr. Farah is a graduate of Harvard Law School (J.D., 2005), and Princeton University (B.A., Woodrow Wilson School of Public and International Affairs, 2000).  Mr. Farah was the recipient of a Paul and Daisy Soros Fellowship, and a delegate to the 2005 International Achievement Summit.



Mr. Farah is admitted to practice in New York.

**Elizabeth S. Finberg**

Elizabeth Finberg is a member of the Securities Litigation Group. Throughout her career, she has litigated a variety of large and complex commercial cases on behalf of clients such as Sun Microsystems, PricewaterhouseCoopers and Teva Pharmaceuticals USA, Inc., among many others. Ms. Finberg was also a part of the Firm's *In re Lupron and Sales Practices Litigation* team, which garnered a settlement of $150 million on behalf of individual consumers.  She has actively litigated a number of high-profile lawsuits, including, *In re Fannie Mae Securities Litigation*, *In re Converium Securities AG*, In *re UICI Securities Litigation*, *In re SourceCorp Securities Litigation*, *In re Integrated Electrical Services Securities Litigation*, *In re Compuware Securities Litigation*, *In re Uniroyal Securities Litigation*, *In re Sirius Satellite Radio Securities Litigation* and *In re Royal Ahold Securities Litigation*.  Ms. Finberg is also an experienced appellate advocate, having briefed multiple cases in the United States Courts of Appeal for the Third, Fourth, Fifth and District of Columbia Circuits.

Prior to entering the field of law, Ms. Finberg served in the United States Air Force as a Russian linguist from 1979-1983.  She was stationed in West Berlin, Germany (FDR) and received the Air Force Commendation Medal for distinguished service. Thereafter, she raised a family before attending law school.

She is a 1998 graduate of The American University's Washington College of Law, (J.D., 1998, *summa cum laude*) and served on the WCL Moot Court Executive Board. She is the recipient of the 1998 Morton F. McDonald Scholarship Award for Excellence in Legal Research and Writing.  Ms. Finberg earned her undergraduate degree from Rollins College (A.B. in International Relations, 1995, *summa cum laude*), where she earned numerous awards for scholarship.

Ms. Finberg is a member of the Virginia and District of Columbia bars.

**Shelly L. Friedland**

Shelly L. Friedland joined the Firm's New York office in 2005 as an associate in the Antitrust practice group.

Ms. Friedland is currently involved in *In re Wellbutrin SR* (E.D. Pa.) , *In re Foundry Resins Antitrust Litigation* (S.D. Ohio), *In re Aspartame Antitrust Litigation* (E.D. Pa), and *In re K-Dur Antitrust Litigation* (D.N.J.) (representing indirect purchasers).  Ms. Friedland also currently represents Registered Nurses employed by hospitals in Albany and Memphis in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws.

Prior to joining Cohen Milstein, Ms. Friedland was an associate in the litigation department at Kronish Lieb Weiner & Hellman (now known as Cooley Godward Kronish), where she practiced commercial litigation and white collar criminal law.  While at Kronish Lieb, Ms. Friedland represented the family of a victim of the September 11 World Trade Center bombing in its



application to the federal Victim Compensation Fund, and a defendant seeking to overturn a wrongful murder conviction.  Previously, she was an associate in the litigation department at Paul, Weiss, Rifkind, Wharton & Garrison.

Ms. Friedland received a bachelor's degree in economics from Columbia University (1987), graduating summa cum laude as a member of Phi Beta Kappa.  She spent her junior year studying at the Hebrew University of Jerusalem.  Ms. Friedland received her law degree from Harvard Law School (J.D., 1997, *cum laude*), where she was an editor of the Human Rights Law Journal.

Ms. Friedland is admitted to practice in New York State, and United States District Court, Southern District of New York, Eastern District of New York, and District of New Jersey.

**Reena Gambhir**

Reena Gambhir joined Cohen Milstein as an Associate in 2004 and is a member of the Antitrust and International practice groups.

Ms. Gambhir is currently working on, among other antitrust class actions, *In re: Hydrogen Peroxide Antitrust Litigation* (E.D.Pa.) and *In re Pressure Sensitive Labelstock Antitrust Litigation* (M.D.Pa) alleging price-fixing on behalf of purchasers.  Among other international and *pro bono* matters, Ms. Gambhir represents a detainee being held at the U.S. government's detention facility in Guantanamo Bay, and residents of Bhopal, India who are exposed to the 1984 Union Carbide gas leak's uncontrolled remaining toxic waste.

Prior to joining the Firm, Ms. Gambhir served as a summer associate and also as a law clerk at the Public Defenders Service for the District of Columbia and the Washington Legal Clinic for the Homeless.  In addition, she studied in the International Human Rights Law program at Oxford University, and was a student attorney in the International Human Rights Clinic at the George Washington University Law School.  Prior to law school, Ms. Gambhir worked as a paralegal at an immigration law firm in Boston, Massachusetts.

Ms. Gambhir received a B.A. from Boston College in English Literature (*cum laude*, 1999) with a minor in American Gender and Race Studies.  She received a Master of Arts in the Humanities from the University of Chicago (2000), and her law degree from the National Law Center, George Washington University (*with honors,* 2004), where she was a Thurgood Marshall Scholar.

Ms. Gambhir is admitted to practice in Massachusetts, admission pending in New York.

**Seth R. Gassman**

Seth R. Gassman joined the Firm as an Associate in 2007 as a member of the Antitrust practice group.

He is currently involved in, among other cases, *Molecular Diagnostics Laboratories v. Hoffman-La Roche, Inc.* (D.D.C.), in which purchasers are suing two companies for the unlawful



monopolization of an enzyme used in DNA amplification, human-genome research, and medical diagnostics, and *Weeks Marine, Inc. v. Bridgestone Corp., et al.* (S.D.N.Y.), which alleges that manufacturers and sellers of specialty hose used in connection with marine services conspired to rig bids, fix prices, and allocate markets and customers in the United States and around the world.

Mr. Gassman is the author of *Direct Democracy As Cultural Dispute Resolution: The Missing Egalitarianism Of Cultural Entrenchment*, 6 NYU Journal of Legislation and Public Policy 525 (2002-2003).  He also provided extensive research assistance to Professor Oscar Chase in preparing the fourth edition of Civil Litigation in New York.

Before joining Cohen Milstein, Mr. Gassman worked for Cahill Gordon & Reindel, where he focused on complex civil and commercial litigation and antitrust.  He also performed merger clearance and corporate counseling antitrust work related to several mergers.

Mr. Gassman graduated from New York University School of Law (J.D., 2003), where he was awarded the Newman Prize, and the University of California at Berkeley with a B.A. in English (1999).

Mr. Gassman is admitted to practice in New York.

**Besrat Gebrewold**

Besrat J. Gebrewold joined Cohen Milstein as an associate in 2007 and is a member of the Antitrust practice group.  Ms. Gebrewold will be working on *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), a multi-billion dollar antitrust action alleging that the world's major cargo airlines colluded in setting the amounts of various surcharges they imposed on their customers, *In Re Air Transportation Antitrust Litigation* (N.D. Cal.), a federal antitrust action challenging a conspiracy among airlines to fix the amount of the fuel surcharge imposed on flights to and from Heathrow airport in London, and *In Re Vitamin C Antitrust Litigation* (E.D.N.Y.), alleging a conspiracy by Chinese manufacturers to fix prices and control the supply of vitamin C for export.

Prior to joining the firm as an associate, Ms. Gebrewold worked as a paralegal in the firm's Antitrust, Unsafe Drugs & Environmental Health Threats, and Consumer Protection practice groups for four years and as a law clerk for three years.  She also worked as a summer associate at Cohen Milstein in 2006.

Ms. Gebrewold has an LL.B from Addis Ababa University, Faculty of Law in Ethiopia and an LL.M in Common Law Studies from Georgetown University Law Center where she was a Fulbright Scholar.  She received a J.D. from the American University Washington College of Law in May 2007 where she was a member of the *Journal of Gender, Social Policy & the Law*.

Ms. Gebrewold is admitted to practice in Maryland.  Her application to the District of Columbia Bar is pending and she is currently practicing under the supervision of Charles E. Tompkins, an



enrolled active member of the District of Columbia Bar, pursuant to Rule 49(c)(8) of the Rules of the District of Columbia Court of Appeals.

## Llezlie L. Green

Llezlie Green, an Associate at Cohen Milstein, joined the Firm in 2004 and is a member of the Civil Rights & Employment practice group.

Ms. Green currently is involved in *Keepseagle v. Veneman* (D.D.C.), where plaintiffs allege the USDA discriminated in granting access to and servicing of farm loans to Native American farmers and ranchers; *Chase v. AIMCO*, alleging that the U.S.'s largest apartment management company violates the Fair Labor Standards Act by failing to pay its maintenance employees for time spent responding to emergency tenant service requests; and *Amos v. GEICO*, alleging *GEICO* discriminates against African-Americans through its use of occupation and level of education in setting automobile insurance rates.

Ms. Green is a member of the American Bar Association, the National Employment Lawyers Association and the Washington Council of Lawyers. She is co-chair of the ABA's Committee on Equal Opportunity in the Legal Profession.

Before joining Cohen Milstein, Ms. Green worked for Wilmer Cutler & Pickering, where she focused on complex litigation and securities investigations and worked on various civil rights and international human rights *pro bono* projects. Ms. Green then clerked for the Honorable Alexander Williams, Jr. on the United States District Court for the District of Maryland.

Ms. Green graduated from Dartmouth College with a B.A. in Government (*cum laude*, 1997) and Columbia Law School (J.D., 2002), where she was a Harlan Fiske Stone Scholar. At Columbia, Ms. Green was active in the Black Law Students Association, participated in the Human Rights Clinic, and served as an Articles Editor for the Columbia Human Rights Law Review. She authored a Note, *Gender Hate Propaganda and Sexual Violence in the Rwandan Genocide: An Argument for Intersectionality in International Law*, 33 Colum. Hum. Rts. L. Rev. 733 (2002). While in law school, Ms. Green interned at the Center for Constitutional Rights and the NAACP Legal Defense and Educational Fund.

Ms. Green is admitted to practice in New York and the District of Columbia.

## Matthew K. Handley

Matthew Handley is a member of the International and Securities Fraud/Investor Protection practice groups.

Mr. Handley focuses much of his practice on enforcement of the federal securities laws on behalf of both domestic and international investors. He currently works on several active securities fraud actions, including *In re Converium Holding AG Securities Litigation* (S.D.N.Y.) and *In re Fannie Mae Securities Litigation* (D.D.C.).



Mr. Handley has been a frequent speaker at institutional investor conferences in Europe including the 2006 U.K. and Irish Pension Summit in Dublin and the 2006 European Pension Investment Forum.

Mr. Handley is also involved in the Firm's international civil and human rights actions, including representation of a class of Indian residents who have suffered from groundwater pollution and representation of disability groups against a nationwide builder for failing to design and build accessible apartments.

In his *pro bono* work, Mr. Handley has represented Nepali citizens in United States Immigration Court in political asylum proceedings and currently represents the families of Nepali laborers who were trafficked and killed while working in Iraq.

Prior to joining the Firm, Mr. Handley was a litigation associate at Covington & Burling in Washington, D.C.  He began his legal career as a law clerk for the Honorable William Wayne Justice, United States District Judge for the Eastern District of Texas.  Before attending law school, Mr. Handley served two years as a Peace Corps Volunteer in Nepal, working as a rural construction engineer.

Mr. Handley graduated from Princeton University with a B.S.E in Civil and Environmental Engineering (1997) and attended the University of Texas School of Law where he graduated with *high honors* in 2002 and was selected for the Order of the Coif and Chancellors Honor Society.  While at the University of Texas, he was an Articles Editor for the Texas Law Review and author of Why Crocodiles, Elephants, and American Citizens Should Prefer Foreign Courts: A Comparative Analysis of Standing to Sue, 21 Rev. Litig. 97 (2002).

Mr. Handley is admitted to practice in New York, the District of Columbia and the U.S. Court of Appeals for the Second Circuit.

**Karen L. Handorf**

Karen Handorf joined the Firm in 2007 as Of Counsel and is a member of the Employee Benefits (ERISA) practice group.

Ms. Handorf began her legal career at the Office of the Solicitor of Labor in 1975. In 1982, she joined the Plan Benefits Security Division (PBS) as a trial attorney where she litigated actions brought by the Secretary of Labor for violations of the fiduciary standards of the ERISA. In 1989, she was appointed Counsel for Decentralized and Special Litigation. As Counsel, Ms. Handorf was responsible for establishing and supervising the Department's amicus brief writing program which addressed a wide range of novel and difficult ERISA issues in both state and federal court. Through her supervision of the amicus brief writing program, Ms. Handorf was instrumental in shaping the law relating to preemption, remedies available under ERISA, and standards for evaluating fiduciary conduct with respect to ESOPs, termination annuities, and employer stock purchases. As Counsel, she was also responsible for supervising the Department's ERISA appellate litigation, district court litigation brought by regional offices of the Solicitor of Labor and administrative litigation involving the civil penalty provisions of ERISA. In 2001, she was appointed Deputy Associate Solicitor of PBS. As the Deputy Associate

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

Solicitor, she was responsible for overseeing litigation brought by the Secretary of Labor and legal advice provided to the Employee Benefit Security Administration, which administers Title I of ERISA. In 2005, she returned to her position as supervisor of the ERISA appellate and amicus brief writing program, serving as Counsel for Appellate and Special Litigation. Ms. Handorf is a recipient of the Department of Labor Distinguished Career Service Award.

Ms. Handorf received her law degree from the University of Wisconsin Law School in 1975, where she received the International Academy of Trial Lawyers Award, the Mathys Memorial Award for Appellate Advocacy, and First Place, Milwaukee Bar Association Moot Court Prize. Prior to law school, she attended the University of Wisconsin-River Falls where she received a B.S. in Speech and History.

Ms. Handorf is admitted to practice in Wisconsin. Her application to the District of Columbia. Bar is pending and she is currently practicing under the supervision of Marc I. Machiz, an enrolled active member of the District of Columbia Bar, pursuant to Rule 49(c)(8) of the Rules of the District of Columbia Court of Appeals.

### Andrea L. Hertzfeld

Andrea Hertzfeld, an Associate at Cohen Milstein, joined the Firm in 2004. She is a member of the International and Antitrust practice groups.

Ms. Hertzfeld currently is working on *Schwab v. Philip Morris, USA Inc., et. al.* (E.D.N.Y.), the largest class action lawsuit certified in history, alleging RICO violations by the major tobacco companies in the sale and advertisement of "light" cigarettes on behalf of approximately 50 million smokers. In addition, Ms. Hertzfeld is working on *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), alleging price-fixing of rates for airfreight shipping services by dozens of major international flagship airlines. She is also involved in, among other matters, the *In re Air Passenger Antitrust Litigation* (N.D.Ca), alleging price-fixing by British Airways and Virgin Atlantic airlines of surcharges added to the price of passenger tickets for long-haul flights and a related matter in the same court alleging similar price-fixing by Korean Air Lines and Asiana Airlines. Ms. Hertzfeld also works on the *In re LCD-TFT Flat Panel Antitrust Litigation* currently pending in the Northern District of California.

Ms. Hertzfeld worked as a summer associate at Cohen Milstein in 2003. She received a B.A. with University Honors in Economics from Bowling Green State University (2000, *summa cum laude*), where she was a Frazier Reams Scholar and a member of Phi Beta Kappa. She received her law degree from Harvard Law School in 2004, where she served as an Article Editor on the Women's Law Journal.

Ms. Hertzfeld is admitted to practice in Ohio and the District of Columbia.

### Megan E. Jones

Megan E. Jones, an Associate at the Firm, joined Cohen Milstein in 2001 and is a member of the Antitrust practice group.



She is currently involved in, among other class actions: *In re Polyester Staple Antitrust Litigation* (D. Conn.); *In re EPDM Antitrust Litigation* (D. Conn.); and *ERC v. Archstone* (D. Md.).

Ms. Jones is the author of several publications and presentations including *Bankers Beware: The Risks of Syndicated Credits*, in The North Carolina Banking Institute (1999); *Navigating the Sea of E-Commerce Regulation*, in Global E-Commerce Law and Business Report (2000); *A Legal Toolkit for E-Commerce in Latin America*, presented in Miami, FL (2000); a live webcast interview on Internet Regulation, at www.wallstreetreporter.com (2000); and co-author of *The Sedona Conference Glossary: E-Discovery and Digital Management (2nd Ed.)* (Dec. 2007).

Prior to coming to the Firm, Ms. Jones litigated intellectual property matters and represented clients before Congress at a Washington, D.C. law firm.

She received her B.A. in English from North Carolina State University in Raleigh, N.C. in 1995 (*magna cum laude*) and her J.D. from the University of North Carolina at Chapel Hill School of Law in 1999. During law school, she served as Article and Notes Editor of the Journal of the North Carolina Banking Institute. In addition, she competed as a member of the National Civil Trial Team. Ms. Jones also clerked for the Committee on the Judiciary, U.S. House of Representatives.

Ms. Jones is admitted to practice in North Carolina and the District of Columbia.

**Matthew B. Kaplan**

Matt Kaplan joined the Firm in 2005 as an Associate in the Securities Fraud/Investor Protection practice group.

Mr. Kaplan focuses his practice on litigation on behalf of individual and institutional investors. He is currently working on several active federal securities fraud actions, including *In re Buca Inc. Securities Litigation*, *In re C.P. Ships Securities Litigation*, *In re Dura Pharmaceuticals Securities Litigation*, and *In re ProQuest Securities Litigation*. He also represents the plaintiff in Conrad v. Blank, a derivative case in Delaware Chancery court which seeks to recover damages from Staples, Inc. executives who were improperly awarded backdated stock options.

Mr. Kaplan is also involved in the Firm's International Human Rights Practice Group. He currently represents several detainees at the U.S. Naval base in Guantanamo Bay, Cuba in proceedings before U.S. Courts.

Mr. Kaplan is a graduate of Georgetown University's School of Foreign Service (B.S.F.S., *with honors*). He received his law degree from The George Washington University Law School (J.D., *With Highest Honors*, Order of the Coif).

Before coming to Cohen Milstein, Mr. Kaplan was a litigation associate with White & Case, LLP. Prior to becoming an attorney he was a Foreign Service Officer with the U.S. Department of State and was stationed in Venezuela, Colombia, The Bahamas and Nicaragua.



Mr. Kaplan is admitted to practice in the District of Columbia and Virginia.

**Jon T. King**

Jon King joined the firm in 2008 as an Associate, and he is a member of the Antitrust Practice Group.

Among other matters, Mr. King is currently working on *In re Intel Corporation Microprocessor Antitrust Litigation*, MDL No. 1717 (D. Del.), in which plaintiffs allege monopolization of the market for x86 microprocessors. Mr. King also represents the Golden Gate Bridge, Highway & Transportation District in *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663 (D.N.J.), a case that has resulted in approximately $150 million in settlements to date.

Prior to joining the firm, Mr. King practiced antitrust law for eight years at The Furth Firm LLP, a San Francisco plaintiffs' firm, and worked on dozens of direct and indirect purchaser actions that resulted in hundreds of millions of dollars in settlements. He began his legal career in Los Angeles at Skadden, Arps, Slate, Meagher & Flom LLP. While in law school, Mr. King also served as a summer intern for the Honorable John M. Munter in San Francisco Superior Court.

At The Furth Firm, Mr. King was appointed as plaintiffs' interim liaison counsel in the complex antitrust case captioned *Hydrogen Peroxide Cases* (San Francisco Superior Court, JCCP No. 4416), and has been quoted on antitrust class action topics in *Rubber & Plastics News* and *Competition Law 360*.

Published opinion: *Jackson v. Kincaid, et al.*, 122 S.W. 3d 440 (Tex.-App.-Corpus Christi 2003). In that legal malpractice action, Mr. King represented the plaintiffs against the largest law firm in Oklahoma and various partners, and successfully obtained an appellate reversal establishing that Texas had personal jurisdiction over the defendant partners. The case subsequently was settled for a confidential sum.

Mr. King obtained his undergraduate degree from Santa Clara University, where he majored in Political Science and was a member of Pi Sigma Alpha, the national political science honor society. He received his law degree from the University of California, Hastings College of the Law in San Francisco, where he was Editor in Chief of the *Hastings Law Journal*, and graduated cum laude and as a member of the Order of the Coif.

Mr. King is admitted to practice in California, U.S. District Courts for the Northern and Central District of California, and the U.S. Court of Appeals for the Ninth Circuit.

**Kathleen M. Konopka**

Kathleen Konopka joined Cohen, Milstein, Hausfeld & Toll in December 2006 as an associate in the Antitrust practice group.

Prior to joining the firm, Ms. Konopka served as an Assistant United States Attorney for the District of Columbia. In that capacity, she prosecuted criminal defendants in both the local and federal courts and defended the United States in civil litigation at both the trial and appellate



levels. Ms. Konopka also conducted a large-scale review of the Federal Bureau of Investigation as an attorney advisor with the Department of Justice's Office of the Inspector General.

Ms. Konopka graduated from Northeastern University School of Law and Vassar College with a B.A. in Feminist Theory. She has also studied the impact of litigation on the enforceability of discrimination laws in Stockholm, Sweden.

Ms. Konopka is admitted to practice in Maryland and the District of Columbia.

**Kalpana Kotagal**

Kalpana Kotagal joined the firm as an associate in November, 2006 and is a member of the Antitrust practice group. Ms. Kotagal represents Registered Nurses employed by hospitals in Albany, Chicago, Detroit, Memphis, and San Antonio in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws.

Before attending law school, Ms. Kotagal worked in the environmental community as Assistant National Field Director of the United States Public Interest Research Group, running national legislative campaigns on energy and environmental issues, and as an organizer with Green Corps. She recently served as an advisor to a Congressional candidate.

While in law school, Ms. Kotagal was a summer associate at Cohen Milstein and served as law clerk in the Chambers of the Honorable J. Curtis Joyner, Eastern District of Pennsylvania. She was also involved in litigation under the Alien Tort Claims Act and RICO on behalf of Haider Mushin Saleh against contractors CACI and Titan for human rights abuses in Abu Ghraib prison. She served on the Editorial Board of the University of Pennsylvania Law Review as an Articles Editor.

Following law school, Ms. Kotagal clerked for the Honorable Betty Binns Fletcher, United States Court of Appeals for the Ninth Circuit.

Ms. Kotagal received her undergraduate degree from Stanford University (A.B., economics, B.S., earth systems, *with honors*, 1999) and was a Morris K. Udall Scholar. She received her law degree from the University of Pennsylvania (2005, *cum laude*), where she was a James Wilson Fellow.

Ms. Kotagal is the co-author, with Michael Hausfeld and Charles Tompkins, of "Innovation, Economics and the Law: The Health Care Industry's Exposure to Antitrust Liability," to be published by the ABA Antitrust Law Section in 2007.

Ms. Kotagal is admitted to practice in New York and the District of Columbia.

**Brent W. Landau**

Brent W. Landau, an Associate, joined Cohen Milstein in 2002 and is a member of the Antitrust practice group.



Mr. Landau currently is working on *Schwab v. Philip Morris USA, Inc., et al.* (E.D.N.Y.), alleging a RICO conspiracy and fraud in connection with the marketing and sale of "light" cigarettes; *In re Intel Corporation Microprocessor Antitrust Litigation* (D. Del.), alleging monopolization of the market for x86 microprocessors; and *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group, L.P.* (C.D. Cal.), alleging monopolization of the market for pulse oximetry products. Other cases in which he has been involved include *In re Vitamins Antitrust Litigation* (D.D.C.), where a 2003 trial resulted in a trial verdict in favor of the plaintiffs and the class of $49.5 million before trebling, the fifth largest that year; *Ferko v. National Association for Stock Car Auto Racing, Inc.* (E.D. Tex.), alleging anticompetitive conduct in the market for top-level stock car racing (a settlement in the case succeeded in bringing the inaugural second Nextel Cup Series race to Texas Motor Speedway); and *Meijer, Inc. v. 3M Co.* (E.D. Pa.), alleging monopolization of the market for invisible and transparent tape (an approximately $28 million settlement was approved in 2006).

Prior to joining the Firm, Mr. Landau served as a judicial law clerk to the Honorable Bruce W. Kauffman, United States District Court for the Eastern District of Pennsylvania.

He is the author of *State Employees and Sovereign Immunity: Alternatives and Strategies for Enforcing Federal Employment Laws*, 39 Harv. J. on Legis. 169 (2002); *State Bans on City Gun Lawsuits*, 37 Harv. J. on Legis. 623 (2000); and *Sovereign Immunity and You: How New York State Employees Can Enforce Their Federal Employment Rights*, United University Professions Working Paper Series (Dec. 2005) (presented at November 2005 UUP conference on "Preserving the Rights of Public Employees").

Mr. Landau graduated from the State University of New York at Binghamton, where he received a B.A. in History and Philosophy (*summa cum laude*, 1998) and was a member of Phi Beta Kappa. He obtained his law degree from Harvard Law School (*cum laude*, 2001), where he was co-chairperson of the Tenant Advocacy Project and a supervising editor of the *Harvard Journal on Legislation*.

Mr. Landau is admitted to practice in Pennsylvania, New York, and the District of Columbia.

**Christopher L. Lebsock**

Christopher L. Lebsock, Of Counsel, joined Cohen Milstein in January 2008 and is a member of the Antitrust practice group.

Mr. Lebsock is currently working on a number of computer technology antitrust cases including *In re Flash Memory Antitrust Litigation* (N.D. Cal.), *In re TFT-LCD* (Flat Panel) Antitrust Litigation (N.D. Cal.), and *In re Intel Corp. Microprocessor Antitrust Litigation* (D. Del.).

Prior to joining the Firm, Mr. Lebsock was a principal attorney with The Furth Firm, LLP where he specialized in complex business litigation, particularly antitrust and labor and employment class actions. Mr. Lebsock was a principal member of the plaintiffs' trial team in *Savaglio v. Wal-Mart*, a class action of nearly 119,000 Wal-Mart hourly employees who sued their employer for wrongfully denying them meal periods and rest breaks. After more than three months of trial, the jury returned a verdict for the plaintiff class of more than $172 million, including $115

COHEN MILSTEIN
HAUSFELD & TOLL PLLC

million in punitive damages.  Mr. Lebsock was also the primary attorney at the firm responsible for litigating *In Re Automobile Antitrust Cases I & II*, (S.F. Superior Court), a California class action in which the plaintiffs alleged that major automobile manufacturers illegally conspired to prevent the export of Canadian vehicles to the United States.  Mr. Lebsock authored and argued an appeal in that case before California's First District Court of Appeals.  The decision is published at 135 Cal.App.4th 100 (2005).

Mr. Lebsock graduated from the University of Colorado, Boulder (1993), where he received a B.A. in Economics and was a member of Phi Beta Kappa.  He obtained his law degree from the University of California, Hastings College of the Law (1996).  He was Senior Managing Editor of the Hastings Constitutional Law Quarterly.

Mr. Lebsock is admitted to practice in California.

**Jason M. Leviton**

Jason M. Leviton, an Associate at Cohen Milstein, joined the Firm in 2004 as a member of the Securities Fraud/Investor Protection practice group.  Prior to joining Cohen Milstein, Mr. Leviton was a securities class-action attorney with another well-known securities class action firm.

He has been involved in several major securities fraud cases at the Firm, including the class actions *In re Verisign Securities Litigation* (N.D. Cal.; settled for approximately $78 million); *Bovee v. Coopers & Lybrand, et al.* (S.D. Ohio; settled for $7.5 million); *In re Xybernaut Securities Litigation* (E.D. Va.; motions to dismiss denied); *Ong v. Sears, Roebuck, and Co.* (N.D. Ill; motions to dismiss denied and class certification pending); *Welmon, et al. v. Chicago, Bridge & Iron N.A., et al.* (motions to dismiss denied and class certification pending); and *In re SOURCECORP Securities Litigation* (N.D. Tex.; motion to dismiss denied against non-speaking defendant pursuant to SEC Rule 10b-5(a) and (c)).

In addition to his securities litigation practice, Mr. Leviton is also heavily involved in many of the Firm's client outreach efforts.  These efforts include working on the Firm's monthly and quarterly reports to its clients and also with responding to Requests for Proposals from pension funds seeking securities litigation monitoring counsel.

Mr. Leviton attended Gonzaga University where he received both a B.A. in Philosophy (2000) and a J.D. (*cum laude*, 2003).  While in law school, he won the Linden Cup Moot Court competition and was a member of the Editorial Board of the International Law Journal.  Mr. Leviton also received a Master of Laws (Dean's Certificate, 2004) in Securities and Financial Regulations from Georgetown University Law Center.  While at Georgetown, he was the inaugural LL.M. student selected for an externship with the SEC's Division of Enforcement.

Mr. Leviton is admitted to practice in the District of Columbia, State of Washington, and Florida.

**James E. McGovern**



James McGovern focuses his practice on investor protection issues.  Since joining Cohen Milstein, he has worked on several well-known securities fraud cases, including cases currently pending against WorldCom and Parmalat.  Prior to joining Cohen Milstein, Mr. McGovern was an associate at Latham & Watkins where he worked on complex litigation and FIFRA arbitrations.

Mr. McGovern received his law degree from Georgetown University Law Center where he graduated magna cum laude (2002) and was selected for the Order of the Coif.  Prior to law school, he attended American University where he received a B.A., International Studies (1994) and a M.B.A., Finance (1998), with high honors.

Mr. McGovern is admitted to practice in Maryland and the District of Columbia.

**Melissa M. McGuane**

Melissa McGuane, an associate at the Firm, joined the Chicago office of the Firm in 2007 as a member of the Securities Fraud/Investor Protection practice group.

Ms. McGuane currently is involved in a number of securities fraud cases at the Firm, including *Ong v. Sears, Roebuck, and Co., et al.* (N.D. Ill.) and the City of Chicago's case against on-line travel providers.

Prior to joining the Firm, Ms. McGuane spent nearly five years as a litigation associate with the law firm of Ross, Dixon & Bell, LLP.  While at Ross, Dixon & Bell, LLP, Ms. McGuane's practice focused on insurance coverage, civil rights and plaintiffs' antitrust litigation.  Ms. McGuane also provided pro bono representation to individuals seeking asylum.

Ms. McGuane graduated from Miami University in Oxford, Ohio, with a B.S. in Business Economics (*cum laude*, 1999), and received her law degree from American University's Washington College of Law (*cum laude*, 2002).  At the Washington College of Law, Ms. McGuane was a member of the *American University Law Review* and Moot Court Board.

Ms. McGuane is admitted to practice in Illinois, West Virginia, Maryland and the District of Columbia.

**Douglas J. McNamara**

Douglas McNamara, Of Counsel at the Firm, joined Cohen Milstein in 2001 as a member of the Antitrust and Consumer Protection practice groups.

He is currently involved in litigation surrounding  defective products like multifunction printers made by Brother.  He also works on a variety of product liability cases involving pharmaceuticals, like OxyContin and Vioxx.

Prior to joining Cohen Milstein, Mr. McNamara was a litigation associate at Arnold & Porter, specializing in pharmaceutical and product liability cases. He started his career at New York City's Legal Aid Society, defending indigent criminal defendants at trial and on appeal.



He has authored two law review articles: *Buckley, Imbler and Stare Decisis: The Present Predicament of Prosecutorial Immunity and An End to Its Absolute Means*, 59 Alb. L. Rev. 1135 (1996); and *Sexual Discrimination and Sexual Misconduct: Applying New York's Gender-Specific Sexual Misconduct Law to Minors*, 14 Touro L. Rev. 477 (Winter 1998).

A Phi Beta Kappa, Mr. McNamara graduated from SUNY Albany with a B.A. in Political Science (*summa cum laude*, 1992) and New York University School of Law (J.D., 1995).

Mr. McNamara is admitted to practice in New York and the District of Columbia.

**Steig D. Olson**

Steig D. Olson joined the Firm as an Associate in 2003 as a member of the Antitrust practice group.

He is currently involved in, among other cases, *In re Plastics Additives Antitrust Litigation*, (E.D.Pa) in which plaintiffs allege a price-fixing conspiracy by manufacturers of additives for plastics in the United States; *Molecular Diagnostics Laboratories v. Hoffman-La Roche, Inc.* (D.D.C.), for the unlawful monopolization of an enzyme used in DNA amplification, human-genome research, and medical diagnostics; and *Griffin v. Concord EFS, Inc*. (N.D.Cal.), which alleges that member banks of a network conspired to fix fees associated with ATM transactions.

Mr. Olson is the author of *Efforts to Delay Competition from Generic Drugs: Litigation Along a Seismic Fault Between Antitrust and Intellectual Property Law*, co-authored with Joshua P. Davis, 39 U.S.F.L. Rev. 1 (2004). He has also provided research assistance for several articles, including those of V. Schultz, *The Sanitized Workplace*, 11 Yale L.J. 2061 (2003); M. Mutua, *Savages, Victims, and Saviors: The Metaphor of Human Rights*, 42 Harv. Int'l L.J. 201 (2001); and L. Guinier, *Confirmative Action*, 25 L. & Soc. Inquiry 565 (2000).

Before joining Cohen Milstein, Mr. Olson clerked for the Honorable Barrington D. Parker, Jr. of the United States Court of Appeals for the Second Circuit, and the Honorable Vaughn R. Walker of the United States District Court for the Northern District of California.

Mr. Olson graduated from Harvard Law School, *magna cum laude* (J.D., 2001) and Vassar College with a B.A. in Philosophy (1997).

Mr. Olson is admitted to practice in New York.

**James J. Pizzirusso**

James Pizzirusso joined the Firm in 2001 as an Associate and is a member of the Unsafe Drugs & Environmental Health Threats, Consumer Protection and Antitrust practice groups.

Mr. Pizzirusso is currently working on several cases involving toxic products and public health. He represents the City of Milwaukee in a public nuisance lawsuit against lead paint manufacturers and was a member of the successful appellate team in that case. In overturning summary judgment in favor of defendants, the Wisconsin Court of Appeals became the first

COHEN MILSTEIN
HAUSFELD & TOLL PLLC

appellate court in the country to recognize the right of a governmental entity to bring a public nuisance and conspiracy lawsuit against the lead paint industry. Mr. Pizzirusso was also one of the primary authors of the plaintiffs' class certification briefs in a RICO case involving "light" cigarettes - one of the largest class actions ever certified, *Schwab v. Philip Morris, Inc.*, 449 F. Supp. 2d 992 (E.D.N.Y. 2006).

Mr. Pizzirusso has served as a panelist at several conferences and CLEs and presented on topics including: "Strategies for Pursuing Litigation Remedies in Eliminating Childhood Lead Poisoning," "Developing Novel Theories of Recovery in Toxic Tort Litigation," "Consumer Protection Law," and "Public Interest Tort Litigation: Using Private Tort Actions to Further Environmental Justice & Public Ends." He has also served as a Visiting Associate Professor of Clinical Law and Co-Director of the Vaccine Injury Clinic at George Washington University Law School. He is the author of two published papers: *Agency Rule-Making Power and the Clean Air Act: Putting the Brakes on American Trucking, Spring 2001 Term: Whitman v. American Trucking Associations, Inc.*, 7 Envtl. Law. 729 (June, 2001) and *Increased Risk, Fear of Disease and Medical Monitoring – Are Novel Damage Claims Enough to Overcome Causation Difficulties in Toxic Torts*, 7 Envtl. Law. 183 (September, 2000).

Mr. Pizzirusso graduated *summa cum laude* from the University of Tennessee-Knoxville with a B.A. in Environmental Policy. While in college, he was a Whittle Scholar, a member of Phi Beta Kappa and earned the Torchbearer award (the highest student honor conferred by the University) . In 2001, Mr. Pizzirusso obtained his law degree from George Washington University Law School (with honors) where he was a note writer for the *Environmental Lawyer Journal* and the Student Director of the law school clinical program. He was also Vice President of the Trial Court Board and Captain of a team that placed first in the region in ATLA's 2000-2001 Student Trial Advocacy Competition.

Mr. Pizzirusso is admitted to practice in the District of Columbia, Virginia, the Fourth Circuit Court of Appeals, the Court of Federal Claims and the Eastern and Western Districts of Arkansas.

### Hilary K. Ratway

Hilary Ratway joined the Firm in the summer of 2006 as an Associate, and she is a member of the Antitrust Practice Group.

Ms. Ratway is currently working on *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), in which a partial settlement of $85 million was reached with defendants Deutsche AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd. and *In re OSB Antitrust Litigation* (E.D. Pa.), in which a class of direct purchasers was recently certified. Ms. Ratway also works on *Boyd et al. v. AWB Limited* (S.D.N.Y.), an antitrust and RICO class action brought on behalf of American wheat farmers. The wheat farmers allege that a AWB Limited, an Australian wheat exporter, bribed the Saddam Hussein regime under the United Nations Oil for Food Program in exchange for a monopoly in the Iraqi wheat market and the exclusion of American wheat from the Iraqi market. Other antitrust cases Ms. Ratway works on include: *In*



*re Air Transportation and Surcharge Antitrust Litigation* (N.D. Cal.), *In re Publication Paper Antitrust Litigation* (D. Conn.), and *Behrend v. Comcast Corp.* (E.D. Pa.).

In addition to representing victims of anticompetitive conduct, Ms. Ratway also represents Holocaust victims in a breach of contract case alleging certain German corporations failed to pay appropriate interest due on their payments to a reparations fund.

Prior to joining the firm, Ms. Ratway worked at The Furth Firm in San Francisco, California and Finkelstein, Thompson & Loughran in Washington, D.C., where she gained substantial experience representing plaintiffs in antitrust and consumer fraud class actions. Among other cases, Ms. Ratway was involved in *Schwab v. Philip Morris USA et al.* (E.D.N.Y.), the largest class action ever certified, in which the plaintiffs allege a RICO conspiracy and fraud in connection with the marketing and sale of "light" cigarettes.

During law school, Ms. Ratway interned at the United States Supreme Court in the Office of Legal Counsel and for the Honorable Ricardo M. Urbina of the United States District Court for the District of Columbia.

Ms. Ratway received a B.A. in Environmental Studies from the University of Colorado, Boulder (1996) and a J.D. from the American University Washington College of Law (2000, *cum laude*).

Ms. Ratway is admitted to practice in California and the District of Columbia.

**Bruce F. Rinaldi**

Bruce Rinaldi joined the Firm in 2004 as Of Counsel and is a member of the Employee Benfits practice group.

After clerking for United States District Judge James A. Walsh in Tucson, Arizona, Mr. Rinaldi taught at the University of Arizona School of Law and was in private practice in Tucson before serving as a Special Counsel in the Office of the General Counsel at the Securities and Exchange Commission. In 1979 he joined the Special Litigation Division in the Office of the Solicitor of Labor as Supervisory Trial Attorney, where he ran the litigation of *Donovan v. Fitzsimmons* (N.D. Ill.)*,* negotiating and drafting a consent decree governing the management of billions of dollars in assets of the Teamsters Central States Pension Fund, which remains in effect today. Mr. Rinaldi also conducted a four month trial of allegations of ERISA fiduciary breaches with respect to the Teamsters Central States Health and Welfare Fund in *Brock v. Robbins* (D.C. N.D. Ill.).

In 1985 Mr. Rinaldi became the Senior Trial Attorney in the Plan Benefits Security Division of the Department of Labor. Mr. Rinaldi litigated a wide range of major fiduciary breach cases brought by the Secretary of Labor under ERISA including the seminal case of *Reich v. Valley National Bank* ( S.D.N.Y.), concerning fiduciary breaches in the acquisition of employer stock by an ESOP. In 1989 Mr. Rinaldi joined the Office of Thrift Supervision ("OTS") as the Associate Chief Counsel for Litigation and directed investigations and enforcement actions under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") for fiduciary breaches arising out of failures of thrifts and savings and loan organizations. He



directed all of the enforcement actions taken by the OTS against officers, directors, accountants, and attorneys associated with Lincoln Savings and Loan Association, the largest thrift failure in history. *See In re American Continental Corp./Lincoln Sav. & Loan Securities Litigation* (D.C. Ariz.).

In 2000, Mr. Rinaldi left the government for private practice. As the senior litigator at the McTigue Law Firm, Mr. Rinaldi was responsible as co-lead counsel for several cases, including the approved settlement of a case against the fiduciaries of the Morrison Knudson 401(k) plan; *In re McKesson HBOC, Inc. ERISA Litigation* (N.D. Cal.); and *In re CMS Energy ERISA Lit*iga*tion* (E.D.Mich.).

Mr. Rinaldi earned a B.A. in Political Science from the University of California at Berkeley in 1969, after spending three years as a Peace Corps volunteer in Venezuela, and then received his law degree from the University of California at Davis (King Hall) in 1972.

Mr. Rinaldi is admitted to practice in the District of Columbia and is an inactive member of the Arizona and California Bars.

**Sharon K. Robertson**

Sharon K. Robertson, an Associate, joined Cohen Milstein in 2007 and is a member of the Antitrust practice group.

In the antitrust field, Ms. Robertson currently represents Registered Nurses employed by hospitals in Albany and Memphis in lawsuits alleging that their employers unlawfully fixed their wages in violation of federal antitrust laws. Ms. Robertson is also working on *In re: Hydrogen Peroxide Antitrust Litigation* (E.D.Pa.), a lawsuit alleging price-fixing on behalf of purchasers. In the international human rights field, Ms. Robertson currently represents Indonesian villagers in a lawsuit against Exxon Mobil over torture and extrajudicial killings allegedly committed by the defendant's security forces (a unit of the Indonesian military).

Before attending law school, Ms. Robertson worked on the campaign committee of Councilman John Liu, the first Asian-American to be elected to City Council.

During law school, Ms. Robertson served as an Alexander Fellow. In that capacity, she spent a semester interning full-time within the Chambers of the Honorable Shira A. Scheindlin, United States District Court for the Southern District of New York. She was also an intern in the Litigation Bureau of the Office of the New York State Attorney General and the United States Court of Appeals for the Second Circuit.

Ms. Robertson graduated from the State University of New York at Binghamton, where she received a B.A. in Philosophy, Politics and Law (*magna cum laude*, 2003) and was a member of Phi Eta Sigma National Honor Society and the Golden Key International Honor Society. She received her law degree from the Benjamin N. Cardozo School of Law (J.D., 2006). She served as Notes Editor of the Cardozo Public Law, Policy and Ethics Journal.

COHEN MILSTEIN
HAUSFELD & TOLL P.L.L.C.

Ms. Robertson is admitted to practice in New York and New Jersey.

**Bernard S. Sharfman**

Bernard Sharfman joined the Firm in 2006 as Of Counsel and is a member of the Securities Fraud/Investor Protection group.

Mr. Sharfman's legal work experience has included being a legal analyst for Bloomberg Law Reports, a member of the editorial staff of the Takeover Stock Report and an associate counsel for MERSCORP, Inc. in Vienna, Virginia. Mr. Sharfman began his legal career as an associate with the corporate and securities law firm of Muldoon Murphy & Aguggia LLP in Washington, DC. Prior to entering law school, Mr. Sharfman worked for nine years at Fannie Mae and for four years at the Office of Finance, Federal Home Loan Banks.

Mr. Sharfman is the author of two recent articles on the business judgment rule: *Being Informed Does Matter: Fine Tuning Gross Negligence Twenty Plus Years after Van Gorkom*, The Business Lawyer, Vol. 62, No. 1 (November 2006) and *Understanding Maryland's Business Judgment Rule*, Duquesne Business Law Journal, Vol. 8 (Spring 2006). Mr. Sharfman is also the author of *Modifying Model Rule 5.4 to Allow for Minority Ownership of Law Firms by NonLawyers*, Georgetown Journal of Legal Ethics, Vol. 13, No. 3 (Spring 2000).

Mr. Sharfman is a graduate of the Georgetown University Law Center (J.D., 2000) where he was an Executive Editor of the Georgetown Journal of Legal Ethics and the recipient of the journal's Saint Thomas More Award, American University (M.S. in Accounting, 1995), the University of Michigan (M.A. in Economics, 1983), The University of Toledo (M.B.A. (Finance), 1980) and The Ohio State University (B.S. Bus. Adm. *cum laud*e (Economics), 1979).

Mr. Sharfman is a member of the Maryland and District of Columbia bars.

**Daniel Tenny**

Daniel Tenny, an Associate at Cohen Milstein, joined the Firm in September 2007. He is a member of the Civil Rights & Employment practice group.

Mr. Tenny is currently involved in *Keepseagle v. Johanns*, in which Native American farmers and ranchers allege discrimination in the United States Department of Agriculture's provision of agricultural loans, and *Amos v. GEICO*, in which African-American consumers allege that GEICO discriminates against them by considering level of education and occupation when it sets automobile insurance rates.

Prior to joining the Firm, Mr. Tenny served as a law clerk for the Honorable David H. Souter of the Supreme Court of the United States. Before his clerkship with Justice Souter, he was a law clerk for the Honorable David S. Tatel of the United States Court of Appeals for the District of Columbia Circuit.



Mr. Tenny graduated from Harvard University (A.B. in Mathematics, *cum laude*, 1999) and the University of Michigan Law School (J.D., *summa cum laude*, 2005). While at Michigan, he served as Executive Note Editor of the Michigan Law Review and published his own Note, *There Is Always a Need: The "Necessity Doctrine" and Class Certification Against Government Agencies*, 103 Mich. L. Rev. 1018 (2005). Mr. Tenny spent his summers during law school in the Housing Unit at South Brooklyn Legal Services and in the Office of General Counsel at the Equal Employment Opportunity Commission.

Mr. Tenny is admitted to practice in New York. His application to the District of Columbia Bar is pending and he is currently practicing under the supervision of Joseph M. Sellers, an enrolled active member of the District of Columbia Bar, pursuant to Rule 49(c)(8) of the Rules of the District of Columbia Court of Appeals.

## Patrick A. Tillou

Patrick Tillou, an Associate at the Firm, joined Cohen Milstein in 2006 and is a member of the Antitrust practice group.

Mr. Tillou is currently working on *In re New Motor Vehicles Canadian Export Antitrust Litigation* and *In re OSB Antitrust Litigation*, among other cases. Before joining Cohen Milstein, Mr. Tillou previously worked for Winston & Strawn and Cleary, Gottlieb, Steen & Hamilton, where he focused on antitrust, including counseling, mergers and litigation, as well as other complex civil and commercial litigation. He has also done appellate work and collateralized securities offerings.

Mr. Tillou graduated from Duke University with a bachelor's degree in Psychology (1997, *magna cum laude*) and attended law school at the University of Michigan (1999, *cum laude*). During law school, he also studied European Union and international law at the Katholieke Universiteit in Leuven, Belgium.

Mr. Tillou is admitted to practice in the U.S. Virgin Islands and the District of Columbia, and is a member of the bar of the United States Supreme Court.

## Catherine A. Torell

Catherine A. Torell is Of Counsel at Cohen Milstein. She joined the Firm in 2002 and is a member of the Securities Fraud/Investor Protection practice group.

Currently, Ms. Torell is involved in the *In re Parmalat Securities Litigation* (S.D.N.Y.) in which Cohen Milstein serves as co-lead Counsel. She also conducts investigations of securities fraud cases for the practice group, working with all of its litigators.

Prior to joining Cohen Milstein, Ms. Torell was associated with the firm of Entwistle & Cappucci LLP, where she served as one of co-lead counsel in *In re Providian Financial Securities Litigation* ($38 million settlement). In approving the settlement, the Court remarked on the "extremely high quality" and "skill and efficiency" of plaintiffs' counsel's work throughout the litigation. Ms. Torell also was previously associated with Goodkind Labaton Rudoff &



Sucharow LLP, where she served as counsel to the New York City Pension Funds in *In re Orbital Sciences Corp. Securities Litigation* ($22.5 million settlement), and was a key member of the litigation team that successfully resisted defendants' efforts to dismiss the case. Ms Torell also served as counsel to the Florida State Board of Administration in *LaPerriere v. Vesta Insurance Group, et al.*, and as counsel to Amalgamated Bank of New York in *In re Bristol-Myers-Squibb Securities Litigation* ($61 million settlement).

Ms. Torell received a B.A. in Political Science from Stony Brook University (1984) and her law degree from St. John's University School of Law (1990) where she was the recipient of the Federal Jurisprudence Award.

Ms. Torell is admitted to practice in New York.

**Michelle C. Yau**

Michelle Yau joined the firm as an associate in August 2007 and is a member of the Employee Benefits practice group.

Prior to joining the firm Ms. Yau was an attorney in the Solicitor's Office of the U.S. Department of Labor, where she was responsible for the enforcement and administration of a variety of labor statutes. She started with the Department of Labor in the Honors Program where she was involved in several litigation matters, including the Department of Labor's Enron litigation alleging violations of ERISA. During law school Ms. Yau worked in the Employee Benefits and Executive Compensation Group of Shearman & Sterling, at the labor law firm of Segal Roitman & Coleman, and in the New York office of Tibetan Government in exile. Before law school, Ms. Yau worked as a financial analyst at Goldman, Sachs & Co. in the Financial Institutions Group of the Investment Banking Division.

Ms. Yau received her law degree from Harvard Law School in 2003, where was awarded several public interest fellowships, including the Heyman Fellowship for academic excellence and a demonstrated commitment to federal public service. Ms. Yau received a B.A. in Mathematics (with distinction, 1997) from the University of Virginia, where she was a member of Phi Beta Kappa and Phi Mu Epsilon (mathematics honors fraternity). Ms. Yau was also selected as an Echols Scholar and awarded the Student Council Scholarship for leadership, academic achievement and community service.

Ms. Yau is admitted to practice in the United States Court of Appeals for the Fourth Circuit and Massachusetts. Her application to the District of Columbia Bar is pending and she is currently practicing under the supervision of Marc I. Machiz, an enrolled active member of the District of Columbia Bar, pursuant to Rule 49(c)(8) of the Rules of the District of Columbia Court of Appeals.

IMANAGE 221910.3
9/07/07

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEVEN SCHMALZ, on behalf of himself
and all others similarly situated,

Plaintiff,

v.

MBIA, INC., GARY C. DUNTON and C.
EDWARD CHAPLIN,

Defendants.

---

Civil Action No. _____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Steven Schmalz ("Plaintiff"), by his undersigned counsel, brings this action on behalf of himself and all other similarly situated persons (the "Class"), other than Defendants and their affiliates (as described herein), who purchased or otherwise acquired securities of MBIA, Inc. ("MBIA" or the "Company"), between January 30, 2007, through and including January 9, 2008 (the "Class Period"), for violations of the federal securities laws.  Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  The allegations of this Complaint are based on Plaintiff's personal knowledge as to himself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters.

## SUMMARY OF THE ACTION

1.    After the close of trading on December 19, 2007, MBIA – one of the country's largest insurers of credit risk and a company whose reputation for conservative

risk management and ability to maintain its AAA credit rating is the lynchpin of its survival – dropped a bombshell on investors. That day, the Company disclosed for the first time that it faced an additional $8.1 billion of exposure from insuring some of the riskiest securities in the marketplace – collateralized debt obligations ("CDOs") comprised of other CDOs (so called "CDO-squared securities"), whose underlying collateral included residential mortgage backed securities ("RMBS").

2.      The investing public promptly realized that the true risk of investing in MBIA was far higher than previously understood and securities analysts expressed "shock" and "dismay" that "management withheld this information for as long as it did." Losses arising from RMBS securities have already caused other financial institutions to suffer billions in write-downs and increased loss reserves amidst the mortgage meltdown wreaking havoc throughout the economy and could easily wipe out MBIA's already dwindling capital cushion. Investors recognized that MBIA's AAA-credit rating would disappear if its capital became depleted due to these previously hidden obligations, and its insurance business would evaporate along with the rating.

3.      Despite months of specific investor questions to MBIA's senior executives regarding the Company's exposure to assets of this sort, Defendants continually assured the market that its risk exposure was materially lower and safer than it actually was. When the Company finally was forced to admit the true state of affairs because of heightened credit rating agency scrutiny, the price of MBIA stock immediately declined by 26 percent in one trading day, wiping out hundreds of millions of dollars in investor value.

4.     But the Company's December 20 disclosure was just the beginning.  Just a few weeks after this partial disclosure, on January 8, 2008, MBIA's stock price plummeted again as market analysts downgraded MBIA in light of its far-worse than previously disclosed financial condition.

5.     The next day, MBIA stock declined again when the Company disclosed extensive steps necessary to improve its deteriorating capital position and disclosed write-downs arising from mortgage-backed securities and CDOs.  After discussions with the SEC, the Company also revised the disclosures from its 2006 annual report to include more details about the risks it faces from credit-rating downgrades and the reduction in credit quality of the types of debt it insures.  During this two day flurry of news, MBIA's stock price declined from $18.07 per share at the opening on January 8, to $13.40 at the close on January 9, with an intraday trading low of $11.11 per share, reflecting the market's realization of the truth about MBIA's financial weakness and its prior misleading actions.

<u>**JURISDICTION AND VENUE**</u>

6.     The claims asserted herein on behalf of the Class arise under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated by the SEC.

7.     This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

8.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this district.

3

9.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

## PARTIES

10.    Plaintiff Steven Schmalz purchased shares of MBIA during the Class Period and was injured thereby.

11.    Defendant MBIA, Inc. ("MBIA" or "the Company") is a Connecticut corporation with its principal executive offices located at 113 King Street, Armonk, New York 10504.    MBIA, through its subsidiaries, describes itself as a leading financial guarantor and provider of specialized financial services intended to meet the credit enhancement, financial and investment needs of public and private sector clients, domestically and internationally.    MBIA trades on the New York Stock Exchange under the ticker symbol MBI and has more than 125 million shares outstanding.

12.    Defendant Gary C. Dunton ("Dunton") served at all relevant times as Chief Executive Officer, President and Chairman of the Board of Directors of MBIA.

13.    Defendant C. Edward Chaplin ("Chaplin") served at all relevant times as Chief Financial Officer and Vice-Chairman of the Board of Directors of MBIA.

14.    Dunton and Chaplin are referred to collectively herein as the "Individual Defendants," and, together with MBIA, are referred to as the "Defendants."

## FACTUAL ALLEGATIONS

### A.    BACKGROUND ON MBIA'S BUSINESS

15.    MBIA is the nation's largest monoline guarantor of financial risk, insuring over $650 billion in municipal bonds and other debt instruments.    Nearly all of the

Company's revenue and net income are generated by its financial guarantee business through its wholly owned subsidiary MBIA Insurance Corporation (referred to collectively with MBIA, Inc. as "MBIA" or the "Company").

16.    The Company's core business is quite simple: a bond issuer, most often a municipality whose independent debt ratings are below investment grade (and whose stand-alone borrowing costs reflect below investment-grade interest rates), pays a premium to have its bonds insured by a triple-A-rated guarantor like MBIA.

17.    This insurance or guarantee allows the bonds to be sold based on MBIA's triple-A rating rather than the municipality's rating, thus lowering the municipality's interest expense.  In industry parlance, MBIA "wraps" the bond issue by agreeing to pay all principal and interest payments in the event the issuer cannot meet its obligations.

18.    MBIA then recognizes the insurance premium as income over the life of the insurance.  Owing to the benefit to bond issuers of lowering their interest expense, MBIA has reported steady and predictable earnings.  Market analysts have highlighted these attributes when recommending the stock.

19.    The Company has repeatedly observed that maintaining its triple-A credit rating is vital to the continued success of its business, referring to it as MBIA's "Good Housekeeping Seal of Approval."  As described by MBIA CEO Gary Dunton, "MBIA's true constant – our North Star, if you will – is our commitment to protecting our triple-A ratings."  MBIA touts its long history with a triple-A rating in its SEC Form 10-K's, noting: "MBIA Corp. has triple-A financial strength ratings from Standard and Poor's Corporation ("S&P"), which the Association received in 1974; from Moody's Investors

Service, Inc. ("Moody's"), which the Association received in 1984; from Fitch, Inc. ("Fitch"), which MBIA Corp. received in 1995."

20.    Maintaining the highest credit rating possible is essential to MBIA's guaranty business – the ability of MBIA's clients to reduce their interest rates depends on the market's absolute faith in MBIA's ability to step in and make good on its client's obligations should their client default in any way. In effect, MBIA's only "product" that it sells is the lower interest expense it can offer by virtue of its credit rating. Defendants (as well as investors) have long understood that losing its AAA-rating would leave MBIA without any legitimate means of income.

21.    Of all the criteria examined by the rating agencies, capital cushion– the Company's capacity to pay claims if needed – is a primary consideration in securing MBIA's triple-A rating. In assessing capital adequacy, reports of loss reserves and of exposure to especially risky insured products are particularly important to the rating agencies and the investing community, since MBIA's capital cushion depends on payouts on insurance obligations remaining relatively close to the Company's expectations. A sharp increase in losses beyond reserves would threaten MBIA's capital cushion and its investment grade rating.

22.    As of the end of 2006, MBIA reported excess capital of $1.5 billion. Thus, if MBIA's insurance losses exceeded its various loss reserves by that amount, its capital would be wiped out and its investment grade rating jeopardized. Even if over 90% of MBIA's insured portfolio were comprised of the safest municipal bond obligations (and as described below, municipal bonds represented a far lower percentage during the Class Period), if the remaining 10% of the $650 billion insured portfolio were

risky or unstable securities, MBIA's excess capital would face a very significant risk of evaporation due to losses.

23.    As a result, it was imperative for MBIA to inform investors of the "tails" of its portfolio as well as the averages, *i.e.*, since the riskiest portions of the portfolio were potentially sufficient to wipe out MBIA's capital, investors focused on understanding these risks.  In other words, MBIA's business necessarily left it virtually no room for error in accounting for risk or losses, and a sudden increase in risk or loss would be likely to cause investors to flee.

24.    Historically, MBIA has maintained low reserves, which it justified by citing its "rigorous underwriting and pricing discipline."  MBIA assured investors that each deal it guarantees undergoes a thorough screening and risk analysis to ensure the highest credit quality standards before the Company agrees to provide its "wrap."

25.    MBIA established two separate loss reserves each quarter.  The first, "case loss" reserves, are tied to specific credit defaults where the default was both reasonably certain and estimable.

26.    The second, "unallocated loss" reserves, were reserves taken based on the assumption that in any given portfolio of loans, a certain percentage of those loans will go into default and result in claims on MBIA for all or part of the defaulted obligations. MBIA used a "formula-based" approach, taking into consideration factors such as "the composition of the Company's insured portfolio by municipal sector, structured asset class, remaining maturity and credit quality, along with the latest industry data, including historical default and recovery experience for the relevant sectors of the fixed-income market in order to determine if a trend is developing that indicates the loss factor should

be increased or decreased." The Company states that it also "considers its own historical loss activity and how those losses develop over time."

27.    MBIA's claimed expertise in assessing the risk of municipal and other bond issuers was a key factor in supporting the low reserves that MBIA took when issuing its wrap.  Indeed, for most of its history, MBIA received virtually all of its earnings by insuring municipal bonds.  Although each municipality has its unique characteristics, MBIA's long experience underwriting risk in this field allowed it to report exceptionally small write-offs and reserves for future losses on its guaranty business.  Investors credited MBIA's low loss reserves as a function of its extensive experience and knowledge of the risk in the products it insured.

28.    After determining this "formula-based" expected loss rate, a fixed rate of each quarter's insurance premiums are set aside as unallocated loss reserves.  Throughout the Class Period – indeed, since 2002 – MBIA maintained a constant rate of reserving 12% of new insurance premium income.  This indicated to the public that MBIA believed the credit risk associated with its overall insured portfolio had remained constant *i.e.*, MBIA led investors to believe that nothing had changed in its insured portfolio to warrant applying a different loss reserve formula.

## B.    MBIA MOVES AWAY FROM ITS TRADITIONAL BUSINESS IN SEARCH OF GROWTH

29.    MBIA sought increased profits and growth opportunities by moving away from lower risk/lower return municipal bond insurance business and by aggressively expanding into structured finance, which doubled as a percentage of the Company's overall business in the past 10 years, from 16 to 32 percent.  In fact, whereas MBIA

provided essentially no structured finance-related guarantees in 1990, structured finance guarantees comprised 32% of MBIA's insured portfolio by year end 2006.

30.    Of MBIA's $225 billion structured finance portfolio, $114 billion comprises guarantees of complex financial instruments known as Collateralized Debt Obligations ("CDOs").  A CDO is an investment vehicle in which various forms of debt, such as bonds, mortgages, loans or other assets backed by collateral are packaged (or repackaged) and the cash flows from the bundle of assets are divided among tranches of securities, which are then sold to investors.

31.    These CDOs contain varying levels of credit risk and corresponding rates of return, as represented by the credit ratings assigned to the varying tranches.  Investors buying more senior CDO "tranches" receive lower yields but bear lower risk, while more junior "tranches" offer higher yields and greater risk.

32.    As CDOs became increasingly prevalent in the past several years, MBIA began providing credit protection to the more senior layers of many CDOs' capital structure.

33.    In the typical CDO issuance, bond insurers like MBIA would not insure the lower tranches – those bearing ratings of BBB or below – and investors in those lower tranches would take losses before losses would be triggered for the higher tranches.

34.    However, despite the lower tranches suffering losses first, the extent of defaults of the underlying collateral necessary to wipe out the lower tranches and to cause defaults on the higher tranches was often only 10%.  Thus, even a relatively nominal increase in defaults of the underlying collateral could trigger the insurance obligations that MBIA provided to support the higher tranches.

35.    Throughout the Company's involvement in the structured finance business, MBIA has continued to promise investors the strictest of underwriting standards to ensure its new credit products maintain the integrity and security of its traditional bond guarantees.  Further, even as its exposure to structured finance securities ballooned in recent years, its loss reserves as a percentage of its total par outstanding obligations declined from a range of 6.2 to 5.4 basis points during the period from 2000 through 2004, to as low as 3.5 basis points at year 2006, and only 3.2 basis points in the first quarter of 2007.

## C.    DEFENDANTS MISLEAD INVESTORS REGARDING MBIA'S CDO-SQUARED AND RMBS RELATED EXPOSURE

36.    On January 30, 2007, the first day of the Class Period, MBIA announced its fourth quarter and year-end 2006 results.  The announcement noted an 81 percent increase in total premiums earned on structured finance insurance (as opposed to public finance), and in particular, noted strong production from the CDO sector.  Consistent with the Company's statements that it used the strictest of underwriting standards, the announcement represented to investors:

> Overall credit quality in the insured portfolio remained high, with 81 percent of the total book of business rated A or better, unchanged from the end of 2005.  The percentage of the portfolio rated non-investment grade decreased to 1.9 percent from 2.1 percent in 2005, with about half of the reduction resulting from a decrease in the par amount of non-investment grade rated credits and the other half resulting from the growth of the outstanding book of business.

The Company also told investors it was increasing unallocated loss adjustments reserves and expenses by $80.9 million based on the 12% "formula-based" default risk determination.

37.    Although MBIA touted its underwriting skills and maintained the same formula it had applied to its municipal bond insurance, in reality, MBIA had a very limited history and ability to assess the actual risk of default on CDO products whose underlying collateral was comprised of residential mortgage-backed securities, since CDOs of this sort only became prevalent in the few years leading up to the Class Period. Thus, the Company could not realistically predict the way CDOs backed by residential mortgages would behave in the event of downturns in the housing industry.

38.    Despite MBIA's increasing reliance on CDOs, including those backed by residential mortgage-related securities, MBIA maintained its reserves at exceptionally low levels – about 3 basis points as compared with 70-150 basis points for other large financial institutions with significant mortgage or CDO related exposure.

39.    On April 26, 2007, MBIA announced its earnings for the first quarter of 2007.  Once again, MBIA reported a significant increase – 672% – in U.S.-based structured finance insurance over the prior year.  Nonetheless, the loan loss formula remained unchanged at a 12% reserve, and the Company represented that the credit quality of its portfolio actually *improved* over the prior quarter:

> The overall credit quality in the insured portfolio remained high with 82 percent of the total book of business rated A or better compared with 81 percent in the first quarter of 2006 [and the prior quarter].  The percentage of the portfolio rated below-investment grade decreased to 1.9 percent from 2.1 percent in the same period-end last year.

In announcing these results, Defendant Dunton, MBIA's CEO, remarked: "We remain committed to our rigorous risk management practices with the goal of building shareholder value for the long term."

40.    As concerns over exposure to CDOs and RMBS spread throughout the financial community, MBIA held a conference call presentation August 2, 2007 "to answer questions concerning MBIA's subprime RMBS exposure, CDO exposure and related topics." In connection with that presentation, MBIA produced a book of slides called "MBIA's Selective Approach to Subprime RMBS and Multi-Sector CDOs." MBIA used this presentation to tout its limited risk exposure in the potentially volatile mortgage-backed securities market.

41.    In the August 2 presentation, MBIA informed investors that the total amount of the CDOs underwritten by the Company with some exposure to RMBS was $15.9 billion. As set forth below, this figure was materially understated, false and misleading.

42.    During the conference call, one investor specifically asked about the composition of MBIA's exposure to "CDO-squared" securities, an investment that is particularly risky because it is a CDO whose sole collateral is other CDOs. These are considered among the most risky of investments because the instruments are at least twice removed from the assets and borrowers that support the underlying cash flows, and thus the insurer has little or no ability to assess the adequacy of the underlying collateral and other default risk metrics. (Notably, when the Fitch rating service calculated MBIA's excess capital as of year end 2006, it recognized $15.3 billion of CDO exposure, but unlike MBIA's competitors, which held "CDO-Squared" securities, Fitch reported that MBIA held no CDO-Squared assets.) In response to the investor question on August 2, 2007, Defendant Chaplin stated that MBIA had approximately $6.1 billion in net par exposure to CDO-squared securities, and that 60% of the underlying collateral consisted

of CDOs and Collateralized Loan Obligations (CLOs). The Company further stated that 22% of the underlying collateral was comprised of CDOs of Asset-Backed Securities (ABSs).

43.    However, the Company never mentioned that any part of the $6.1 billion in CDO-squareds contained RMBS exposure. Investors were particularly concerned at the time about RMBS exposure because of the ongoing and worsening mortgage market meltdown that was causing billions of dollars in losses for other financial institutions. Indeed, within a short time of this conference call, major financial institutions began disclosing writedowns of their own CDO holdings, including supposedly "Super Senior AAA" securities and securities insured by MBIA. Nevertheless, MBIA did not disclose the full extent of its risk exposure.

44.    On October 25, 2007, the Company reported its third quarter results. According to Dunton: "From an Adjusted Direct Premium production standpoint, the third quarter was outstanding – the Company's second best quarter ever and the best quarter for our structured finance business. Pricing was strong across many sectors, and the credit quality of our new business was very high." In fact, structured finance business was up more than 200% overall, and up 294% for U.S.-based business. Despite this marked increase in riskier structured finance insurance, the Company continued to reserve for unallocated losses at the same 12% rate. MBIA once again represented to investors that the credit quality of its portfolio was improving:

> The overall credit quality of the insured portfolio remained high with 82 percent of the total book of business rated A or better as of September 30, 2007. The percentage of the portfolio rated below investment grade on an S&P priority basis decreased to 1.4 percent as of September 30, 2007 from 2.2 percent as of September 30, 2006. . . .

45.     In an investor conference call later that day, MBIA CFO Chuck Chaplin falsely and misleadingly told investors that the total amount of all of the Company's CDOs that contained some RMBS had increased to $19 billion at the end of the third quarter due to additional RMBS-related transactions during the quarter.  Chaplin also reiterated that "we think it is critical as a AAA rated company for our balance sheet strength to be unquestioned and at this point, it is unquestioned."  The reality was far worse.

## D.     MBIA'S HIDDEN EXPOSURE TO CDO-SQUARED SECURITIES BACKED IN PART BY RMBS STUNS INVESTORS

46.     On December 19, 2007, S&P issued a report analyzing MBIA's credit situation.  The result was that MBIA's AAA rating was placed on negative watch.  This intra-day news caused the stock to drift slightly lower, from $28.04 to $27.02, or 3.6%.

47.     It was not until after market close that investors realized the MBIA had been materially under-reporting its total RMBS exposure.  Contained within the S&P report was an analysis of information provided by MBIA to S&P (but not previously to investors) that showed the Company's total CDOs with RMBS exposure was $30.4 billion.  This was nearly twice the figure report in the August 2 analyst presentation and more than $11 billion more than the Company reported in its earnings call on October 25.

48.     At 6:38 p.m. the evening of December 19, the Company issued a press release saying it had put an analysis of its CDO portfolio on its website that was consistent with the information given to S&P (but never previously disclosed to investors).  The new analysis disclosed for the first time that $8.1 billion of MBIA's Multi-Sector CDOs were exposed to a significant amount of RMBS risk.  In addition, over $5.1 billion of that insurance was written in 2006 and 2007, a time when it was clear

that the housing market was deteriorating, interest rates were rising and foreclosures were increasing at an exponential rate. With this disclosure, investors learned for the first time that Defendants had placed their triple-A rating in serious jeopardy.

49.    The market's reaction the very next trading day was as rapid as it was harsh. In response to the December 19 announcement, MBIA shares plunged over 26% on extremely heavy trading volume – from $27.02 at the close on December 19, to $19.95 per share by the close on December 20 – dipping to as low as $18.84 per share intraday, its lowest level in over a decade. This was the biggest one-day decline in the Company's history, leaving the stock price a fraction of the stock's record high of $73.02 per share posted less than a year before. The Company's total market capitalization has declined by about $6.7 billion during this time period.

50.    As explained herein, MBIA's $8.1 billion CDO-squared portfolio – which represents almost a third of the Company's overall $30.6 billion exposure to structured finance collateralized debt obligations – is particularly distressing because of the potential impact on the Company's "North Star" triple-A credit rating. The disclosure of the CDO-squared portfolio indicates that MBIA's reserves are wholly inadequate for the risk MBIA faces and its capital is likely insufficient to withstand a likely level of expected guarantee-related losses. If downgraded from triple-A, MBIA will not be able to write insurance policies on bonds that have a lower rating than it does, a segment that makes up the vast majority of the Company's business.

51.    The market was quick to condemn this deceit. Shortly after MBIA's revelation, Morgan Stanley analyst Ken Zerbe issued a report the same evening stating:

> **What's New:** MBIA published an updated list of its CDO exposures. It disclosed that it has a massive $8.1 billion of

exposure to CDO-squared transactions (where the underlying collateral is more than 75% CDOs *and the remainder is mostly RMBS*).  Of the total, $5.1 billion was written in 2006 and 2007.  *We are shocked that management withheld this information for as long as it did.*

(emphasis supplied)  The analyst went on to note that "MBIA simply did not disclose arguably the riskiest parts of its CDO portfolio to investors: $8.1 billion of CDO-squareds."

52.    Kathleen Shanley, an analyst with Gimme Credit, said the "eleventh-hour" disclosure by MBIA "ignites concerns all over again about the prospect for future losses." Shanley said that prior to the disclosure, outside investors lacked information about the Company's exposure to CDO-squareds, which she called the riskiest type of CDO.

53.    "It's surprising," said Piper Jaffray analyst Michael Grasher, "considering others have disclosed their CDO-squared for a couple of months now."

54.    "It questions my confidence about how upfront the company is being and has been," Robert Haines, an analyst at the research firm CreditSights, said of MBIA. "That's the asset class that everyone has been scrambling about."

55.    The following day, S&P equity analyst Catherine Seifert cut her rating on the Company from hold to sell, noting: "We share the market's dismay that this revelation changes the risk profile of MBI as compared with its financial guaranty peers."

56.    The full extent of the Company's concealed risk unfolded over the next several weeks.  On December 21, 2007, MBIA announced that Fitch had informed the Company that it would lose its AAA credit rating as a result of its high-risk insurance practices unless it could raise $1 billion in additional capital to cover anticipated claims. Fitch notified the company that failure to do so within the next several weeks would result in a loss of the MBIA's "North Star" AAA credit rating.

16

57.    Notwithstanding MBIA's insistence that its insurance portfolio consisted of only the highest credits, the hidden risks in its portfolio continued to damage the Company.

58.    On January 8, 2008, MBIA shares declined an additional 21 percent, from an opening price of $18.07 per share to a closing price of $13.98 after hitting an intraday low of $13.02 per share.  This drop was attributed, in part, to analyst comments regarding MBIA's worsening financial condition and its desperate need to shore up its flagging capital condition.   According to a report on Bloomberg, Morgan Stanley analyst Ken Zerbe "cut his fourth-quarter estimate to a loss of $2.09 per share, from $1.63.

59.    On January 9, 2008 a series of stunning announcements further shook the market's trust in the Company's operations and management's integrity.  It announced that:

> The Company has recently had discussions with and has provided information on a voluntary basis to the New York Insurance Department ("Department") and the Securities and Exchange Commission ("SEC") in response to informal inquiries with respect to certain matters, including the Warburg Pincus transaction, the Company's announcement of preliminary loss reserve estimates on December 10, 2007 related to MBIA's residential mortgage-backed securities exposure and disclosures regarding MBIA's CDO exposure.

60.    Further confirming that its prior disclosures to investors were materially false and misleading, MBIA revised its 2006 annual report to include additional disclosure of the potential risk it faces from credit-rating downgrades and the reduction in credit quality of the debt it insures.  Specifically, the Company's Form 8-K stated as follows:

> The Company has revised certain risk factors it previously disclosed in its Form 10-K for the year ended December 31, 2006. The updated risk factors are listed below. References in the risk factors to the "Company" are to MBIA Inc., together with its domestic and international subsidiaries.

References to "we," "our" and "us" are to MBIA Inc. or the Company, as the context requires.

***A reduction in MBIA's financial strength ratings from any of the major rating agencies would materially and adversely affect our financial condition, results of operations and future business***

MBIA's ability to attract new business and to compete with other triple-A rated financial guarantors is largely dependent on the triple-A financial strength ratings assigned to it by the major rating agencies and the financial enhancement rating assigned by S&P. MBIA intends to comply with the requirements imposed by the rating agencies to maintain such ratings; however, no assurance can be given that MBIA will successfully comply with these requirements, that these requirements will not change or that, even if MBIA complies with these requirements, one or more of such rating agencies will not lower or withdraw its financial strength ratings of MBIA or place MBIA on "negative outlook" or "rating watch negative" status indicating that a downgrade may be considered in the future. On December 14, 2007, Moody's changed MBIA's outlook to "negative" from "stable," while confirming the outlook of three of MBIA's competitors as "stable," on December 19, 2007, S&P changed MBIA's outlook to "negative" from "stable" while confirming the outlook of two of MBIA's competitors as "stable" and on December 20, 2007, Fitch placed MBIA Inc. and MBIA on rating watch negative. MBIA's ability to attract new business and to compete with other triple-A rated financial guarantors, and its results of operations and financial condition, would be materially adversely affected by any reduction, or suggested possibility of reduction, in its ratings.

Requirements imposed by the rating agencies to maintain our triple-A rating are outside of our control, and such requirements oblige us to raise additional capital or take other remedial actions in a relatively short timeframe. We are implementing a capital plan in order to raise sufficient funds to meet the rating agency capital requirements to maintain our triple-A rating and obtain a "stable" outlook from S&P, Moody's and Fitch. The capital plan consists of the previously announced Warburg Pincus investment, indebtedness, and capital formation and risk reduction from operations. However, there can be no assurance that we will successfully complete all or any of these transactions, and there can be no assurance that the rating agencies, in particular S&P, will change our outlook to "stable" even if we successfully implement our capital plan. The Warburg Pincus investment is subject to closing conditions, including performance of specified covenants, receipt of Hart-Scott-Rodino approval, as well as the approvals of the various regulatory authorities (including insurance regulatory approvals in New York, Illinois and the United Kingdom), and the absence of any injunction or other legal prohibition on closing. Each element of the capital plan is subject to

conditions and delays, during which new economic developments could adversely affect rating agency capital requirements or our ability to successfully implement the capital plan. If we are unable to successfully implement all or any portion of the capital plan, our financial strength ratings may be downgraded, which would materially adversely affect our financial condition, results of operations and future business.

***Recent adverse developments in the credit markets and any potential negative impact on MBIA's insured portfolio may materially and adversely affect our financial condition, results of operations and future business***

MBIA is exposed to credit risks in its portfolio that may arise from deterioration in the credit markets, wherein such deterioration in credit performance could lead to potential erosion in the quality of assets and also the collection of cash flows from such assets within structured securities that it has guaranteed. While MBIA has sought to underwrite direct residential mortgage-backed securities ("RMBS"), structured pools of commercial mortgage-backed securities ("CMBS") and collateralized debt obligations ("CDOs") of asset-backed securities ("ABS") with levels of subordination and other credit enhancements designed to protect it from loss in the event of poor performance on the underlying assets collateralizing the securities in the insured portfolio, ***as of January 8, 2008, we estimated that we would establish case basis loss reserves of $614 million under GAAP and $814 million under SAP and a special increase to unallocated loss reserves of $100 million under GAAP due to projected inadequacies of such credit enhancements in securities it has guaranteed. The special increase to unallocated loss reserve is in addition to MBIA's regular quarterly addition of 12% of scheduled earned premiums, or approximately $23 million in the fourth quarter of 2007. We expect the after-tax effect of the establishment of such SAP reserves to eliminate MBIA's net income and produce a loss for the fourth quarter and possibly for 2007 under SAP.*** No assurance can be given that such credit enhancements will prove to be adequate to protect MBIA from incurring additional material losses in view of the current significantly higher rates of delinquency, foreclosure and loss rates being observed among residential homeowners. The extent and duration of any future continued deterioration of the credit markets is unknown, as is the impact, if any, on potential claim payments and ultimate losses of the securities within MBIA's portfolios. In addition, there can be no assurance that any of the governmental or private sector initiatives designed to address such credit deterioration in the markets will be implemented, and there is no way to know the effect that any such initiatives could have on the credit performance over time of the actual securities that MBIA insures.

In addition, there can be no assurance that we would be successful, or that we would not be delayed, in enforcing the subordination provisions, credit enhancements or other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures in the event of litigation or the bankruptcy of other transaction parties. *Many of the subordination provisions, credit enhancements and other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures are untested in the market and, therefore, it is uncertain how such subordination provisions, credit enhancements and other contractual provisions will be interpreted in the event of an action for enforcement.*

Individual credits in MBIA's insured portfolio (including potential new credits) are assessed a rating agency "capital charge" based on a variety of factors, including the nature of the credits, their underlying ratings, their tenor and their expected and actual performance. In the event of an actual or perceived deterioration in creditworthiness, a reduction in the underlying rating or a change in the rating agency capital methodology, MBIA may be required to hold more of its capital in reserve against credits in its insured portfolio, regardless of whether losses actually occur, or against potential new business. Significant reductions in underlying ratings of credits in MBIA's insured portfolio can produce significant increases in assessed "capital charges." There can be no assurance that MBIA's capital position will be adequate to meet such increased reserve requirements or that MBIA will be able to secure additional capital, especially at a time of actual or perceived deterioration in creditworthiness of new or existing credits. Unless MBIA was able to increase its amount of available capital, an increase in capital charges could reduce the amount of capital available to pay claims and support MBIA's triple-A ratings and could have an adverse effect on MBIA's ability to write new business.

In recent weeks and months Fitch, Moody's and S&P have announced the downgrade of, or other negative ratings actions with respect to, a large number of structured finance transactions, including certain transactions that MBIA insures. While less than 5% of MBIA's insured portfolio as of September 30, 2007 has been downgraded as of January 8, 2008 in connection with the rating agencies' recent downgrades of structured finance transactions, there can be no assurance that additional securities in MBIA's insured portfolio will not be reviewed and downgraded in the future. Moreover, we do not know what portion of the securities in MBIA's insured portfolio already have been reviewed by the rating agencies and if, and when, the rating agencies might review additional securities in MBIA's insured portfolio or review again securities that have already been reviewed and/or downgraded. Downgrades of credits that MBIA insures will result in higher capital charges to MBIA under the relevant rating agency model or models. If the additional amount of capital required to support such exposures is significant, MBIA could be required to raise additional capital, if available, on terms and conditions that may

not be favorable to MBIA, curtail current business writings, or pay to transfer a portion of its in-force business to generate capital for ratings purposes with the goal of maintaining its triple-A ratings. Among other things, such events or goal may not be obtainable, and such events or actions could adversely affect the results of operations and financial condition of MBIA going forward.

*     *     *

***We are required to report credit derivatives at fair value in accordance with generally accepted accounting principles, which subjects our results of operations to volatility and losses***

Any event causing credit spreads on an underlying security referenced in a credit derivative insured by MBIA to either widen or tighten will affect the fair value of the credit derivative and may increase the volatility of our earnings under GAAP. In our GAAP financial statements, we apply fair value accounting for the portion of our business executed in credit derivative form as required by Statement of Financial Accounting Standards No. 133 ("SFAS 133") and changes in fair value are recognized immediately in earnings. Therefore, any increases or decreases in the fair value of these credit derivatives have an immediate corresponding impact on reported earnings under GAAP. As changes in fair value can be caused by factors unrelated to the performance of MBIA's business and credit portfolio, including general market conditions and perceptions of credit risk, as well as market use of credit derivatives for hedging purposes unrelated to the specific referenced credits in addition to events that affect particular credit derivative exposure, the application of fair value accounting may cause our earnings to be more volatile than would be suggested by the actual performance of MBIA's business operations and credit portfolio. In addition, due to the complexity of fair value accounting and the application of SFAS 133, future amendments or interpretations of SFAS 133 may cause us to modify our accounting methodology in a manner which may have an adverse impact on our financial results.

In the fourth quarter of 2007, we observed a further widening of market spreads and credit ratings downgrades of collateral underlying certain MBIA-insured CDO tranches. *As of January 8, 2008, the pre-tax change in fair value of insured derivatives ("mark-to-market") from September 30, 2007 to December 31, 2007 was estimated to be approximately $3.3 billion under GAAP, or approximately $2.1 billion on an after-tax basis, and is subject to change, which could be material. We are in the process of finalizing our evaluation and analysis of the mark-to-market for the quarter ended December 31, 2007. This increase in our mark-to-market loss in the fourth quarter of 2007 compared to the $342 million mark-to-market loss for the third quarter is a consequence of continued spread volatility, including a substantial*

21

*widening in CMBS spreads and the deterioration of credit ratings in collateral underlying multi-sector CDOs*. The mark-to-market amount disclosed above reflects a refinement to MBIA's valuation modeling techniques that was implemented in the fourth quarter. Specifically, in light of extraordinary widening of the market spreads for the asset-backed security portion of the collateral underlying certain insured CDO tranches, for purposes of its valuation model, MBIA revised its approach and treated that ABS collateral as if it were in default.

\*   \*   \*

### Market and other factors may cause investors and/or issuers to decrease demand for MBIA's products

The demand for financial guarantee insurance depends upon many factors, some of which are beyond the control of MBIA. While all the major financial guarantee insurers have triple-A financial strength ratings from the major rating agencies, Moody's and S&P have recently changed the ratings outlook for some financial guarantee insurers, including MBIA, to "negative," placed other financial guarantee insurers on review for a possible downgrade, and affirmed a "stable" outlook for other major financial guarantee insurers. In addition, Fitch has placed the insurer financial strength ratings of several financial guarantee insurers, including MBIA on rating watch negative and affirmed a "stable" outlook for other major financial guarantee insurers. Investors from time to time distinguish among financial guarantors on the basis of various factors, including rating agency assessment, size, insured portfolio concentration and financial performance. These distinctions may result in differentials in trading levels for securities insured by particular financial guarantors which, in turn, may provide a competitive advantage to those financial guarantors with better trading characteristics. In addition, various investors may, due to regulatory or internal guidelines, lack additional capacity to purchase securities insured by certain financial guarantors, which may provide a competitive advantage to guarantors with fewer insured obligations outstanding. Distinctions in trading values or investor capacity constraints that do not favor MBIA would have an adverse effect on MBIA's ability to attract new business at appropriate pricing levels.

Additionally, in the face of the disruption in the credit markets and the recent announcements by Fitch, Moody's and S&P concerning financial guarantee insurers generally and MBIA in particular, the price of our common stock has experienced a significant decline and there has been a widening of spreads on our credit default swaps. This recent widening of spreads on our credit default swaps could impact the perception of our financial condition by MBIA's insured bondholders and counterparties and could affect their willingness to purchase MBIA's insured bonds and to continue to enter into transactions with MBIA.

*A reduction in the financial strength ratings of or a default by one or more of MBIA's key reinsurers could adversely impact our capital position, financial strength rating and ability to write new business*

MBIA uses reinsurance to cede exposure for purposes of syndicating risk and increasing its capacity to write new business while complying with its single risk and credit guidelines. When a reinsurer is downgraded by one or more of the rating agencies, less capital credit is given to MBIA under rating agency models. Over the past several years, most of MBIA's reinsurers have been downgraded and others remain under review. The downgrade of one of MBIA's key reinsurers could adversely impact MBIA's capital position under rating agency models, and affect MBIA's financial strength rating and ability to write new business accordingly.

MBIA generally retains the right to recapture the business ceded to reinsurers under certain circumstances, including rating downgrades of its reinsurers. Additionally, reinsurers and counterparties under other reimbursement agreements may default on their obligations to us due to bankruptcy, insolvency, lack of liquidity, adverse economic conditions, operational failure, fraud or other reasons. Such defaults could have a material adverse effect on our business or profitability or require us to raise additional capital. MBIA remains liable on a primary basis for all reinsured risk, and although MBIA believes that its reinsurers remain capable of meeting their obligations, there can be no assurance of such in the future.

61.    Also on January 9, 2008, MBIA announced it would report a loss of $737 million for the fourth quarter as a result of securities backed by residential home equity loans. The Company also announced it estimated that it would take a $3.3 billion loss in the fourth quarter related to due to MBIA's CDO portfolio and that it would write off $200 million of permanent impairment losses on three of the CDO-squared transactions it had previously misrepresented to the market, admitting that it now expected to incur actual claims as the underlying assets defaulted.

62.    The Company also announced its plan to raise $1 billion through a debt offering of "surplus notes." However, it soon became clear the Company would have problems finding buyers for the notes, even at the very expensive coupon rate of 12%. MBIA ultimately had to pay 14% to place the notes.

23

63.    In a supplement attached to a Form 8-K on January 9, 2008, MBIA also admitted that even its stunning December 19 disclosure of $8.1 billion of CDO-squared exposure was not complete.  Specifically, the Company's supplement disclosed that it actually held $9 billion of these risky securities, that nearly 60% of these securities were originated in 2006 or later (which was material because recent vintages are defaulting with greater consistency) and that the portfolio had already caused a $200 million impairment.

64.    In a final shot to investors, the Company announced on January 9 that it was slashing its quarterly dividend from 34 cents to 13 cents in an attempt to preserve capital and salvage its coveted AAA rating.

## RELIANCE: APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION

65.    At all relevant times, the market for MBIA's common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.  Through the Class Period:

(a)    MBIA's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, MBIA filed periodic public reports with the SEC and the NYSE;

(c)    MBIA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

24

(d)     Securities analysts and the business press followed and published research reports regarding MBIA that were publicly available to investors;

(e)     The market price of MBIA securities reacted promptly to the dissemination of public information regarding the Company;

(f)     The average weekly trading volume for MBIA stock during the Class Period was approximately 21 million; and

(g)     The Company's market capitalization was approximately $9.75 billion on January 30, 2007 (at the beginning of the Class Period), and $3.52 billion as of the close of market trading on December 18, 2007.

66.     As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for MBIA securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

67.     Plaintiff and the other Class members relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of MBIA securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

68.     Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased MBIA securities at inflated prices.

69.     Plaintiff is also entitled to the *Affiliate Ute* presumption of reliance to the extent that Defendants failed to disclose material facts concerning the composition of

MBIA's insured structured finance portfolio, which information Plaintiff would have wanted to have known and which would have caused investors to not have purchased shares of MBIA at the prices at which they traded during the Class Period.

## CLASS ACTION ALLEGATIONS

70.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who purchased or acquired MBIA common stock during the period from January 30, 2007 through and including January 9, 2008 ("the Class Period") and suffered damages as a result.

71.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of MBIA during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

72.    The members of the Class, purchasers of MBIA securities, are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher.  As of October 31, 2007, MBIA reported 125,394,150 shares of common stock outstanding.

73.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

26

74.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained court-appointed counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

75.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

76.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants, during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether the market price of MBIA stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

(d)      with respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(f)      with respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether the Defendants named in those counts are controlling persons of the Company; and

(g)      whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

77.      Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

78.      The names and addresses of the record owners of MBIA shares purchased during the Class Period, are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## INAPPLICABILITY OF SAFE HARBOR FOR FORWARD LOOKING STATEMENTS

79.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking when made, and there were no meaningful

cautionary statements identifying facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission

### (Against All Defendants)

80.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

81.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against all Defendants.

82.    Throughout the Class Period, Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class

29

members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

83.    Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiff and the other members of the Class to purchase MBIA's securities at inflated prices.

84.    By failing to inform the market of the true risk to MBIA's credit rating as a result of exposure to CDO-squareds and RMBS, and making other false statements and material omissions, these Defendants presented a misleading picture of MBIA's prospects. This caused and maintained artificial inflation in the trading prices of MBIA's publicly traded securities throughout the Class Period and until the truth came out.

85.    Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

86.    During the Class Period, Defendants occupied executive-level positions at MBIA and were privy to non-public information concerning the Company. Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

87.    As described herein, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased MBIA securities during the Class Period.  Throughout the Class Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading.   There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available about the prospects of the Company.

88.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

89.    In ignorance of the false and misleading nature of Defendants' statements and/or upon the integrity of the market price for MBIA securities, Plaintiff and the other members of the Class purchased MBIA securities at artificially inflated prices during the Class Period.   But for the fraud, they would not have purchased the securities at artificially inflated prices.

90.    The market price for MBIA securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

91.    Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of MBIA securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

92.     This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

93.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II

### Violation of Section 20(a) of the Exchange Act

### (Against Defendants Dunton and Chaplin)

94.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.  This Claim is brought pursuant to Section 20(a) of the Exchange Act against the individual defendants on behalf of Plaintiff and all members of the Class who purchased MBIA securities during the Class Period.

95.     As alleged herein, MBIA is liable to Plaintiff and the members of the Class who purchased MBIA securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.     Throughout the Class Period, the Section 20(a) Defendants were controlling persons of MBIA within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the MBIA fraud, as detailed herein.

97.     Each of the Section 20(a) Defendants exercised control over MBIA during the Class Period by virtue of, among other things, their executive positions with the Company, the key roles they played in the Company's management, and their direct

involvement in its day to day operations, including its financial reporting and accounting functions.

98.     In addition to the allegations set forth above, the following allegations demonstrate the Section 20(a) Defendants' control over MBIA during the Class Period.

99.     Given their individual and collective responsibilities for managing MBIA throughout the Class Period, the Section 20(a) Defendants were regularly presented to the market as the individuals who were responsible for MBIA's day-to-day business and operations, as well as the Company's strategic direction.  These Section 20(a) Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for the Company. No one else at MBIA exercised that degree of responsibility for, or control over, the Company's activities and public statements.

100.     As a result of the false and misleading statements and omissions alleged herein, the market price of MBIA securities was artificially inflated during the Class Period.  Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above.  Plaintiff and the members of the Class relied upon either the integrity of the market or upon the statements and reports of the Section 20(a) Defendants in purchasing MBIA securities at artificially inflated prices.

101.     This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

102.    By virtue of the forgoing, each of the Section 20(a) Defendants are liable to Plaintiff and the Class, each of whom has been damaged as a result of MBIA's underlying violations.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiff and the members of the Class compensatory damages and/or rescission;

C.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated:  January 11, 2008

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

_____
Salvatore J. Graziano (SG-6854)
Mark Lebovitch (ML-6654)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444

**ABRAHAM FRUCHTER & TWERSKY LLP**
Jeffrey Abraham (JA-2946)
One Penn Plaza
Suite 1910
New York, NY 10119
Telephone: (212)  279-5050
Facsimile:  (212)  279-3655

*Attorneys for Plaintiff Steven Schmalz*

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Steven Schmalz, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a class action complaint asserting securities claims against MBIA Inc. and wish to join as a plaintiff, retaining Bernstein Litowitz Berger & Grossmann LLP and Abraham Fruchter & Twersky LLP as my counsel.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    My transactions in MBIA Inc. during the Class Period of January 30, 2007 to January 9, 2008 are attached.

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws except as follows:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing are true and correct.

Executed this 11th day of January, 2008.

Steven Schmalz

**Transactions in MBIA Inc.**
Class Period: 01/30/07 – 01/09/08

| Transaction Type (buy or sell) | Transaction Date | Number of Shares | Price Per Share |
|---|---|---|---|
| Buy | 12/26/07 | 200 | $21.72 |

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

STEVEN SCHMALZ on behalf of himself and    :
all others similarly situated,

                      :

        Plaintiff,            Case 7:08-cv-00264-KMK

                      :

    -against-

                      :

MBIA, INC., GARY C. DUNTON, EDWARD
CHAPLIN,

                      :

        Defendants.

------------------------------------- X

TEAMSTERS LOCAL 807 LABOR
MANAGEMENT PENSION FUND,      :
Individually and on behalf of all others
similarly situated,              :    Case No. 1:08-cv-01845-UA

        Plaintiff,             :

    -against-                :

MBIA INC., GARY C. DUNTON, C.
EDWARD CHAPLIN, and JOSEPH W.   :
BROWN

                      :

        Defendants.

------------------------------------- X

GARY KOSSEFF, Individually and on behalf    :
of all others similarly situated,

                      :    Case 7:08-cv-02362-UA

        Plaintiff,             :

    -against-                :

MBIA INC., GARY C. DUNTON, and C.
EDWARD CHAPLIN,            :

        Defendants.           :

### [PROPOSED] ORDER CONSOLIDATING RELATED CASES
### AND APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL

Having considered the papers filed in support of the Tulare County Employees' Retirement Association's ("TCERA" or "Movant") Motion For Consolidation, Appointment as Lead Plaintiff, and For Approval of Choice of Lead Counsel pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(B), and for good cause shown, the Court hereby enters the following Order.

## I.    CONSOLIDATION

1.    The above-captioned actions are hereby consolidated for all purposes into one action pursuant to Rule 42(a) of the Federal Rules of Civil Procedure and 15 U.S.C. § 78u-4(a)(3)(B)(ii), along with any future-filed or transferred tag-along actions relating to the securities of MBIA, Inc. ("MBIA").

2.    The instant actions and any tag-along actions shall be referred to herein as the "Consolidated Actions." This Order shall apply to the Consolidated Actions and to any and all cases that are subsequently filed in this Court or transferred to this Court, which action is brought against the defendants and/or any other past or present employee or agent of any defendant, on behalf of purchasers of MBIA securities.

3.    The short caption for the Consolidated Actions shall be "*In re MBIA, Inc. Securities Litigation*, Civil Action No. 7:08-cv-00264-KMK." Every pleading in this Consolidated Action shall bear the following caption:

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
                                                  )
IN RE MBIA, INC. SECURITIES LITIGATION    )        7:08-cv-00264-KMK
—————————————————————————)

     4.       This Court requests the assistance of counsel in calling to the attention of the clerk of this Court the filing or transfer of any case which might properly be consolidated as part of the Consolidated Actions.

## II.    <u>MASTER DOCKET AND MASTER FILE</u>

     5.       A Master Docket and Master File are hereby established for the Consolidated Actions.  The Master File shall be Case No. 7:08-cv-00264-KMK.  Entries in the Master Docket shall be applicable to these Consolidated Actions as more fully set forth below.  Separate dockets shall also be maintained for each of these Consolidated Actions, and entries shall be made in accordance with the regular procedures of the Clerk of the Court, except as modified by this Order.

## III.    <u>NEWLY-FILED OR TRANSFERRED ACTIONS</u>

     6.       When a case that arises out of the subject matter of this action is hereinafter filed in this Court or transferred from another Court, the Clerk of this Court shall:

     a.       file a copy of this Order in the separate file for such action;

     b.       mail a copy of this Order to the attorneys for the plaintiff(s) in the newly filed or transferred case and to any new defendant(s) in the newly filed or transferred case; and

     c.       make the appropriate entry in the docket for this action.

     7.       Each new case which arises out of the subject matter of the Consolidated Actions that is filed in this Court or transferred to this Court shall be consolidated with this action and this Order shall apply thereto, unless a party objecting to this Order or any provision of this Order shall, within

2

ten (10) days after the date upon which a copy of this Order is served on counsel for such party, file an application for relief from this Order or any provision herein and this Court deems it appropriate to grant such application.

8.    During the pendency of this litigation, or until further order of this Court, the parties shall take reasonable steps to preserve all documents within their possession, custody or control, including computer-generated and stored information and materials such as computerized data and electronic mail, containing information that is relevant to or which may lead to the discovery of information relevant to the subject matter of the pending litigation.

## IV.    APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL

9.    TCERA has moved the Court to be appointed as Lead Plaintiff on behalf of purchasers of MBIA securities in this consolidated class action and to approve the counsel retained to be Lead Counsel.

10.    Having considered the provisions of § 21D(a)(3)(B) of the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B), the Court hereby determines that Movant is the most adequate plaintiff to represent purchasers of MBIA securities and that Movant satisfies the requirements of the PSLRA.  The Court hereby appoints Movant to be the Lead Plaintiff and to represent the interests of the class of MBIA securities purchasers in the Consolidated Actions.

11.    Pursuant to §21D(a)(3)(B)(v) of the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B)(v), Movant has selected and retained the law firm Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein") to serve as Lead Counsel for the class.  The Court approves Movant's selection of Lead Counsel for the Consolidated Actions.

12.    Lead Counsel shall have the following responsibilities and duties, to be carried out either personally or through counsel whom Lead Counsel shall designate:

a.     to coordinate the briefing and argument of any and all motions;

b.     to coordinate the conduct of any and all discovery proceedings;

c.     to coordinate the examination of any and all witnesses in depositions;

d.     to coordinate the selection of counsel to act as spokesperson at all pretrial conferences;

e.     to call meetings of the plaintiffs' counsel as they deem necessary and appropriate from time to time;

f.     to coordinate all settlement negotiations with counsel for defendants;

g.     to coordinate and direct the pretrial discovery proceedings and the preparation for trial and the trial of this matter and to delegate work responsibilities to selected counsel as may be required;

h.     to coordinate the preparation and filings of all pleadings; and

i.     to supervise all other matters concerning the prosecution or resolution of the Consolidated Actions.

13.     No motion, discovery request or other pretrial proceedings shall be initiated or filed by any plaintiffs without the approval of Lead Counsel, so as to prevent duplicative pleadings or discovery by plaintiffs.  No settlement negotiations shall be conducted without the approval of Lead Counsel.

14.     Lead Counsel shall have the responsibility of receiving and disseminating Court orders and notices.

15.     Lead Counsel shall be the contact between plaintiffs' counsel and defendants' counsel, as well as the spokespersons for all plaintiffs' counsel, and shall direct and coordinate the activities of plaintiffs' counsel.  Lead Counsel shall be the contact between the Court and plaintiffs

4

and their counsel.

16.    All counsel for plaintiffs in the Consolidated Actions shall submit to Lead Counsel detailed time reports reflecting the hours of work expended by each attorney, their billing rate and the subject matter of the work.  Time reports shall be submitted on a quarterly basis with the first report due no later than one month following entry of this Order, and shall continue for each subsequent quarter thereafter or on such schedule as Lead Counsel shall determine.  Any failure to timely submit such reports to Lead Counsel may result in the disqualification of such unreported time from being reimbursed from any common fund, which may be created in the Consolidated Actions.

17.    Defendants shall effect service of papers on plaintiffs by serving copies on Lead Counsel by overnight delivery service, electronic mail ("e-mail"), telecopy or hand delivery. Plaintiffs shall effect service of papers on defendants by serving copies on each of their counsel by overnight delivery service, e-mail, telecopy or hand delivery.

18.    Each attorney not a member of the Bar of this Court who is acting as counsel for a plaintiff or defendant herein shall be deemed admitted *pro hac vice* to practice before this Court in connection with these proceedings.

SO ORDERED THIS ____day of _____, 2008.

_____

Honorable United States District Judge

5

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 11, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record in this matter. Any counsel not receiving a copy of the foregoing through the CM/ECF system will be sent a hard-copy via UPS Overnight.

 /s/ Jason M. Leviton_____
Jason M. Leviton, Esq.